# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

## Case No. 25-cv-00765

M.A., on behalf of himself and a class of
similarly situated individuals,

*Plaintiff.*

v.

KEVIN GUTHRIE, Executive Director
of the Florida Division of Emergency
Management, in his official capacity;
RICKY D. DICKSON, Secretary of the
Florida Department of Corrections, in his
official capacity; DAVID M. KERNER,
Director of the Florida Highway Patrol,
in his official capacity; MARK GLASS,
Commissioner of the Florida Department
of Law Enforcement, in his official
capacity; JOHN D. HAAS, Adjutant
General of the Florida National Guard, in
his official capacity; MARK THIEME,
Executive Director of the Florida State
Guard, in his official capacity; JEROME
WORLEY, Division Director of the
Florida Department of Business &
Professional Regulation, Division of
Alcoholic Beverages and Tobacco, in his
official capacity; JIMMY PATRONIS,
Chief Financial Officer of the Florida
Department of Financial Services, in his
official capacity; RODNEY BARRETO,
Chairman of the Florida Wildlife
Conservation Commission, in his official

**PETITION FOR WRIT OF
HABEAS CORPUS AND
COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

capacity; ALEXIS A. LAMBERT,
Secretary of the Florida Department of
Environmental Protection, in her official
capacity; JOHN F. DAVIS, Secretary of
the Florida Lottery, in his official
capacity; and MATTHEW MORDANT,
Warden of "Alligator Alcatraz," in his
official capacity,

        *Defendants*.

## INTRODUCTION

1.    Plaintiff-Petitioner ("Plaintiff") is a Florida resident and immigrant currently being detained at a detention facility inside the Big Cypress National Preserve that the State of Florida has named "Alligator Alcatraz" ("the facility"). Plaintiff and hundreds of others are detained at the facility in violation of federal law, by state employees and contractors who lack statutory authority to hold them for civil immigration violations.

2.    In just the first few weeks of the facility's operations, people detained there have experienced unprecedented challenges that people in immigration detention typically do not face.  They have been held for weeks at the facility without being charged for removal or anything else.   They have not received initial determinations of custody and bond.  They do not appear in ICE's online detainee locator system, which means they are effectively "off the grid" of the immigration tracking system.  As a result, their attorneys and family members often do not know where they are or how to contact them.  Until recently, none of the detainees had been allowed to file bond petitions or attend hearings in immigration court.  Others cannot meaningfully access legal counsel.

3.    These unprecedented issues stem from the clear lack of authority at the heart of the facility's operations.  Congress required ICE to maintain federal custody and control over immigration detainees, and it imposed stringent requirements for

1

deputizing state officers to help with removal efforts, all to ensure that immigration enforcement would be carried out in line with federal standards, by individuals who are prepared to undertake the many complex tasks involved in immigration detention. *See* 8 U.S.C. § 1357(g). "Alligator Alcatraz" flouts these rules. Section 1357(g) does not provide authority for state agencies to hold immigration detainees during the removal process. And it certainly does not let them place detention in the hands of un-trained, un-supervised private contractors who are not and cannot be deputized to perform immigration functions. By ignoring these standards, Florida has created exactly the kind of disaster that Congress took pains to avoid.

4.      Because Plaintiff's detention at "Alligator Alcatraz" violates federal law, Plaintiff seeks a writ of habeas corpus ordering his release from the facility. Plaintiff seeks this relief on behalf of himself and a class of similarly situated current and future detainees at "Alligator Alcatraz."

## JURISDICTION AND VENUE

5.      This case arises under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, et seq. and its implementing regulations; and the All Writs Act, 28 U.S.C. § 1651.

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 2241 et seq. (habeas corpus); art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause);

28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1651 (All Writs Act). No exhaustion is required because Plaintiff is not held pursuant to a state court order.

7.    The Court may grant relief pursuant to 28 U.S.C. § 2241; the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; 28 U.S.C. § 1331; the All Writs Act, 28 U.S.C. § 1651; and the Court's equitable powers.

8.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district and because Plaintiff's immediate custodian resides in this district.

