## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

### Case No. 2:25-cv-765

| |
|---|
| M.A., on behalf of himself and a class of similarly situated individuals, |
| *Plaintiff.* |
| |
| v. |
| |
| KEVIN GUTHRIE et al., |
| *Defendants.* |
| |

## **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Alligator Alcatraz ("the facility") is an unprecedented detention facility—set up outside the normal channels for immigration detention, and without regard for multiple limits and safeguards in federal law. As a result, the facility is beset by a host of previously unthinkable problems: People have been held for weeks without removal charges. Detainees who enter the facility disappear from the normal detainee tracking system. Some have been barred from accessing immigration court. Attorney access is severely hampered. Physical conditions are atrocious. And reports of coerced and erroneous removals are mounting.

These problems stem from a number of legal violations.  Alligator Alcatraz is the nation's first-ever immigration facility that is claimed to be operated and controlled entirely by *state* agencies, instead of the Department of Homeland Security (DHS).  Florida claims that detention at the facility is authorized by 8 U.S.C. § 1357(g).  But that statute does not and has never before been used to support an independent state facility.  To the contrary, in every detention statute, Congress required *federal* agencies, not states, to conduct all detention of noncitizens pending removal or a decision on removal.  Section 1357(g), by contrast, simply allows delegation of certain policing functions, like interrogation, arrest, and transport, to individual state officers.  Running detention operations—which requires a litany of complex tasks to manage hundreds or thousands of detainees' removal proceedings—is not one of the individual-officer policing functions that Section 1357(g) authorizes.  That's why no State has ever before tried to run its own facility under Section 1357(g).

Even if detention operations were an individual immigration-officer function that could be delegated to state police under Section 1357(g), detention at Alligator Alcatraz would still violate the statute, because the facility is run and staffed by *private contractors* who are not and cannot be deputized under the statute.  Section 1357(g) only provides authority to an "employee of the State."  And it does not allow deputized state officers to sub-delegate their authority to *non*-deputized individuals—again, something no state officer has ever tried before.

Finally, even the purportedly deputized Florida officers at Alligator Alcatraz have not complied with Section 1357(g).  The statute requires federal control over all

2

delegated enforcement activities. Yet Florida asserts that it has total control over detention decisions. The statute also requires training sufficient for deputized officers to perform their delegated functions. Yet instead of the five *months* of training that federal law requires for equivalent federal officers, many of the Florida officers at the facility are receiving almost no training at all, and others get at most five *days*. This attempt to jettison the statute's training and supervision requirements is likewise unprecedented.

These statutory violations are causing immense harm. Hundreds of people are being held with no legal authority, subject to a host of problems that immigration detainees do not typically face. Congress required federal control over detention and rigorous training precisely to avoid these kinds of problems. The Court should enjoin further detention at this facility.

## BACKGROUND

### A. Immigration Detention

Immigration detention is a complex and multifaceted undertaking that, until Alligator Alcatraz, was managed exclusively by DHS, which had custody and responsibility for all immigration detainees.

The process starts when a person is arrested. After a warrantless arrest, officers must determine whether there was probable cause for the arrest. 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.3(a). Officers must then determine whether the detained person is subject to removal. Within 48 hours, they must decide whether to file a Notice to Appear (NTA) in immigration court. 8 C.F.R. § 287.3(d). If, instead, they believe the

person meets the criteria for expedited removal, 8 U.S.C. § 1225(b)(1)(A)(i), they must refer any person who expresses fear of persecution for a Credible Fear Interview (CFI) or Reasonable Fear Interview (RFI). *Id.* §§ 1225(b)(1)(A)(ii), 1225(b)(1)(B), 1231(b)(3)(A).

The beginning of detention requires a series of complex custody determinations. Officers must first determine, based on the person's immigration and criminal history, whether they are eligible for release or bond. *Compare, e.g.*, 8 U.S.C. § 1226(c) (mandatory detention), *with id.* § 1226(a) (release and bond eligible). Within 48 hours of the arrest, officers much decide whether to detain or release the person, and whether to set bond (and in what amount). 8 C.F.R. §§ 236.1(c)(8); 287.3(d).[1]

Detention also requires a number of steps to track a person's case within the detention and removal system. Detainees must be entered into ICE's online detainee locator,[2] so that their counsel and family can find and contact them. Detainees must be assigned a detention and deportation officer, who manages their case, answers their questions, and communicates with their counsel. *See* ICE, Detention and Deportation Officer's Field Manual (Mar. 27, 2006) (629 pages), https://tinyurl.com/29hehj58.

