# DECLARATION OF KATHERINE H. BLANKENSHIP

I, Katherine H. Blankenship, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. I am an attorney in good standing in the states of Tennessee and Florida. I am admitted in all U.S. States District Courts in Florida and the Eleventh Circuit Court of Appeals. I specialize in the practice of immigration law.

3. I am an attorney and co-founder of Sanctuary of the South, PLLC, ("SOS"), a legal services organization based in Miami, with offices in New Orleans, Miami, and Chattanooga, Tennessee. SOS provides direct pro bono and low-cost immigration legal services and civil rights representation to people in Florida and throughout the Southeast. As part of its immigrants' rights work and mission to provide legal representation and counsel to immigrants, SOS and its lawyers provide deportation defense, asylum assistance, and family-based immigration services. SOS also represents and advocates for individuals harmed in federal custody, families of people who died wrongfully in ICE custody, and individuals physically abused by law enforcement. SOS represents people held in carceral and detention facilities due to their perceived or actual immigration status to advocate for their fundamental constitutional and human rights.

4. Since July 2025, SOS has had eight prospective or retained clients held at the Collier Dade Transition and Training Detention Center in the Florida Everglades, otherwise known as "Alligator Alcatraz." My staff and I have also spoken to dozens of family members

1

trying to find their loved ones, ensure their safety, and establish legal representation at "Alligator Alcatraz."

5.  SOS has faced severe challenges meeting with clients at "Alligator Alcatraz" and having confidential communications. Many of these problems are unusual in the immigration system. I have spent years representing clients at a variety of immigration detention facilities, and the problems at this facility are some of the worst I have ever seen.

6.  Our clients have also reported inhumane conditions and gross human rights abuses to loved ones. These conditions are also not common in normal ICE detention facilities, which are required to follow federal standards that prohibit many of the conditions we have seen.

7.  The abnormal conditions at "Alligator Alcatraz" have forced SOS to spend enormous additional resources trying to represent clients there. To date we have spent over 100 hours of staff time and at least $2,750 in costs that we would otherwise not have needed to spend in working to provide legal services. This includes time spent attempting to obtain information about how to establish communication with clients at the facility, speaking and coordinating with client and prospective client families to attempt to contact and receive news about their loved ones detained at "Alligator Alcatraz," corresponding with state and federal agents to request access to clients at the facility, corresponding and working with partner organizations and attorneys to secure access to the facility for client visits, informing state and federal congressional representatives about the issues of access to legal visits, or waiting for hours in person at the facility, only to be refused an in-person visit. The time I and other SOS staff have spent to date in trying to establish contact with immigrants incarcerated in this facility has resulted in our organization not being able to help other clients.

8. For example, SOS represents Michael Borrego Fernandez ("Mr. Borrego") in his immigration proceedings. Mr. Borrego is a Cuban national who was detained at Alligator Alcatraz from July 5, 2025 until his transfer to Krome North ICE Processing Center ("Krome") in Miami, Florida, on or about midnight on August 2, 2025.

9. Mr. Borrego has a final order of removal, and his family originally retained SOS to represent Mr. Borrego in filing a motion to reopen the case. However, after he was transferred to Alligator Alcatraz, he began to report life-threatening conditions there, including profuse bleeding and pain from Stage 4 hemorrhoids, which got much worse after his detention at Alligator Alactraz due to stress, filthy conditions, and lack of medical attention. Mr. Borrego's medical situation became so dire that twice he had to be transported to the emergency room for surgery and post-operative care. As a result, he and his family changed the terms of the legal representation to help facilitate his removal as soon as possible.

10. After Mr. Borrego was moved to "Alligator Alcatraz" on July 5, I attempted to locate him on ICE's online detainee locator at https://locator.ice.gov/odls/#/search. Mr. Borrego appeared on the ICE Locator as "Call Field Office," which was a live link. When I clicked the link, it directed me to a page showing that my client was detained at an unnamed facility with the address of 54575 Tamiami Trail East, Ochopee, Florida, 34141, which is the address for the Collier Dade Transition and Training Detention Center, or "Alligator Alcatraz," and it listed the phone number of Krome North Processing Center, an ICE detention center in Miami. When I attempted to call this listed number multiple times throughout the day, there was no answer. I had multiple clients who were listed in the same manner and when I called Krome to inquire about further contact information and to confirm my clients' locations, there was no answer. This happened multiple times, for multiple clients and prospective clients.

