UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
No. 25-cv-22896-KMW

FRIENDS OF THE EVERGLADES, INC., et al.,

    Plaintiffs,

v.

KRISTI NOEM, et al.,

    Defendants.

### DECLARATION OF DAVID M. KERNER

I, David M. Kerner, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct based upon my personal knowledge and review of the relevant records:

1. I am the Executive Director of the Florida Department of Highway Safety and Motor Vehicles ("DHSMV"). I am over 18 years of age and, if called, I could and would testify to the information provided herein.

2. In my role as Executive Director, I am responsible for the day-to-day operation, direction, and management of the DHSMV and all its component divisions and offices, including the Florida Highway Patrol ("FHP"). I am also directly responsible for the creation and operation of the FHP immigration enforcement 287(g) program, which is currently the first, largest, and most productive state or local law-enforcement agency under 287(g).

3. Before becoming Executive Director, I served as the County Mayor and a County Commissioner for Palm Beach County, as a member of the Florida House of Representatives, and as a law-enforcement officer. I currently serve as a sworn law-enforcement officer as Executive

1

Director, having completed the State of Florida Police Academy in 2004; an Immigration and Customs Enforcement ("ICE") Delegated Immigration Officer under 287(g); and have served as a former special prosecutor.

4. In my role as Executive Director of DHSMV, I have gained unique insight into the state of our country's illegal immigration crisis. My agency has executed a 287(g) agreement with ICE. Under this agreement, DHSMV law-enforcement officers may be deputized to execute federal warrants and apprehend illegal aliens, investigate persons suspected of immigration violations, take and maintain custody of illegal aliens, and otherwise assist in the removal of dangerous illegal aliens from our communities. It is my understanding that FHP is a uniquely important law-enforcement partner given the size of its jurisdiction, which extends across the entire State, and the number of officers deputized under 287(g), which exceeds 1,800.

5. Given that experience, I have seen firsthand that our Nation is experiencing an illegal immigration crisis unlike anything I have seen in my time as a public official. And that crisis has inflicted real harm on the State of Florida. For example, there have been estimated to be over 1,000,000 illegal aliens in Florida alone.[1] Beyond the obvious pressures and stress on our healthcare, education, and infrastructure systems, we have encountered and apprehended several thousands of illegal aliens, many of which have committed serious crimes in Florida, including murder, manslaughter, rape, rape of minors, fleeing and eluding law enforcement, hit and run causing death, and much more. Additionally, we have encountered and apprehended illegal aliens who are wanted in their home countries for serious crimes. In the last two months, for example, FHP has encountered and arrested illegal aliens wanted for murder in Guatemala and Venezuela.

---

[1] Jeffrey Passel & Jens Manuel Krogstad, *What we know about unauthorized immigrants living in the U.S.*, Pew Research Center (July 22, 2024), https://tinyurl.com/3v8zpjr3.

2

What follows below is but a small example of the types of dangerous, criminal illegal aliens FHP alone has encountered and apprehended under 287(g):

    a. An illegal alien Romanian subject on the Federal Terrorist Watch list driving a van with a California license plate was identified through license-plate-reader technology after making multiple suspicious trips between Georgia and Florida over several days. The vehicle was observed traveling back and forth between Thomasville, Tallahassee, and Orlando, and then later determined to be heading back to Georgia in a pattern consistent with possible pre-operational terroristic activity. FHP Troopers intercepted the subject in Tallahassee by stopping him for a traffic violation. He was taken into custody and turned over to Homeland Security Investigations for further investigation.

    b. Four illegal alien Russian Nationals were stopped by FHP Troopers on Interstate 10 in Northwest Florida for a traffic violation. During the stop, Troopers discovered all four individuals were listed on the Federal Terrorist Watch List. They were taken into custody and turned over to Homeland Security Investigations for further investigation.

    c. ICE and FHP's Immigration Task Force Officer received a tip from the wife of an illegal alien from Venezuela. The wife reported that she and her children were the victims of domestic violence at the hands of her husband who also dealt in illegal drugs. ICE and FHP Troopers conducted surveillance and worked with the wife to take the husband into custody for deportation proceedings.