## PARTIES

### **Plaintiff**

9.    Plaintiff M.A. has lived in the United States since 2018. He is married to a U.S. citizen and has five U.S.-citizen stepchildren.

10.    M.A. entered the country on a visa and subsequently applied for asylum. He has a work permit, a social security card, and a driver's license.

11.    M.A. was arrested on July 23 outside his home.

12.    M.A. has been detained at "Alligator Alcatraz" since July 26.

13.    After his arrest but before he arrived at the facility, multiple officers pressured M.A. to sign an English-only form that he could not read and that was not translated for him. He was later told that the form was a voluntary removal order.

M.A. had no intention of agreeing to removal.  He wants to stay in the United States with his wife and stepchildren and finish pursuing his asylum application.

14.    M.A. entered the facility able to walk, but he is now in a wheelchair.

15.    During his time at the facility, M.A. has been hospitalized twice for acute medical issues.

16.    On around August 8, M.A. woke up unable to feel his legs and in acute pain.  He was hospitalized.

17.    M.A. was sent back to "Alligator Alcatraz," but around August 14, he was admitted to the hospital again. On around August 22, M.A. was sent back to the facility, where he is presently being detained.

18.    Since his arrest a month ago, M.A. has not appeared in ICE's online detainee locator.

19.    Plaintiff plans to file a motion for leave to proceed under his initials.

**Defendants**

20.    Defendant Kevin Guthrie is the Executive Director of the Florida Division of Emergency Management. Defendant Guthrie is a legal custodian of Plaintiff M.A. and the members of the putative class. Defendant Guthrie is sued in his official capacity.

21.     Defendant Ricky D. Dickson is the Secretary of the Florida Department of Corrections.  Defendant Dickson is a legal custodian of Plaintiff M.A. and the members of the putative class.  Defendant Dickson is sued in his official capacity.

22.     Defendant David M. Kerner is the Director of the Florida Highway Patrol.  Defendant Kerner is a legal custodian of Plaintiff M.A. and the members of the putative class.  Defendant Kerner is sued in his official capacity.

23.     Mark Glass is the Commissioner of the Florida Department of Law Enforcement.  He is a legal custodian of Plaintiff M.A. and the members of the putative class.  He is sued in his official capacity.

24.     John D. Haas is the Adjutant General of the Florida National Guard. He is a legal custodian of Plaintiff M.A. and the members of the putative class.  He is sued in his official capacity.

25.     Mark Thieme is the Executive Director of the Florida State Guard.  He is a legal custodian of Plaintiff M.A. and the members of the putative class.  He is sued in his official capacity.

26.     Jerome Worley is the Division Director of the Florida Department of Business & Professional Regulation, Division of Alcoholic Beverages and Tobacco. He is a legal custodian of Plaintiff M.A. and the members of the putative class.  He is sued in his official capacity.

27.    Jimmy Patronis is the Chief Financial Officer of the Florida Department of Financial Services.  He is a legal custodian of Plaintiff M.A. and the members of the putative class.  He is sued in his official capacity.

28.    Rodney Barreto is the Chairman of the Florida Wildlife Conservation Commission.  He is a legal custodian of Plaintiff M.A. and the members of the putative class.  He is sued in his official capacity.

29.    Alexis A. Lambert is the Secretary of the Florida Department of Environmental Protection.  He is a legal custodian of Plaintiff M.A. and the members of the putative class.  He is sued in his official capacity.

30.    John F. Davis is the Secretary of the Florida Lottery.  He is a legal custodian of Plaintiff M.A. and the members of the putative class.  He is sued in his official capacity.

31.    Matthew Mordant is employed by Critical Response Strategies and serves as the Warden of "Alligator Alcatraz."  He is a legal custodian of Plaintiff M.A. and the members of the putative class.  He is sued in his official capacity.

32.    In legal filings, the State of Florida has identified these Defendants as those who "have legal custody over people detained at Alligator Alcatraz," and as those who "are responsible for carrying out detention operations at Alligator Alcatraz."