Immigration detention facilities must uphold a long list of standards required by DHS policies, federal law, and the Constitution. For instance, facilities must provide detainees with a list of pro bono legal counsel they can contact. *See, e.g.*, ICE,

---

[1] A number of ICE policies guide these decisions. *See, e.g.*, ICE, Bond Management Handbook (Aug. 19, 2014), https://tinyurl.com/y5k5avz6.
[2] https://locator.ice.gov/odls/#/search.

Performance-Based National Detention Standards of 2011, 388 (Rev. 2016) (PBNDS), https://tinyurl.com/2e8ua5w9.  They must facilitate timely and confidential meetings with legal counsel.  *See* PBNDS at 398-401.  And they must adhere to a range of health and safety standards.  *See generally* PBNDS (establishing standards for medical care, emergency planning, deaths in custody, and media visits); 29 U.S.C. § 794 (establishing protections for people with disabilities in immigration detention); 42 U.S.C. § 2000bb-1 (protecting free exercise of religion in immigration detention centers).

### B.  The 287(g) Program

States cannot participate in immigration enforcement absent permission from Congress.  *Arizona v. United States*, 567 U.S. 387, 408 (2012).  The authority that Florida claims for Alligator Alcatraz is 8 U.S.C. § 1357(g).  Section 1357(g) allows state and local agencies to sign agreements with DHS—called "287(g) agreements"—under which individual state and local officers can be deputized to perform "a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens." *Id.* § 1357(g)(1).  Before they can perform any federal function, each deputized officer must have "knowledge" of the function and receive "adequate training," *id.* § 1357(g)(2), they must be "supervise[d] and direct[ed]" by a named DHS official, *id.* § 1357(g)(5), (3), and DHS must specify the nature and duration of their authority, *id.* § 1357(g)(5).  State activities under Section 1357(g) must be carried out "at the expense of the State."  *Id.* § 1357(g)(1).

Prior to Alligator Alcatraz, no State had ever claimed authority to run its own detention operations under Section 1357(g).

### C. Alligator Alcatraz

Alligator Alcatraz is a tent facility in the Everglades that was constructed in eight days. *Friends of the Everglades v. Noem*, 2025 WL 2423258, *33 (S.D. Fla. Aug. 21, 2025), *stay pending appeal*, 2025 WL 2598567 (11th Cir. Sept. 4, 2025). It is the first-ever immigration facility claimed to be owned, operated, and controlled entirely by state agencies. Throughout its operations, the facility has been mired in problems, many of which were previously unheard-of in the immigration system.

Many of the normal immigration procedures are being dropped or delayed for people who enter the facility after an arrest. Numerous people report being held at the facility for days or weeks without anyone filing a Notice to Appear to commence their removal proceedings—thus preventing them from going before an immigration judge. *See* Blankenship Decl. ¶ 44; Khan Decl. ¶ 9; Supp. Khan Decl. ¶ 8, 11; Weiser Decl. ¶ 6-8, 13; Supp. Weiser Decl. ¶ 21-22; Choi Decl., Ex. C; 8 C.F.R. § 287.3(d) (requiring NTA in 48 hours).[3] No one appears to be making custody or bond determinations for newly arrested people, *id.*; Weiser Decl. ¶ 6-8, 13, which can impede their ability to seek bond in immigration court, 8 C.F.R. § 236.1(d)(1), 1003.19(a). There is no indication that anyone at the facility is acting as their detention officers to manage their cases and address these issues. Blankenship Decl. ¶ 34. And detainees do not

---

[3] Most of these declarations were originally submitted in *C.M.* and *Friends of the Everglades*.

show up in ICE's online detainee locator, *see id.* ¶ 10, 11, 34; Supp. Weiser Decl. ¶ 13; Saturne Decl. ¶ 5; Garcia Decl. ¶ 4; Flores Decl. ¶ 4, which prevents their family and counsel from finding and contacting them.

People who are transferred to Alligator Alcatraz from other detention facilities disappear from the immigration system. Their information is removed from the online detainee locator. *See id.* Immigration courts initially refused to hear their bond applications for lack of jurisdiction and canceled previously scheduled hearings. *See* Blankenship Decl. ¶ 43, 44; Khan Decl. ¶ 9-12; Weiser Decl. ¶ 16; Supp. Weiser Decl. ¶ 19-20; *see also C.M. v. Noem*, 2025 WL 2400953, *10 (S.D. Fla. Aug. 18, 2025) (ICE designated an immigration court only after thousands had already been held and hundreds deported).