11. Soon after, SOS was contacted by numerous other families of detainees asking our organization to represent their loved ones inside the detention facility in their immigration or civil rights cases. But when we looked them up on ICE's online detainee locator, they were either not listed at all or the location listed was as described above in Paragraph 10.

12. For weeks, there was publicly available phone number or published process to request confidential calls or legal visits with clients at the "Alligator Alcatraz" facility. Instead emails and phone calls went unanswered. Finally, the facility provided an email address to request legal calls, legal@privacy6.com. However, this account is not consistently responsive and functional. I have had many requests for client meetings go ignored, and when legal calls are scheduled, the majority of these calls do not actually occur - they are either cancelled ahead of time by the facility or the facility simply fails to present my clients for legal calls.

13. After learning of potential clients' detention at "Alligator Alcatraz," my SOS colleagues and I have tried to contact them as quickly as possible. We contacted Charles Parra, Miami ERO Field Office Director with ICE, to confirm these detainees' whereabouts and schedule legal visits. We emailed Officer Parra, copying other Miami ERO ICE officers, on July 7, 8, and 11, 2025. We received no response to any of these messages.

14. I also contacted the Florida Department of Emergency Management. Unable to find an email or phone number, on July 9, 2025, I sent a message through an online portal on the Department of Emergency Management's website stating that I would be traveling to the facility the next day to visit clients. This message was answered by Stephanie Houp, Esq., Deputy Executive Director & General Counsel Florida Division of Emergency Management, who sent me an email stating that she would forward my message to the "Facility's legal inbox" and copying two email addresses: southfacility@em.myflorida.com and legal@privacy6.com. I

4

responded to her email, copying both of these accounts, again requesting access for legal visits. I received no response.

15. On Thursday, July 10, 2025, I drove to the Collier Dade Transition and Training Detention Center (or "Alligator Alcatraz"), at 54575 Tamiami Trail East, Ochopee, Florida, 34141, to attempt to meet with Mr. Borrego and other people at the facility for legal visits. Upon arrival at about 9:45 am, I was stopped at a checkpoint at the turn-off to the facility by law enforcement, including Florida police, Florida National Guard, Florida Highway Patrol, and Florida Department of Law Enforcement. I asked to speak with five people – my client Mr. Borrego, three prospective clients, and another person who reportedly is a minor that was being held at the facility. I was ultimately denied access to all legal visits.

16. Upon arrival that morning, I was told I would have to wait in my car at the checkpoint and that someone employed by one of the facility's contractors, CRS, would come speak with me. I waited for about two and half hours at the checkpoint. This is unheard of in ICE detention. Every ICE detention center I have ever visited allows legal visits throughout business days and typically even on weekends. These meetings do not have to be scheduled in advance and attorneys and paralegals, as a matter of course, can travel to an ICE facility and request a legal visit with their client that same day.

17. At about 12:30 pm, a staff member with a CRS badge, Carlos Flores, came to the checkpoint to speak with me. Mr. Flores asked me to fill out attorney client visitation forms, which I did for all five people.

18. At that point, Mr. Flores instructed me to leave the checkpoint area and said that someone would call me to schedule either a legal call or visit within the next 48 hours.

5

19. I asked Mr. Flores how long it would take to actually meet with my clients, and he provided no response.

20. I asked Mr. Flores to confirm the process for scheduling legal calls and visits at the facility, and he informed me that "this is the process." I confirmed, asking him if the process to obtain a legal call and meeting with clients required attorneys to drive to the site, wait for hours at the checkpoint, only to turn in a form and hope that a call or visit gets scheduled in the future. He confirmed that this was indeed the process, and that there was no other means of speaking with or meeting with clients at the facility.

21. I asked Mr. Flores to provide a phone number and email address so that I could follow up and ensure that I could schedule legal visits. Mr. Flores told me no such email or phone number existed.

22. Throughout the long wait outside the facility, I spoke with various Florida state police officers who were staffing the entry gate. These officers were from various arms of Florida state law enforcement and from different areas of the state. I asked the officers if they were operating under 287(g) agreements and one officer stated that "they had started the training, but we never finished." I asked again whether they were operating under any valid 287(g) agreement and the officer stated they were not. I finally left the facility after being denied access to my clients on the afternoon of July 10, 2025. That evening, I emailed the legal@privacy6.com account at 8:10 pm, informing this account that I had been denied access to clients, and provided a full list and identifying information for the five people I needed to visit. I included in the message an alert to the authorities that one of the people I was trying to meet with was a 15-year-old minor. I never received a response to this email.