    d. An illegal alien subject from Chile who was a member of a Transnational Theft Group and on the Federal Terrorist Watch List was arrested by ICE and FHP under a final deportation order. He had a criminal history of human trafficking.

    e. An illegal alien from El Salvador and known MS-13 gang member—a designated international terrorist organization—was arrested by ICE and FHP Troopers under a final deportation order. He was part of a known credit card fraud ring.

    f. Two illegal alien Brazilian Nationals were found in possession of credit card skimming devices and laptop computers containing stolen Personal Identification Information of thousands of victims.

    g. Fourteen pounds of Methamphetamine were discovered on the persons of two illegal alien Mexican Nationals who were unlawfully present in the United States.

    h. Two illegal alien Cuban Nationals were found in possession of skimming devices, altered credit cards, and stolen currency.

6. It is important to note that due to the tactics and strategies of the FHP, we are encountering and apprehending very high rates of illegal aliens that have never had any interaction with the federal government, meaning they are truly undocumented—i.e., they illegally crossed the border, purposefully evaded detection, and neither intended nor attempted to obtain legal presence in the United States. These individuals are generally referred to as "got aways." It is estimated that between 40% to 50% of our apprehensions involve "got aways."

7. Another way in which the illegal immigration crisis has harmed Florida is by overcrowding its detention facilities. Overcrowding at detention facilities poses serious risks to public safety. For instance, because of FHP's 287(g) efforts alone, Florida has apprehended approximately 3,000 illegal aliens since March 2025. This massive increase in illegal alien

apprehensions has quickly exceeded the federal government's logistical capacity for transportation and detention.

8. While working within the 287(g) framework, I have also grown familiar with how that framework governs state actors. In my experience, although the federal government may identify individuals that it requests Florida to detain, ICE does not direct state officials to detain them in particular facilities. Rather, Florida decides which facilities to use pursuant to its inherent sovereign power to manage its detention. In addition, although state and local facilities can house federal immigration detainees, those facilities remain owned and operated by state and local actors. They are not federal facilities.

9. I am familiar with the detention facility at the Dade-Collier Training and Transition Airport because I have visited the site on multiple occasions and my officers have apprehended illegal aliens who are being held there.

10. Each time I visited the facility, it was operated entirely by state law-enforcement officials and the Florida Division of Emergency Management. It is as well-managed as any detention facility I have seen in my over 20 years as a certified Florida law-enforcement officer.

11. The facility is also critical to Florida's immigration enforcement efforts. A secure border and effective immigration enforcement are policy priorities of both President Trump and Governor DeSantis. It is also critical to public safety. For context, the current footprint of federal immigration enforcement personnel in Florida consists of approximately 600 officers, 400 ICE-Enforcement and Removal Operations (ERO) personnel, and 200 United States Border Patrol agents. The FHP, by contrast, has nearly 2,000 State Troopers with 287(g) authority standing alone. Multiple other state and local law-enforcement agencies in Florida have combined several hundred officers with 287(g) authority, and this will quickly increase into the thousands in the near

5

future. With just the efforts of FHP since March 2025, Florida quickly overran the federal government's ability to detain and house illegal aliens in Florida. With the combined state and local footprint of immigration enforcement officers far exceeding the federal footprint of law enforcement officers in Florida, apprehension rates will continue to increase at a fast pace.

12. That uptick in immigration enforcement directly led to the State's decision to design, construct, operate, and maintain a detention facility at the Dade-Collier Training and Transition Airport. This facility is critical to ensure that FHP can adequately house, detain, and care for illegal aliens apprehended under 287(g). And as Florida continues to increase apprehension of illegal aliens under 287(g), the necessity of the facility, and increased detention capacity in general, will continue to grow.

13. Simply put, if Florida is to have a meaningful opportunity to enforce immigration law and protect the people and interests of this State, it must be able to maintain its ability to not only apprehend but detain illegal aliens. The evisceration of Florida's additional detention capacity is tantamount to the evisceration of Florida's ability to enforce the law, as the two are inextricably intertwined.

Executed on August 11, 2025, in Miami, Florida.

                                                    /s/ David M. Kerner
                                                    David M. Kerner
                                                    Executive Director
                                                    Department of Highway Safety and Motor Vehicles