## STATEMENT OF FACTS

### I.    The Immigration Detention Process

33.    The federal government has "broad, undoubted power over the subject of immigration," which triggers multiple sensitive public policy, humanitarian, and foreign affairs considerations. *Arizona v. United States*, 567 U.S. 387, 394-95 (2012).  Congress has enacted an "extensive and complex" framework to regulate all aspects of immigration, including detention and removal.  *Id.* at 395, 407-08.

34.    Immigration detention is a complex undertaking that requires immigration officers to perform a variety of functions to comply with the Immigration and Nationality Act, its implementing regulations, and DHS policies, as well as fundamental constitutional rights.

35.    After a person is arrested without a warrant, the person must be taken before additional immigration officers to determine whether there was probable cause for the arrest.  8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.3(a).

36.    Within 48 hours of an arrest, immigration officers must decide whether to charge the person with removal by issuing a Notice to Appear.  8 C.F.R. § 287.3(d); Form I-862 "Notice to Appear."  The Notice to Appear is filed with an immigration court and starts the person's removal proceedings.  If a person is not charged with being removable from the United States, they must be released from

detention.  *See* 8 U.S.C. § 1226(a) (only authorizing detention "pending a decision on whether the [noncitizen] is to be removed from the United States").

37.    If immigration officers choose to pursue removal, they must make a series of complex custody determinations.  They must first determine which detention statute governs the person's detention, and whether they are eligible for release or bond.  For those who are eligible, immigration officers must decide whether the person should be detained during their removal proceedings, released on their own recognizance, or released on bond (as well as the appropriate amount of bond).  *See* 8 C.F.R. § 236.1(c)(8); Form I-286 "Notice of Custody Determination."  These custody and bond determinations must also occur within 48 hours of an arrest.  8 C.F.R. § 287.3(d). The immigration officer's custody and bond determination trigger the noncitizen's opportunity to appeal the officer's determination to an immigration judge. 8 C.F.R. § 236.1(d)(1); 8 C.F.R. § 1003.19(a).

38.    When a person enters immigration detention, their information must be entered into ICE's online detainee locator.[1]  This is a database that counsel and family members can use to determine where a person is being held and how to contact them.

---

[1] U.S. Immig. & Customs Enf't, *Online Detainee Locator System*, https://locator.ice.gov/odls/#/search.

39.    Every detainee must have an immigration officer designated to serve as their Deportation Officer.  Deportation Officers are responsible for facilitating the detainee's access to legal counsel, managing the person's removal case, ensuring that they can attend their hearings in immigration court, and answering their questions about their detention and removal case.  Deportation Officers are also necessary to help a detainee and their counsel address any problems that may arise during a person's detention and removal proceedings.

40.    To facilitate access to legal counsel, detention facilities must maintain a publicly posted list of pro bono legal counsel that detainees may contact.

41.    DHS has issued detention standards that require immigration detention facilities to meet a detailed set of requirements.  These address issues like medical care, safety protocols, emergency response, recreation, complaint procedures, and accommodations for vulnerable detainee populations. And Congress has mandated in DHS's annual appropriation that immigration detention facilities must regularly pass inspections.

42.    In addition to these statutory, regulatory, and sub-regulatory rules, the First and Fifth Amendments impose a number of requirements regarding immigration detainees' access to attorneys, access to immigration courts, and conditions of confinement.

43.    Immigration officers receive multiple months' worth of training in immigration law, the removal process, detention procedures, and Spanish, to ensure that immigration detention during the removal process complies with all of these rules.

## II.    Operations at "Alligator Alcatraz" Are in Stark Contrast to Typical ICE Operations.

44.    The State of Florida announced on June 19, 2025, that it would swiftly begin construction of the first ever wholly state operated immigration detention facility on an airstrip surrounded by the Big Cypress National Preserve, Miccosukee and Seminole land.

45.    Because the facility is surrounded by swampland on all sides, Florida officials refer to it as "Alligator Alcatraz,"[2] referencing the infamous maximum-security prison.  Florida officials have boasted that dangerous wildlife, such as alligators and pythons, will intimidate detainees and prompt them to accept removal and forego any claims they may have to remain in the United States.

46.    The facility is Florida-owned and Florida-operated.  State and federal officials have stated in court filings that Florida exercises "complete discretion" over operations and over who is detained at the facility.