Immigration counsel has faced enormous barriers in communicating with clients at the facility. For multiple weeks, there was simply no way for lawyers to contact their clients or schedule a call or visit. *See* Blankenship Decl. ¶ 12-21; Supp. Khan Decl. ¶ 4; Weiser Decl. ¶ 5, 17, 18. To this day, attorney-client telephone communication is not confidential and outgoing calls to attorneys are recorded by the facility. *See* Blankenship Decl. ¶ 39; Elder Decl. ¶ 6; Garcia Decl. ¶ 6; Bilbao Decl. ¶ 11, 19; Gonzalez Decl. ¶ 5; Flores Decl. ¶ 5; Saturne Decl. ¶ 6. Unlike normal ICE facilities, where attorneys can typically show up during specified hours and expect to see a client, attorneys must schedule legal visits at Alligator Alcatraz days in advance and sometimes face such significant delays that they cannot consult with clients before key deadlines. *See* Blankenship Decl. ¶ 37; Gutierrez Decl. ¶ 10; Flores Decl. ¶ 6. And

the facility has a striking and troubling practice of transferring detainees elsewhere mere hours before their previously scheduled meetings with counsel.  *See* Elder Decl. ¶ 10-17; Gonzalez Decl. ¶ 6, 7; Saturne Decl. ¶ 8, 10.  These barriers are dramatically worse than at regular ICE detention facilities.  *See* Blankenship Decl. ¶ 5, 16, 38, 39; Supp. Khan Decl. ¶ 5; Supp. Weiser Decl. ¶ 9, 12, 18.

Physical conditions at the facility have been dire, with many hospitalizations in just the first few weeks, outbreaks of disease, and basic issues with access to water and hygiene.  *See* Blankenship Decl. ¶ 9, 30-31, 40; Lee Decl. ¶ 3-7; Choi Decl., Exhibits C, F, H, I, J, L.  These anomalous and severe issues raise questions about whether Defendants are following ICE detention standards and ensuring that the contractor abides by all ICE detention policies.

Disturbing reports have emerged of some detainees being pressured to sign removal orders and others being removed in error.  *See* Lee Decl. ¶ 4; Supp. Weiser Decl. ¶ 5; Saturne Decl. ¶ 8; Choi Decl., Ex. E.  At least hundreds and likely thousands of people have been removed from the facility so far, despite their struggle to access counsel and their exclusion from many of the normal protections of the immigration system.  *See* Choi Decl., Exhibits D, E.

Two lawsuits have challenged other aspects of Alligator Alcatraz's operations. *See Friends of the Everglades*, *supra* (National Environmental Policy Act challenge); *C.M. v. Noem*, No. 2:25-cv-747 (M.D. Fla.) (access-to-counsel challenge, preliminary injunction motion pending).  The facility was depopulated after a preliminary injunction in *Friends of the Everglades*, but transfers have resumed in recent weeks after

a stay pending appeal.  At a hearing in *C.M.*, Judge Ruiz noted "that certainly there could be a disconnect between what is required by Section 287 and the ICE standards and what is being done under the guise of this federal authority" at Alligator Alcatraz. C.M. Hearing Tr. 99 ("[T]hat continues to be a concern for the Court.").

## STANDARD OF REVIEW

To obtain a preliminary injunction, plaintiffs must show that they are "likely to succeed on the merits," they face "irreparable injury," the balance of equities favor an injunction, and "the injunction would not be adverse to the public interest."  *Windsor v. United States*, 379 Fed. App'x 912, 915 (11th Cir. 2010).

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits, Because Detention at "Alligator Alcatraz" Violates 8 U.S.C. § 1357(g).

Detention at "Alligator Alcatraz" goes beyond the authority provided by Section 1357(g) for three separate reasons.  First, Section 1357(g) does not allow state agencies to carry out immigration detention—that authority belongs to DHS alone. Second, the facility is run by private contractors who lack any authority under Section 1357(g), and the statute does not allow deputized state officers to sub-delegate their federal authority to non-deputized individuals.  Third, even the few state officers at the facility who purport to be deputized under Section 1357(g) have not received the "direction" and "training" that the statute requires.

### A. 8 U.S.C. § 1357(g) Does Not Authorize States to Operate Their Own Independent Detention Centers.

Alligator Alcatraz is a state-owned and -operated facility where Florida agencies hold civil immigration detainees. State and federal officials have made this crystal clear: "The State of Florida has complete discretion in deciding who is detained at this facility." Fuentes Decl. ¶ 18; *see* Giles Decl. ¶ 6 (Florida has "ultimate discretion" over detention decisions). DHS has not contracted "or otherwise procured any detention space" at the facility. *Id.* ¶ 10. DHS has claimed that the facility is operated "exclusively by state officials." Gadea-Guidicelli Decl. ¶ 24 ("ICE officers do not control the site."); Fuentes Decl. ¶ 19 ("ICE does not direct or supervise construction or physical maintenance activities at [Alligator Alcatraz]."); Kerner Decl. ¶ 10 (same).