6

23. Later in the day on July 10, at 9:54 pm, I received an email from the address of admin@southerndetention.com that appeared to be responding to my previous emails to the Florida Department of Emergency Management, that I had sent on July 9, 2025. The email sent the same attorney client visit form that I had completed when I was at the facility the morning of July 10 and asked me to submit requests for legal visits. I responded, confirming that I was on site earlier that day, had been denied access to counsel, and had already submitted five of the legal visitation forms and requested prompt scheduling of my legal visits.

24. On the afternoon of Friday, July 11, 2025, I received an email from the admin@southerndetention.com address, which stated that I had been "verified" for a one-hour virtual attorney visit on Saturday, July 12, 2025, between the hours of 9:30-5:30. No specific time or mechanism for the virtual visit was given, nor did the email identify which of the five clients that I had requested to speak to would be on the virtual visit. I replied, asking for clarifications about these issues. I then received an email on July 12 at 11:06 am, informing me that the facility was now facing "unforeseen technical difficulties currently affecting our systems," and that the sender anticipated notifying me of a time for a visit in four days.

25. On July 11, 2025, I also checked the Florida Department of Corrections inmate locator website at https://pubapps.fdc.myflorida.com/OffenderSearch/search.aspx, to see if I could find any additional information as to how to contact Mr. Borrego. The website stated "No offender records were found that matched your search criteria."

26. Neither the "Collier Dade Transition and Training Detention Center," nor a facility called "Alligator Alcatraz" appear on the list of Florida state correctional institutions at https://www.fdc.myflorida.com/institutions/institutions-list.

7

27. The promised July 12, 2025, virtual visit did not occur with any of the five people for whom I had requested an attorney visit on July 10.

28. On July 15, 2025, I emailed the admin@southerndetention.com account to confirm Mr. Borrego's whereabouts and to schedule an in-person legal visit. I also submitted my G-28.

29. On July 10, Mr. Borrego made calls to his wife on a payphone from "Alligator Alcatraz" to contact my colleagues and me. This phone line is not confidential or private and is a monitored and recorded line.

30. Michael Borrego is the only client SOS has been able to speak with from that initial list of clients and potential clients, and this consists of a single video call that was interrupted at least twice by technological failures. After the filing of *C.M. v. Noem*, in which Mr. Borrego is a plaintiff, I received emails from legal@pravacy6.com to facilitate a video call with Mr. Borrego. SOS was not able to speak to Mr. Borrego until July 23rd via Zoom. At that time, Mr. Borrego was shackled at his ankles, wrists, and waist-chained, inhibiting his ability to fully participate in this legal visit. The call was interrupted at least twice by technical failures. Additionally, it was visible in the video call that Mr. Borrego was not in a private, enclosed room, but a cage with TNT staff walking by throughout the approximate 50 minute call. Mr. Borrego stated during the call that he felt unsafe and facility guards were intermittently listening to the conversation. He also reported inhumane conditions at the facility such as lack of medical care and access to working toilets and showers. He expressed fear about speaking about these issues with legal counsel for fear of reprisal. He described a pattern of retaliating against detained individuals at the facility for seeking and obtaining legal counsel.

31. I am worried that my clients are being held in dangerous, inhumane conditions at the "Alligator Alcatraz" facility. During several phone calls with his family since he arrived at the facility on July 5, 2025, Mr. Borrego has described harsh and inhumane conditions of confinement there. He reported that detained people are only allowed one meal a day (and given only a few minutes to eat), can only shower once a week, and are otherwise kept around the clock in cages inside detention center tents. Mr. Borrego also reports that there have been physical assaults and excessive use of force by guards, and a lack of medical care and attention. The restrictions on attorney-client access to people inside the "Alligator Alcatraz" facility have greatly limited SOS's ability to adequately represent and advocate for our clients.

32. Mr. Borrego's situation was especially dire, as I learned on July 12, 2025, that on July 11, 2025, he was transported from "Alligator Alcatraz" to a local hospital due to excessive bleeding and a need for emergency surgery. He had been unable to secure necessary medical attention at the facility and only was transported off-site for emergency care when he was bleeding profusely. On July 15, 2025, I learned that Mr. Borrego had returned to "Alligator Alcatraz" and remained there until his transfer to Krome on August 2, 2025. His family reported on July 15 that the facility staff were not providing him with the postsurgical antibiotics the hospital had prescribed, and that due to the heat and humidity, he had pus coming out of his operation site, and he was in a great deal of pain. I believe that Mr. Borrego was in grave danger at this facility.