_____

[2] Raisa Habersham, *As the Jokes Fly, Alligator Alcatraz Evokes Racist Trope of 'Gator Bait'*, Miami Herald (July 10, 2025), https://www.miamiherald.com/news/state/florida/article310224360.html.

47.     Defendants began construction on June 23, 2025, and the first detainees were moved to the facility on July 3, 2025.

48.     On June 27, 2025, Defendant Governor DeSantis wrote on X.com: "Alligator Alcatraz is a secure facility in Florida that will stage criminal illegal aliens for mass deportation."  However, early data showed that hundreds of detainees at the facility had no criminal convictions or even charges.

49.     Defendants have credited the Florida Division of Emergency Management ("FDEM") with managing the facility's operations.

50.     On July 12, 2025, FDEM gave state and congressional lawmakers a guided tour of the facility and asserted this was a "state-run immigration" facility, with their power "rooted in 287(g)."

51.     In other litigation, Florida has stated that it believes 8 U.S.C. § 1357(g) provides the authority to detain people at the facility.  That statute allows DHS to sign agreements with state and local law enforcement agencies—known as "287(g) agreements"—under which individual employees of those agencies can be deputized to perform specified immigration officer functions, after DHS has trained them, certified their qualification, spelled out their authorities, and assigned an immigration officer to provide ongoing "direction and supervision."  8 U.S.C. § 1357(g)(1)-(g)(5).

52.     Several Florida agencies, including many of the Defendants in this case, have signed 287(g) agreements with ICE.  But those agreements do not give any authority to the state agencies themselves—only to those individual employees who have been fully trained and certified by DHS.  Florida officials have not publicly stated how many state officers at the facility, if any, have completed the deputization procedures under Section 1357(g).

53.     Defendant FDEM hired a contractor, Critical Response Strategies, to run the facility and hire the warden and other staff.  But FDEM does not have a 287(g) agreement with ICE.

54.     No other immigration detention facility in the country has ever operated based on 8 U.S.C. § 1357(g).  In the thirty years since the statute was enacted, state officers have never claimed the authority to detain people under this statute, other than the short period after an arrest during transport to an ICE facility.

55.     In the first month of operations, a number of anomalies and severe problems have emerged at the facility.  Many of them were previously unheard-of in the immigration system.

56.     Numerous people have been held for days or weeks without removal charges or any other charge.  This is a sharp departure from ICE's normal practices, since its regulations require immigration agents to file the removal charging

document—called a Notice to Appear—within 48 hours of detention, and the Fifth Amendment prohibits detention without charge.

57.    Detained individuals who enter the facility disappear from ICE's online detainee locator.  As a result, lawyers often cannot find their clients, and families cannot locate their loved ones inside ICE's vast detention system.  This problem has been exacerbated by frequent transfers between facilities.    In recent weeks, Defendants have transferred numerous people out of the facility the day before or the day of a scheduled attorney meeting.

58.    No one at the facility appears to be making the initial custody or bond determinations that ICE typically makes for new detainees, which for *pro se* individuals may be their only avenue to seek review of these determinations by an immigration judge.  This too is unheard-of in immigration detention.

59.    Until recently, immigration courts rejected all detainees' bond petitions.  ICE attorneys and immigration judges have told lawyers for detainees that their clients at the facility could not access immigration court because they were in Florida state custody.

60.    Detainees have been prevented from accessing attorneys in numerous ways.  Detainees without counsel have been cut off from the normal channels of obtaining a lawyer.  They have not been given lists of pro bono attorneys to contact, and they are not permitted to make free, unrecorded, outgoing legal calls.  The

facility has refused all requests for legal representatives to give legal "Know Your Rights" presentations and meet with detainees—which has been routine at other immigration detention facilities in Florida.

61.    Detainees with counsel also face numerous barriers.  The facility has no publicly-posted attorney access protocol.  The facility initially provided no way for attorneys to arrange legal visits with clients.  ICE provided attorneys with the email address of a Florida contractor, but the emails bounced back or went unanswered.