Section 1357(g) does not authorize state agencies to operate their own immigration detention facilities. Section 1357 as whole simply specifies the policing functions that individual immigration officers can perform. And those do not include managing long-term detention operations. Detention during the removal process is governed by other statutes, which give that authority exclusively to DHS, to ensure that all civil immigration detainees are held by the federal government.

Every single time the INA provides authority to detain noncitizens during the removal process, it provides that authority to DHS alone.[4] That is true for noncitizens

---

[4] "Though the statute refers to the Attorney General, that authority has been transferred to the Secretary of the Department of Homeland Security." *Toro v. DHS Sec'y*, 2011 WL 13137354, *5 n.8 (M.D. Fla. Nov. 16, 2011). The same is true for DOJ's former sub-agency the Immigration and Naturalization Service (INS or the Service). *Tofade v. U.S. Att'y Gen.*, 236 Fed. App'x 526, 527 n.1 (11th Cir. 2007).

who are in removal proceedings. *See* 8 U.S.C. § 1226(a) ("the Attorney General . . . may continue to detain"); *id.* § 1226(c) (detention by "the Attorney General"). It is true for noncitizens with final removal orders. *See* 8 U.S.C. § 1231(a)(2)(A) ("the Attorney General shall detain"). It is true for noncitizens who are arrested at the border. *See* 8 U.S.C. § 1225(b)(2)(A); *Jennings v. Rodriguez*, 583 U.S. 281, 287-91 (2018) (explaining these detention authorities). And it is true for all the specialized detentions schemes in the INA. *See* 8 U.S.C. § 1226a(1)-(2); *id.* § 1228(a)(2); *id.* § 1536(a)(1); *id.* § 1537(b)(1), (c), (e)(1). Congress thus provided that all civil immigration detainees must be held in DHS's custody. The detention statutes do not provide this authority to anyone else.

Congress confirmed this in directing "[t]he Attorney General" to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). The statute provides DHS with three options for immigration detention, all of which require detention by DHS itself: (1) "United States Government facilities," (2) "rental" facilities, or—if neither of these are available—(3) DHS can "acquire land" and "acquire, build, remodel, [or] repair" its own facilities. *Id.* Independent state facilities are absent from the list.

Congress expressed this same understanding in the one statute that speaks explicitly to immigration detention in state jails. The INA allows DHS to enter into a "a cooperative agreement with any State" for "detention services." 8 U.S.C. § 1103(a)(11)(B). But the statute specifies that this is merely a rental agreement, with DHS paying for "bed space for persons *detained by the Service*," and thus presupposes

11

that such detainees are held by DHS. *Id.* (emphasis added). In other words, Congress let DHS use states as contractors for DHS's own detainees. But it did not authorize states to hold people independently.[5]

Section 1357 is a different kind of statute. Instead of laying out agency-level authorities like detention and removal, it specifies which duties can be assigned to individual officers. It is titled "Powers of immigration officers and employees." And its provisions lay out enforcement actions that can be taken by an individual "officer or employee of the Service," 8 U.S.C. § 1357(a), or an individual "officer or employee of the State," *id.* § 1357(g)(1). These individual functions are all about policing—things like searches and arrests. *See, e.g., id.* § 1357(a)(2) (arrest), *id.* § 1357(a)(3) (search). They do not involve broad programmatic activities like establishing and running a detention facility, because that is an *agency* authority, not a function of individual immigration officers.

Congress used this same distinction—between agency authorities and individual-officer functions—throughout the INA. Across dozens of statutes, Congress consistently referred to "the Attorney General," "the Service," and "the Secretary" when giving power to federal agencies writ large. *See, e.g.,* 8 U.S.C. § 1103(a); *id.* § 1231(a)(3) (authority to issue "regulations"). By contrast, Congress consistently referred to "immigration officers" when assigning tasks to individual employees. *See, e.g.,* 8 U.S.C. § 1357(a); *id.* § 1231(a)(3)(A) (task of supervising

---

[5] DHS has not contracted "or otherwise procured any detention space" at Alligator Alcatraz. Giles Decl. ¶ 10.

individual noncitizens). By assigning detention authority to DHS as an agency writ large, Congress made clear that operating a detention center is not an individual-officer function that could be delegated to state officers under Section 1357(g).