33. Although there is allegedly more attorney access at Alligator Alcatraz since *C.M. v. Noem* was filed, my clients and I are still facing significant and unreasonable restrictions on attorney-client communication. SOS and our clients are unaware of any formal process to submit a complaint or grievance to the facility and have seen no such process posted to any website or

9

communicated to those held at the facility or their attorneys. Typically, ICE facilities have clearly posted and established complaint procedures, as is required by the National Detention Standards.

34. It remains unclear who has custody of SOS clients, and it is impossible to find individuals at the facility on the ICE Locator, https://locator.ice.gov/odls/, or the Florida Department of Corrections "Inmate Population Information Search" at https://pubapps.fdc.myflorida.com/OffenderSearch/Search.aspx?TypeSearch=AI. Not only can I not find my clients, I am completely unable to identify typical immigration points of contact such as detention officers. In other ICE facilities, I am usually able to contact the facility and the officers in charge of my clients' cases. Not so at Alligator Alcatraz. I do not have a single contact at the facility to contact about issues regarding my clients and in fact, I am unsure who or what entity I should contact and who is actually in charge of and responsible for my clients detained at Alligator Alcatraz. There is also no mechanism to file court papers for people at Alligator Alcatraz. Individuals in removal proceedings in ICE custody are typically included in an online filing system called ECAS. This is where attorneys file all documents relevant to a client's case. Yet individuals at Alligator Alcatraz are excluded from ECAS, despite many of them being in removal proceedings. For example, I cannot even file a notice of representation to alert the court that my clients have counsel, much less file applications for relief. This is a major impediment to my representation and makes fulsome immigration representation impossible. .

35. SOS attorneys and legal staff continue to be blocked from in-person visits. On July 16, 2025, a SOS paralegal attempted to visit the facility to collect signatures on time sensitive documents. She was turned away and told that the facility had no legal mail set up so that she could confidentially deliver the documents. The only option she was given was to leave

the documents with TNT staff, giving up all confidentiality, and return at an unknown date and time to retrieve them.

36. On July 30, 2025, SOS attorney Mich Gonzalez visited the facility to meet with one SOS client (Mr. Borrego) and two prospective clients and was again denied access. At the front gate of the facility, Mr. Gonzalez was stopped by two armed members of the Florida National Guard and asked to pull over. At that point Attorney Gonzalez informed the officers he was there for legal visits, but the officers appeared confused at his presence and stated they would contact "dispatch." The officer with dispatch explained that she was "not deputized" and therefore "did not know the law," but that Attorney Gonzalez would have to seek approval from the legal@privacy6.com email to be allowed access. These statements were similar to those made to me on July 10, 2025, again confirming the lack of 287(g) agreements in place for the operation of Alligator Alcatraz. Attorney Gonzalez asked the dispatch officer who in fact was responsible for responding to that email address, and she replied that she did not know. Attorney Gonzalez expressed that he had the right to visit with his client the same day and that people inside the facility were being denied their right to access counsel. At that point one of the officers stated that the only attorney visit he had seen was one approved happened the day prior (July 29, 2025) where an attorney visited with nearly thirty clients. He stated therefore Attorney Gonzalez just needed to get the required approval for in-person visitation. Upon information and belief, the July 29, 2025, visit was in fact by an official from the Mexican consulate slated to meet with 29 detainees, and not attorney-client visitations.

37. On July 31, 2025, Attorney Gonzalez and I received correspondence from the legal@privacy6.com email stating that Mr. Gonzalez could not be accommodated to visit with clients in-person at the facility, including Mr. Borrego, until August 4, 2025, because other

11

attorneys had visits slated for all times available in the dates prior to Monday the 4th of August. On the evening of August 1, 2025, Attorney Gonzalez received a message from Mr. Borrego's family member stating that he had been transferred out of the Alligator Alcatraz facility. After being processed at the Krome facility around midnight on August 2, 2025, Mr. Borrego finally appeared on the ICE detainee locator website. Attorney Gonzalez then immediately visited Mr. Borrego at Krome in-person on the morning of August 2, 2025, without providing any prior written notice to ICE or Krome security. This was the first time SOS was able to meet with Mr. Borrego in person since his initial detention at Alligator Alcatraz on July 5, 2025.