62.    When attorneys have managed to schedule visits or calls, they have been monitored by security staff.  And they have often had to wait multiple days, or even weeks, just to speak with their clients, which has sometimes left them unable to prepare for upcoming filings or hearings.  There is no legal mail system, and there is no way for attorneys and detainees at the facility to confidentially exchange legal documents. Detainees cannot make confidential outgoing legal calls.

63.    There is separate litigation pending which challenges these many failures to provide attorney access at the facility.

64.    Despite their inability to access counsel, detainees report being pressured by facility staff to sign voluntary deportation orders.  This is something that ICE protocol forbids.

65. Physical conditions at the facility are alarming. The facility is not a typical detention facility with permanent structures, but rather a series of large tents with smaller chain-link cages inside them, and other more temporary structures that are vulnerable to the elements and prone to flooding.

66. Former staff at the facility have described swarms of mosquitoes inside the tents that are unavoidable, even with repellant, and that expose detainees to skin irritations and a high risk of mosquito-borne illness.

67. Detainees report restrictions on their access to water, with showers allowed only once every several days, and drinking water allowed only at mealtimes.

68. Respiratory illnesses have reportedly spread throughout the facility. Numerous detainees have required emergency care via ambulance.

69. Sewage from the impermanent structures has backed up on multiple occasions. On at least one occasion, detainees reported that staff waited for leaked excrement simply to dry, and then returned people back to their cells without safely or sufficiently cleaning the waste.

70. Detainees experience punishing sleep and psychological stress, as they are forced to sleep with the lights on at all times. Sleep deprivation is also common because of the constant exposure to swarms of mosquitoes.

71.    Exposure to mosquitoes, sun, and other harsh elements has also been used as form of punishment and retaliation, with restrained individuals placed outside for hours at a time to be bitten and sun burned.

72.    Regular summer rains have caused flooding and leaks in the dormitory tents.

73.    Governor DeSantis has explained that these atrocious conditions are an intentional feature of the facility.  As he put it: "You'll have a lot of people that will deport on their own because they don't want to end up in Alligator Alcatraz."

74.    At least a hundred people—and likely many more—have already been deported from the facility after a brief stop at an ICE facility on the way out of the country.

75.    Among the people deported from the facility, disturbing reports of erroneous and uninformed removals are starting to emerge.  One person—a 20-year resident of the United States who lived with his wife and four children—was deported to Guatemala in error, despite having no final removal order and ongoing removal proceedings.  This occurred after the immigration court canceled his bond hearing because he was at "Alligator Alcatraz."  The government has so far refused to bring him back to the United States to continue his removal proceedings.

76.     Other detainees report being pressured to sign voluntary removal forms, without consulting legal counsel.  This has included detainees who were eligible for bond and had upcoming immigration court dates.

77.     One intellectually disabled detainee was asked to sign a form in exchange for a blanket, without the opportunity to speak with counsel. Unbeknownst to him, the form actually provided for his voluntary departure, and he was then deported without finishing his removal proceedings.

## III.  Detention at Alligator Alcatraz Violates a Number of Statutory Requirements.

78.     The federal government has exclusive authority over immigration enforcement. Congress has provided several narrow forms of permission for states to help the federal government with immigration enforcement.  But state enforcement outside of these provisions violates federal law and is preempted.

79.     DHS contracts with state and local agencies—using Intergovernmental Service Agreements (IGSAs)—to rent bed space for federal immigration detainees who are in DHS's custody.  There is no IGSA for this facility.

80.     Florida has claimed that it is operating the facility under the authority of 8 U.S.C. § 1357(g).  This is an unprecedented attempt to use Section 1357(g) as authority for an independent state-run detention facility.

81.     The statute provides a mechanism for individual state officers to be deputized to perform specified immigration officer functions.  In order to receive

deputized federal authority, state officers must complete a stringent formal process specified by the statute, which includes training comparable to the training that federal immigration officers receive, direction and supervision by a DHS officer, and certification by DHS that the individual is qualified to perform the delegated functions.

82.    Section 1357(g) does not provide any authority to state agencies themselves—only to individual officers to help DHS by performing specified functions.  The statute provides no authority for state agencies to detain anyone, or for deputized officers to hold people in the custody of state agencies.