That same conclusion is apparent from reading Section 1357(g) in the context of Section 1357 as a whole. Section 1357(g) imposes two limits on the authority that can be delegated to state officers: It must be an "immigration officer function[]," and it must be related to "investigation, apprehension, or detention." 8 U.S.C. § 1357(g), (g)(1). That set of functions is provided by the rest of Section 1357, which lists a number of policing actions that "immigration officers" can perform. *See* 8 U.S.C. § 1357(a)(1), (b) (interrogation); *id.* § 1357(a)(3), (c), (e) (search); *id.* § 1357(a)(2), (4), (5), (d) (arrest); *id.* § 1357(a)(5) (carrying firearms); *El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018) (Section 1357 "specifies immigration-officer functions and describes circumstances under which state and local officers can perform those functions."). Yet critically, *none* of the functions described in Sections 1357(a)-(f) involve detaining people pending removal proceedings or removal. The statute as a whole addresses policing, not detention, because detention operations are not an immigration officer function.

Section 1357's implementing regulations demonstrate which "detention" activities *are* immigration-officer functions, and thus subject to delegation under Section 1357(g). *See* 8 C.F.R. §§ 287.5, 287.8. The regulations list the same immigration-officer functions as the statute. *See* 8 C.F.R. § 287.5(a) (interrogation); *id.* § 287.5(c), (e) (arrest); *id.* § 287.5(d) (search); *id.* § 287.5(f) (carrying firearms). And

the only detention functions they mention are, again, individual-level policing tasks. One is the authority to conduct a brief "detention not amounting to arrest." 8 C.F.R. § 287.8(b); *id.* § 287.8(b)(2) ("the immigration officer may briefly detain the person for questioning"). The other detention function is a subsidiary of the "authority to arrest," *id.* § 287.5(c): the authority "to take and maintain custody of and transport any person who has been arrested by an immigration officer." *Id.* § 287.5(c)(6); *see also* 8 U.S.C. § 1357(g)(1) (describing "the transportation of such aliens across State lines to detention centers"). Those are the "detention" authorities that are "function[s] of an immigration officer," and that can therefore be delegated under Section 1357(g)(1). And they are a far cry from setting up and operating a detention facility to hold hundreds of noncitizens during removal proceedings.

Decades of 287(g) agreements reflect this same understanding. For 30 years prior to recent months, all 287(g) agreements—including Defendants'—have required deputized state officers to transport noncitizens to ICE facilities within 48 hours of an arrest. *See, e.g.*, DOC 287(g) agreement, at 8; Collier County 287(g) agreement at 8, https://tinyurl.com/mweaj65d. And the only "detention" authority they have described is "authority to detain and transport, 8 U.S.C. § 1357(g)(1) and 8 C.F.R. § 287.5(c)(6), arrested aliens subject to removal to ICE-approved detention facilities." DOC 287(g) agreement, at 9; Collier at 9.

By contrast, *different* sets of regulations, outside of Section 1357, are what implement DHS's authority to detain immigrants pending removal proceedings and removal. *See* 8 C.F.R. §§ 235.3, 236.1-236.3, 241.3-241.5. These detention authorities

14

match the detention statutes described above, which uniformly assign detention authority to DHS as an agency, not to individual officers.

In sum, Congress gave DHS exclusive authority to detain immigrants during the removal process, and so in Section 1357, Congress did not make such detention a function of individual immigration officers. Section 1357(g) therefore does not provide Defendants authority to detain putative class members during their removal proceedings. And because that is the only asserted basis of authority to detain people Alligator Alcatraz, such detention is illegal under federal law.

### B. Authority Under 8 U.S.C. § 1357 Cannot Be Sub-Delegated to the Contractors Who Operate Alligator Alcatraz.

Even if immigration detention were a function of individual immigration officers, and thus could be delegated to state officers, those officers could not *re-assign* that authority to private contractors who are not and cannot be deputized under Section 1357(g).

Detention operations at Alligator Alcatraz are primarily being carried out by private contractors. As Florida has stated in a sworn declaration: "On any given day, there are about 115 state officials and between 800-1000 state contractors carrying out various activities at the site." Gadea-Guidicelli Decl. ¶ 24 ("there are just four ICE officers present"). The facility is thus around 90% run by private contractors. And the contractors are performing critical detention roles, including the facility's "Manager" and "Corrections Officer[s]." *See* CRS Invoice at 1-2.

This is an unprecedented and straightforward violation of 8 U.S.C. § 1357(g)(1). The statute's text could not be clearer: Immigration functions can only be delegated to "an officer or employee of the *State or subdivision*." *Id.* (emphasis added); *id.* § 1357(g) (title).  Private contractors are obviously not officers or employees of the State of Florida, and so under the plain terms of the statute, they *cannot* be delegated any immigration-officer authority under Section 1357(g).  Just as a deputized state officer could not hire a private security company to make immigration arrests, they cannot hire a private company to carry out any detention function they have been delegated. No 287(g) agreement has ever provided for private contractors to perform immigration functions.