38. Scheduling legal video calls continues to be incredibly difficult and untimely. The facility is unable to schedule legal calls within any reasonable period of time, often taking over a week to schedule a legal video call. The facility also repeatedly fails to facilitate legal video calls, either not showing up for the call at all or dropping the call due to technical difficulties. I have never seen problems this bad in normal ICE detention facilities.

39. The only way that my clients have been able to call me is on a monitored, recorded outgoing phone line from Alligator Alcatraz. These calls are limited to 15-20 minutes and every 2-3 minutes a recorded voice interrupts the call with a notice that the call is being recorded and monitored. I have never experienced this at other immigration detention facilities. I feel speaking with my clients on this line violates my ethical obligations to maintain attorney client confidentiality and makes it impossible for my clients to have a private legal call. My clients have told me that access to this phone line has been severely restricted lately, and that the phone is only available to all individuals detained at the facility for only 3 hours per day.

40. The facility's refusal to allow in-person visits and the extreme delay and problems with legal video calls have harmed my clients. For example, Mr. Borrego suffered two medical

emergencies at the facility and reported that he was suffering life threatening medical neglect. Because of the impediments at Alligator Alcatraz SOS was unable to verify his health and safety, secure critical medical and detention records, or speak with anyone responsible for his custody regarding his acute medical condition and need for medical care and accommodation. I have had other clients suffer similarly. One client was beaten by guards at the facility and then denied medical care, causing lasting pain and trauma. Another client was unable to secure critical medication for days at time.

41. It also remains impossible to exchange legal documents confidentially with my clients at the facility. This too is unheard of in normal immigration detention. As set forth above, SOS staff were informed that there was no mechanism to send or receive legal mail from the facility and that the only way to deliver legal documents was to drop them off at the facility, without any assurance or mechanism to ensure confidentiality, to be picked up at an unknown date and time. Further, the facility often refuses to schedule legal calls unless attorneys can submit a G-28 form executed by client. The execution of this form is made impossible by the facility, thus inhibiting all legal contact with clients and prospective clients. The lack of legal mail and complete inability to exchange confidential legal documents has delayed my ability to review documents and to obtain signatures.

42. Although the facility has never allowed SOS staff access, staff at "Alligator Alcatraz" now allege that attorneys can schedule in-person meetings with detained individuals. Although SOS staff have yet to successfully schedule such visits, the requirement to pre-schedule legal visits is unlike any other detention facility. For example, for every other immigration detention center in Florida, I am able to travel to such facilities for legal visits every day of the week without and prescheduling requirements.

13

43. SOS clients who are detained at Alligator Alcatraz are prevented from having access to the Immigration Courts. For example, prior to being transferred to the facility, another SOS client was in removal proceedings before the non-detained Miami Immigration Court and his proceedings were fully accessible to counsel via the ECAS online filing system. However, once he was detained at the facility, his proceedings were no longer accessible via ECAS. Even after his subsequent transfer to Krome, SOS was unable to file any motions in his case via the ECAS portal.

44. SOS had a similar problem with client, E.R., a recently retained SOS client who has been detained at Alligator Alcatraz for over two weeks. E.R. is a DACA recipient who has never been placed into removal proceedings. E.R. was served with a Notice to Appear while in ICE custody in Orlando. However, upon arriving at Alligator Alcatraz, these documents were taken from him and no one at the facility explained to him what would happen in his case. SOS had a video legal call with E.R. on August 7, 2025 during which he stated that days prior, upon seeing the rare sight of an ICE officer walking through the facility, he asked what happened to the Notice to Appear he had been given with a hearing date to which the officer replied that this paperwork meant nothing now and he would simply have to wait. When SOS staff search for E.R. in the EOIR case status website, there are no results. Had E.R. been held at a regular immigrant detention center, his NTA would likely have been filed and SOS would have the ability to file a notice of appearance and other critical pleadings in his case. In short, we are being prevented from providing E.R. the legal representation he has retained SOS to provide. Every single client SOS has represented at Alligator Alcatraz has had the same issue. We are not able to access our clients' immigration records, review Notices to Appear, file documents, or do anything to further our clients' cases or represent them in their immigration proceedings. This is

exceptionally rare in the immigration system. I have never been denied the ability to represent my clients - both by blocking attorney-client communications and prohibiting case filings and access. These impediments continue and are inflicting serious harm on the individuals detained at this facility.

Executed on September 29, 2025 at Chattanooga, Tennessee.

*/s/ Katherine H. Blankenship*
Katherine H. Blankenship