83.    Alligator Alcatraz is staffed and run by private contractors who are not and cannot be deputized to perform any immigration functions under 8 U.S.C. § 1357(g).  It is also staffed and run by state employees who have not completed the certification and deputization process under the statute.  Section 1357(g) does not allow deputized state officers to sub-delegate their federal authority to non-deputized contractors or state officers.

84.    FDEM, which hired the contractor that operates the facility, does not even have a 287(g) agreement with DHS, which means that none of its employees are deputized to perform any immigration functions.  FDEM is not a law enforcement agency and therefore none of its employees may be deputized under Section 1357(g).

85.    According to FDEM, the facility is primarily operated by private contractors, who account for around 90 percent of the staff.

86.    State and federal officials have stated in court that Florida agencies have "complete discretion" over the facility's operations and who is detained at the facility.

87.    Section 1357(g) does not allow state officers to operate their own immigration detention center and carry out long-term detention on their own.  That is not one of the "immigration officer functions" outlined in 8 U.S.C. § 1357.  The statute as a whole authorizes various policing activities, but does not allow independent state detention operations.

88.    Florida officers who purport to act under 8 U.S.C. § 1357(g) have not received adequate training in the complex tasks involved in immigration detention. Some officers have been purportedly deputized despite receiving no DHS training, testing, or individualized direction from any identified federal immigration officer. Other officers have only received a few hours of online training, with no back-and-forth with an instructor, and limited exposure to substantive immigration law, the federal immigration system, and the relevant federal detention and removal procedures.

89.    Federal officers performing equivalent functions receive multiple months of in-person training.

19

90.     Officers at the facility are not receiving the direction and supervision required by the statute.  As DHS and Florida have stated on the record in other litigation, Florida retains "complete discretion" over which detainees are held at the facility.  Section 1357(g) does not allow an arrangement where state officers make independent decisions about immigration detention free from federal control.

91.     Federal officials have stated that they are likely to pay Florida law enforcement agencies for detention at the facility.  But § 1357(g)(1) requires deputized officers to "carry out . . . function[s] at the expense of the State."

## CLASS ACTION ALLEGATIONS

92.     Plaintiff seeks to represent a class of similarly situated current and future detainees at the facility.  The class would consist of:

All individuals who are detained, or will be detained, at "Alligator Alcatraz."

93.     The class is sufficiently numerous that joinder would be impractical. Defendants have been detaining hundreds of people at a time at the facility, some days nearing 1,000 people, and the facility currently has capacity for 3,000 people.

94.     The class's claims raise the overarching common issue of whether Defendants are authorized under 8 U.S.C. § 1357(g) to detain class members at the facility.  There are a number of common legal and factual issues, including whether Section 1357(g) allows state agencies to detain immigrants during the removal process, whether the statute allows deputized officers to re-assign their authority to

20

non-deputized officers, whether class members are being detained by non-deputized individuals, and whether the purportedly deputized officers at the facility have received adequate training and supervision.

95.    The Named Plaintiff's claims are typical of the class because he and all other class members raise the exact same legal claims.  Any differences in class members' factual circumstances do not impact the underlying legal question of whether Defendants have authority to detain them at the facility under Section 1357(g).

96.    Plaintiff and class counsel will adequately represent the class.  There are no conflicts between named and unnamed plaintiffs.  And class counsel has extensive experience litigating class actions as well as immigration detention and state immigration enforcement issues.

97.    The class satisfies the requirements of Federal Rule of Civil Procedure 23(b)(2) because Defendants are violating 8 U.S.C. § 1357(g) in the same way as to all class members, and the same court order barring further detention at the facility will remedy all class members' harms in one fell swoop.

98.     The Court can certify the class under both Rule 23 and equitable principles.

## **CLAIMS FOR RELIEF**

## **COUNT 1: VIOLATION OF 8 U.S.C. § 1357(g)**

### *Against all Defendants*

99.    Federal law provides limited permission for individual state and local officers to "perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g).  To perform such a function, an officer must complete adequate training and have sufficient knowledge of the delegated immigration function, must be directed and supervised by a designated federal official at all times, and must be certified by DHS as being qualified to perform the delegated function.