Because they cannot exercise authority under the statute or any 287(g) agreement, the private contractors who run Alligator Alcatraz also cannot satisfy any of the statute's other requirements.  They have not been assigned a DHS officer to "supervise and direct" their detention activities.  *Id.* § 1357(g)(5), (3).  They have no "written agreement" with DHS which specifies their "specific powers and duties" or "the duration of the[ir] authority." *Id.* § 1357(g)(5).  They have not received "written certification" from DHS or "adequate training regarding the enforcement of relevant Federal immigration laws." *Id.* § 1357(g)(2).  If immigration detention were really a function of individual immigration officers, re-assigning it to private contractors would violate nearly every aspect of the statute.

In addition to violating the statute's literal terms, sub-delegation is impossible to square with the overall design of the statute.  "Section 1357 creates a highly

16

regulated scheme for adopting 287(g) agreements," *El Cenizo*, 890 F.3d at 177, in which federal officials must train, direct, supervise, and certify state officers, and thus keep close control over every aspect of a state officer's immigration activities. Close federal control is essential to ensure that deputized officers can navigate "the significant complexities involved in enforcing federal immigration law." *Creedle v. Miami-Dade*, 349 F. Supp. 3d 1276, 1302 (S.D. Fla. 2018) (quoting *Arizona*, 567 U.S. at 409); *Arizona*, 567 U.S. at 396-97 (explaining the complex mix of "human concerns" and "foreign policy" concerns that officials must balance). Having imposed such detailed requirements on deputized state officers, Congress plainly did not allow those officers to turn around and re-assign their immigration officer functions to *non*-deputized officers who satisfy none of those criteria—officers who are *not* trained, supervised, directed, or certified by the federal government.

By sub-delegating immigration authority and entering into detention contracts, Florida officials are unlawfully exercising powers that belong to the Secretary of Homeland Security, not to individual immigration officers. *See* 8 U.S.C. § 1103(a)(6) (power of the "Secretary" to delegate immigration authority); *id.* § 1103(a)(11) (the "Attorney General" may contract for "detention services"); *id.* § 1231(g) ("Attorney General['s]" "rental" authority); 6 U.S.C. § 112(b)(2) ("The Secretary" can "make contracts" "to carry out the Secretary's responsibilities."); 48 C.F.R. § 1.601(a) (describing "the *agency's* contracting functions") (emphasis added). Nothing in Section 1357 allows immigration officers to delegate *any* of their functions—be it search, arrest,

or detention—to private contractors or anyone else. The only delegation authority is in Section 1357(g), and it belongs to "the Attorney General" alone. 8 U.S.C. § 1357(g)(1), (3), (4), (5), (6). *See supra* Part I.A (explaining the INA's distinction between agency authority and immigration-officer authority).

Even if a deputized state officer could sub-delegate their authority to contractors, none has done so here. The state agency that hired the contractor—the Florida Division of Emergency Management—does not have a 287(g) agreement, *see* C.M. Discovery Response at 3, and therefore has no deputized officers who could delegate their authority through contract, even if that were permissible.

Finally, just as Defendants cannot re-assign immigration-officer functions to non-deputized contractors, they cannot re-assign those functions to non-deputized state officers. Section 1357(g) requires every individual officer to satisfy the statutory requirements before they can exercise immigration authority. *See Santos v. Frederick County*, 725 F.3d 451, 457, 465 (4th Cir. 2013) (non-deputized officers lacked authority despite employer's 287(g) agreement). Yet Florida has admitted that multiple state agencies are "assisting with detention operations" at the facility even though they have not signed a 287(g) agreement, and therefore have no deputized employees. *See* C.M. Discovery Response at 3 (Florida Division of Emergency Management, Florida State Guard); Blankenship Decl. ¶ 21, 36. And for the agencies that have signed 287(g) agreements, Florida has not stated how many of their officers at the facility have actually completed the deputization procedures under Section 1357(g).

18

### C. Even Florida Officers Who Purport to Be Deputized Have Not Satisfied Section 1357(g)'s Training and Supervision Requirements.

Even if 287(g) officers could set up their own detention facilities and re-assign their detention authority to private contractors, detention at "Alligator Alcatraz" would still violate Section 1357(g), because the Florida officers there who purport to be deputized have not satisfied the statute's training and supervision requirements.

**Direction and supervision**.  The facility as a whole violates Section 1357(g)(2) and (5), because Florida claims that its officers have "complete discretion" over whom they detain.  *See supra* at 10 ("ultimate discretion," "ICE officers do not control the site," "ICE does not direct or supervise").  That violates the statute's requirement that federal officials "supervise and direct" the immigration activities of every deputized state officer.  8 U.S.C. § 1357(g)(5), (3).  Congress stated *twice* in Section 1357(g) that federal officials had to closely control the immigration activities of deputized state officers.  *Id.*  That need for federal control cannot be squared with an arrangement where state officers can overrule federal decisions and operate a detention facility on their own.