100.    8 U.S.C. § 1357(g) does not allow state agencies to detain anyone or to maintain their own, independent immigration detention centers.  Congress required DHS to maintain custody and control of all immigration detainees.

101.    8 U.S.C. § 1357(g) does not allow deputized officers to hold noncitizens in detention pending removal or removal proceedings.

102.    The statute does not allow deputized officers to sub-delegate their authority to private contractors or any other individuals who have not been deputized under the statute.

103.    Florida officers at the facility have not satisfied the statute's training and supervision requirements because they have not received adequate training in

the enforcement of immigration law, and they are not subject to federal direction and supervision in their detention decisions and operations.

104.　Only the federal government can "arrange for appropriate places" of immigration detention. 8 U.S.C. § 1231(g).　State officers cannot exercise that authority pursuant to § 1357(g).

105.　Plaintiff brings this claim in equity and pursuant to the habeas statute.

## COUNT 2: ULTRA VIRES

### *Against all Defendants*

106.　States generally lack authority to engage in immigration enforcement unless authorized by Congress.　The federal government has an overwhelmingly dominant interest in the regulation of immigration, which triggers multiple sensitive public policy, humanitarian, and foreign affairs considerations.　And Congress has enacted a comprehensive framework to regulate all aspects of immigration, including detention and removal.

107.　No federal statute authorizes Defendants to hold civil immigration detainees at "Alligator Alcatraz."

108.　Any independent state detention at the facility is preempted because it does not fall within the narrow permission that Congress has provided for states to engage in immigration enforcement.　State action outside of congressional permission is both field preempted and conflict preempted.

23

109.    Plaintiff brings this claim in equity and pursuant to the habeas statute.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court:

A.    Certify a class consisting of current and future detainees at "Alligator Alcatraz";

B.    Enter a temporary restraining order and preliminary injunction barring Defendants from detaining class members at the facility;

C.    Issue a writ of habeas corpus and permanent injunction barring Defendants from detaining class members at the facility;

D.    Issue a declaratory judgment that Defendants lack authority under federal law to detain civil immigration detainees at the facility;

E.    Issue such other relief as the Court deems necessary and proper.


Dated: August 22, 2025                     Respectfully submitted,

                                           /s/*Amy Godshall*
Spencer Amdur*                             Amy Godshall, Fla. Bar No. 1049803
Michael K.T. Tan*                          Daniel Tilley, Fla. Bar No. 102882
Cody Wofsy*                                AMERICAN CIVIL LIBERTIES
Hannah Steinberg*                          UNION FOUNDATION OF
Corene Kendrick*                           FLORIDA
Kyle Virgien*                              4343 West Flagler Street, Suite 400
AMERICAN CIVIL LIBERTIES                   Miami, FL 33134
UNION FOUNDATION                           786-363-2714
425 California Street, Suite 700           agodshall@aclufl.org
San Francisco, CA 94104                    dtilley@aclufl.org
T: (415) 343-0770
samdur@aclu.org                            Miriam Haskell (Fla. Bar No. 69033)

                          24

m.tan@aclu.org
cwofsy@aclu.org
hsteinberg@aclu.org
ckendrick@aclu.org
kvirgien@aclu.org

Omar Jadwat*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org

Eunice H. Cho*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St. N.W., 7th Floor
Washington, DC 20005
202-548-6616
echo@aclu.org

miriam@communityjusticeproject.com
Alana Greer (Fla. Bar No. 92423)
alana@communityjusticeproject.com
COMMUNITY JUSTICE PROJECT,
INC.
3000 Biscayne Blvd. Suite 106
Miami, Florida 33137
Tel: (305) 907-7697

Mark Fleming*
Mark Feldman*
NATIONAL IMMIGRANT JUSTICE
CENTER
111 W. Jackson Blvd., Suite 800
Chicago, Illinois 60604
Tel: 312-660-1628
mfleming@immigrantjustice.org
mfeldman@immigrantjustice.org


*Attorneys for Plaintiff*
*Pro hac vice application forthcoming*