Florida's process for deputizing its officers also violates this requirement. Florida Department of Corrections ("DOC"), one of the state agencies that runs the facility, recently signed an Addendum to its 287(g) agreement which provides that *all* of its corrections officers—there are more than 18,000[6]—"may immediately exercise"

---

[6] Fl. Dep't of Corr., Annual Report for FY 2023-2024, at 3 (stating that 79% of 23,447 employees are corrections officers), https://tinyurl.com/2w4t7b4k.

immigration detention authority once DOC simply states that they have received
training.  DOC 287(g) Addendum § 1.4(B) (Aug. 6, 2025) (emphasis added).  And
while the agreement contains a conclusory assertion that ICE will "retain
supervision," it shows just the opposite: that DOC officers are deputized *without* being
assigned a particular ICE supervisor, and without any mechanism for ICE to direct
their activities.  It simply says that ICE will bring people to and from the facility.  *Id.* §
1.4(C).

It's hard to imagine a clearer violation.  Congress required that for "*each* officer"
there must be a "written agreement" which specifies "the position of the agency of the
Attorney General who is required to supervise and direct the individual."  8 U.S.C. §
1357(g)(5) (emphasis added).  DOC officers are now simply skipping this step.

**<u>Training</u>**.  To exercise immigration authority, a state officer must "have
knowledge of . . . Federal law relating to the [delegated] function," and "adequate
training regarding the enforcement of relevant Federal immigration laws."  8 U.S.C. §
1357(g)(2).  Yet some Florida officers appear to be exercising immigration authority
despite having received no training at all from DHS.  And others have at most received
a few days' worth of online training—woefully short of the months of live training that
equivalent federal immigration officers receive.

Training is a key requirement for both federal immigration officers and state
officers deputized under Section 1357(g).  Federal law requires immigration officers to
complete "basic immigration law enforcement officer training" before performing
virtually any immigration-officer function.  8 C.F.R. § 287.5(b) (patrolling the border),

(c)(1), (e)(3) (arrests), (c)(6) (maintaining custody and transporting after an arrest), (d),
(e)(1) (searches).  Basic immigration law enforcement officer training is defined by
regulation, *see* 8 C.F.R. § 287.1(g), and requires 16 weeks of training on federal
immigration law, procedures, and enforcement standards, along with 5 weeks of
Spanish language training.   *See* ICE, *ICE Academy Instructors Teach Prospective
Deportation Officers* (Oct. 10, 2018), https://tinyurl.com/mwy56h34.

As the Supreme Court has explained, § 287.1(g) also "defin[es] the training"
that is required for state officers to perform these same immigration-officer functions
under Section 1357(g).  *Arizona*, 567 U.S. at 409.  Recognizing the "significant
complexities involved in enforcing federal immigration law," Congress made 287(g)
authority "contingent on training" to ensure that deputized state officers uphold the
same standards as federal officers who perform equivalent functions.  *Id.* (citing 8
C.F.R. § 287.1(g)); *see Padilla v. Kentucky,* 559 U.S. 356, 379-380 (2010) (Alito, J.,
concurring in judgment) (detailing the complexity in just one small corner of
immigration law).  Indeed, it would make little sense to let deputized state officers
perform an immigration function "on their own initiative" despite receiving
significantly less training than federal officers who perform the exact same function.
*El Cenizo*, 890 F.3d at 180.

Yet that is exactly what Florida officers at Alligator Alcatraz are doing.  DOC's
Addendum provides a blanket delegation of authority to tens of thousands of officers,
and states that they may "immediately" perform immigration detention functions once
DOC simply "confirm[s] in writing," presumably in a short email, that its corrections

officers "ha[ve] received training on ICE-approved detention standards, including use-of-force standards." DOC 287(g) Addendum § 1.4(B). In other words, DOC officers are purporting to act as immigration officers at Alligator Alcatraz with *zero* training from ICE, no specified amount of training from anyone, and no testing by ICE to determine whether they have sufficient "knowledge" of the delegated function. 8 U.S.C. § 1357(g)(2). Detaining people during the removal process is an extraordinarily complex undertaking. *See supra* at 3-5. It is no surprise that such intense and anomalous problems have proliferated at Alligator Alcatraz, given that the state officers who run it have practically jettisoned the statute's training requirement altogether.

For other Defendants too, their 287(g) officers are not receiving anything close to the training of equivalent federal immigration officers. Rather than the 21 weeks that federal law requires before "immigration officers" can "maintain custody" of arrested individuals, 8 C.F.R. § 287.5(c)(6), Florida law enforcement report that they are receiving at most *five days* of online training. *See* Meeting Tr. of Fla. State Imm. Enf. Council at 107 (transcript). That alone is sufficient to invalidate their authority under Section 1357(g). By delegating authority to perform "immigration officer functions," Congress required state officers to comply with the explicit requirements in federal law that attach to those functions. *See* 8 C.F.R. §§ 287.5, 287.1(g) (training requirements), 287.8 (conduct requirements). Given Congress's preoccupation with ensuring that deputized state officers uphold federal standards, it would make no sense for Congress to excuse them from the standards that apply to federal officers. And

indeed, Congress incorporated those standards into the statute, providing that immigration-officer functions can only be carried out in accord with "regulations" that govern the "standards" and "training" applicable to each function. 8 U.S.C. § 1357(a) (final paragraph).

Even worse, there are indications that, like DOC officers, other Florida officers may be receiving even less than five days of training. Defendants have described thousands of their officers that have been deputized, with no indication that entire agencies have taken a week out of their duties to study immigration law. *See* Choi Decl., Exhibits A, B. This utter lack of training is an independent reason to grant an injunction.

## II. Plaintiffs Face Irreparable Harm.

Putative class members face numerous forms of irreparable harm from being illegally detained at Alligator Alcatraz. Unlawful detention is a paradigmatic form of irreparable harm. *See United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988) (holding that "unnecessary deprivation of liberty clearly constitutes irreparable harm"); *Arias Gudino v. Lowe*, 2025 WL 1162488, *13 (M.D. Pa. Apr. 21, 2025) ("unlawful detention is a sufficient irreparable injury").

Class members' unlawful detention is also causing numerous downstream irreparable harms. It is resulting in serious impairments to their First Amendment right to counsel, and the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347,

373 (1976); *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (same).

Detention at the facility is also impairing many class members' immigration cases and forcing them to live in unsafe and unsanitary conditions. *Supra* at 7-8. Each of these harms is sufficient to support an injunction.

## III.    The Remaining Factors Favor an Injunction.

Defendants, by contrast, are not harmed by an injunction which simply prevents them from violating federal law.   States' "[f]rustration of federal statutes and prerogatives [is] not in the public interest."   *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *GLAHR v. Governor of Ga.*, 691 F.3d 1250, 1269 (11th Cir. 2012) (concluding that "enforcement of a state law at odds with the federal immigration scheme is neither benign nor equitable").   Defendants have no cognizable interest in exercising immigration enforcement authority that Congress has withheld from them. And where "the moving party demonstrates a likelihood of success on the merits, the public interest leans even more toward granting the injunction."   *Mama Bears of Forsyth Cty. v. McCall*, 642 F. Supp. 3d 1338, 1360 (N.D. Ga. 2022) (cleaned up).

## CONCLUSION

The Court should enjoin Defendants from detaining Plaintiffs and class members at Alligator Alcatraz.

Dated: September 29, 2025

Respectfully submitted,

/s/ *Spencer Amdur*

Amy Godshall (Fla. Bar No. 1049803)
Daniel Tilley (Fla. Bar No. 102882)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
FLORIDA
4343 West Flagler Street, Suite 400
Miami, FL 33134
T: (786) 363-2714
agodshall@aclufl.org
dtilley@aclufl.org

Miriam Haskell (Fla. Bar No. 69033)
Alana Greer (Fla. Bar No. 92423)
COMMUNITY JUSTICE PROJECT,
INC.
3000 Biscayne Blvd. Suite 106
Miami, Florida 33137
T: (305) 907-7697
miriam@communityjusticeproject.com
alana@communityjusticeproject.com

Mark Fleming*
Mark Feldman*
NATIONAL IMMIGRANT JUSTICE
CENTER
111 W. Jackson Blvd., Suite 800
Chicago, Illinois 60604
T: (312) 660-1628
mfleming@immigrantjustice.org
mfeldman@immigrantjustice.org

Spencer Amdur*
Michael K.T. Tan*
Cody Wofsy*
Hannah Steinberg*
Corene Kendrick*
Kyle Virgien*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
samdur@aclu.org
m.tan@aclu.org
cwofsy@aclu.org
hsteinberg@aclu.org
ckendrick@aclu.org
kvirgien@aclu.org

Omar Jadwat*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org

Eunice H. Cho*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St. N.W., 7th Floor
Washington, DC 20005
T: (202) 548-6616
echo@aclu.org

*Attorneys for Plaintiff*
**Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished

by electronic service through the CM/ECF Portal on September 29, 2025, to all

counsel of record.

/s/ *Spencer Amdur*
Spencer Amdur