```
 1                    REAL-TIME ROUGH DRAFT

 2

 3          The stenographic notes taken in the following

 4   proceedings have been translated instantaneously into their

 5   English equivalents through a computerized process called

 6   real-time translation.

 7          The following real-time rough draft, in ASCII, PDF, or

 8   e-transcript format, is being provided to you via e-mail, on a

 9   diskette, or directly transmitted to your computer.  The

10   real-time text as seen on the computer monitor at the site of

11   these proceedings, as well as the rough-draft e-transcript or

12   ASCII version on your hard drive or transferred onto a

13   diskette, is unedited and uncertified and may contain

14   untranslated stenotype, misspelled proper names and technical

15   words, occasional reporter's notes, and/or nonsensical phonetic

16   English word combinations.  These will be corrected on the

17   final certified transcript upon its delivery to you in

18   accordance with the standard delivery terms or on an expedited

19   basis, as requested.

20          The real-time rough draft is intended only for the

21   purpose of augmenting lawyers' notes and is not intended to be

22   used or cited in any court proceeding as representing a final

23   edited and proofread transcript.  Real-time rough drafts are

24   not to be shared, given, copied, scanned, faxed, or distributed

25   in any form, written or electronic.  However, your experts,
```

1   co-counsel, and staff have limited internal use of same with

2   the understanding that all real-time rough drafts, in hard copy

3   or computerized form, will be destroyed and replaced with the

4   final certified copy upon its completion.

5        This real-time uncertified and unedited transcript

6   contains no appearance page, index, or certificate.

7

8        THE COURT:  We are here this morning in Case

9   No. 2523181.  This is the matter of C.M., et al., versus Noem,

10  et al.  I do believe that folks are listening on the audio line

11  so before we proceed I would just ask that anyone that's

12  listening in on today's proceedings is permitted by the

13  judicial conference please make sure you mute so we don't get

14  any feedback here in the courtroom.  With that let a go ahead

15  and get appearances on behalf of the plaintiffs.

16       MS. CHO:  Good morning go Your Honor.  Eunice Cho on

17  behalf of the plaintiffs.

18       THE COURT:  Good morning.  And on behalf of -- we have

19  everybody here I think let's get all our appearances.  I know

20  Ms. Cho is leading the charge but go ahead.

21       MR. VIRGIEN:  Good morning Your Honor.  Kyle whoever on

22  behalf of the plaintiffs.

23       MS. KENDRICK:  Good morning Your Honor correspondence.

24       MR. CHAVEZ:  Good morning Your Honor Paul half.

25       MS. GODSHALL:  Good morning, Your Honor Amy Godshall

1    from the ACLU for plaintiffs.

2            THE COURT:  Good morning to you-all.  And on behalf of

3    our defendants, go ahead guys.

4            MR. MEROS:  Good morning, Your Honor.  Nick Meros on

5    behalf of state defendants.

6            MR. ZACHERL:  Good morning, Your Honor also for the

7    state defendant.

8            MS. RODRIGUEZ:  Good morning, Your Honor.  Marlene

9    Rodriguez on behalf of the federal defendants.  With me at

10   counsel table is Eileen well met who will be assisting with the

11   technology.

12           THE COURT:  Very good.  All right.  So we are set today

13   to address the motion -- renewed motion for preliminary

14   injunction.  The Court intends this morning to go through a

15   couple of the key legal issues that have manifested themselves

16   over the last few weeks by way of affidavits and supplemental

17   filings.  As we discussed last Thursday, I anticipate that the

18   entire hearing will be focused on certain legal concerns,

19   certain issues on both the fifth and the First Amendment,

20   concerns regarding jurisdiction and concerns regarding venue.

21   So we're going to try to coverall of that this morning.

22   Certainly I have a plan of attack, if you will, or way in which

23   I think we can most expeditiously go through the key issues in

24   the case.  And perhaps the best way to started is with the

25   latest development.

1            So Docket Entry 83, filed on Saturday, this was

2    August 16, 2025.  The federal defendant's notice of material

3    development.  And I'm just going to read from it.  The federal

4    defendants notify the Court that the executive office for

5    immigration review, EOIR, has designated chrome north service

6    processing center as the immigration court with administrative

7    responsibility over the Alligator Alcatraz detention facility.

8    And then there is a link posted below that, and most

9    importantly all Alligator Alcatraz detainees may file bond

10   petitions with Krome.

11           Now, the federal defendants maintain that this has

12   rendered Count 5, our fifth amended count in the operation I

13   have complaint, moot.  And going back to the relief requested

14   in Count 5, I would like to address this argument first on the

15   plaintiffs' side.  Because if you look at the supplement,

16   Docket Entry 28, at par 150, are the Fifth Amendment claim is

17   premised entirely on the contention that, quote, defendants

18   have failed to identify which immigration court has

19   jurisdiction over Alligator Alcatraz.  And in facts later on,

20   paragraph 152 states that a this Fifth Amendment violation

21   could, quote, readily be cured by publicly identifying which

22   immigration court has jurisdiction over Alligator Alcatraz.  In

23   fact, I believe it's the only none declaratory relief that's

24   sought in the Fifth Amendment claim.

25           You see that later on as well in Docket Entry 67.

```
 1              So I guess my first opening question, Ms. Cho, for

 2    plaintiffs, now that as of Monday the federal defendants have

 3    identified Krome as the facility or the Court -- the

 4    immigration court with jurisdiction over those in Alligator

 5    Alcatraz, what does that do to your Fifth Amendment count?  Is

 6    it viable?  Is it moot?  What are we doing with that?

 7              MS. CHO:  Yes, Your Honor.  Would it be better for me

 8    to speak from here.

 9              THE COURT:  Whatever is easier.  If you want to go from

10    there -- because then I'm going to have you shuttling back and

11    forth.  These courtrooms are lovely.  They're cavernous.  But

12    they never thought about putting two old plain podiums in the

13    front so I can have everybody closer to me.  So to make it

14    easier, both sides remain where you're at.  As long as you

15    speak in the microphone we'll be good to go.

16              MS. CHO:  Of course, Your Honor.  The plaintiffs are

17    happy to enter into a Krome immigration courts the Court with

18    jurisdiction over Alligator Alcatraz.  The plaintiffs do not

19    believe that this claim is moot because this is an instance of

20    clear voluntary cessation.  And in cases of voluntary

21    cessation, defendants have a very high bar to show that

22    wrongful behavior will not reoccur.  And unfortunately, the

23    record in this case provides little confidence that this will

24    not change or in the last month the defendant have changed

25    their position as to which immigration court if any has
```

1  jurisdiction over people held in Alligator Alcatraz three

2  times.  We initially began the month where the defendants claim

3  that no immigration court had jurisdiction over detainees at

4  Alligator Alcatraz.  Upon filing of the motion the defendants

5  again changed their tune, stating that an immigration Court's

6  had prior hearings with the detainees could have jurisdiction

7  over detainees in Alligator Alcatraz but of course left out is

8  a swath of people who never had any hearings before any

9  immigration court.  And upon the eve of this hearing, the

10 defendants have now again changed their tune with respect to

11 the Krome immigration detention court.

12        Now, there is no guarantee of course that the

13 defendants will not again change their tune at the conclusion

14 of this hearing and for that reason we would request that the

15 Court issue a preliminary injunction to bind the defendants to

16 that position during the pendency of this litigation.

17        THE COURT:  Thank you for that, Ms. Cho.  That's very

18 helpful.  And let me ask just directly to my federal defendants

19 to see if we can get this clear on the record.  I take it that

20 there will be no change of position in this regard in that

21 Krome will be the facility with administrative responsibility

22 over Alligator Alcatraz.

23        So I want to confirm that.  Is that indeed the

24 position, Ms. Rodriguez, that we have on behalf of the federal

25 defendants.

1          MS. RODRIGUEZ:  Yes, Your Honor.  You know I can't

2     speak to let's say three years from now.  You know, if the

3     immigration court at Krome is overrun with immigration

4     petitions or God forbid something happens to the court there,

5     the executive office for immigration review has the discretion

6     and the duty to assign another court.  We can't speak about

7     speculative -- you know, we can't speak about future actions

8     that are completely speculative.  But right now, that is the

9     only relieve that was requested in the supplemental complaint.

10    Your Honor, may I -- may I use the PowerPoint?

11         THE COURT:  Sure.  If you need to, yeah.

12         MS. RODRIGUEZ:  We ask the Court to take judicial

13    notice of the posting that is on the executive office of

14    immigration review website.  If we can go to the next slide,

15    please.  And the next one.  Click again.  Which identifies

16    Alligator Alcatraz, Florida detention center, in Ochopee,

17    Florida, as falling under the designation of Krome north

18    processing detention center.  Next one, please.  Next one.

19         As Your Honor pointed out in the supplemental

20    complaint, that is the only relieve that was requested, that a

21    court be designated, and as Your Honor also pointed out -- we

22    can go to the next, please -- in the plaintiffs' reply on the

23    preliminary injunction motion, plaintiffs' procedural due

24    process claim asked the EOIR defendants to take a simple steps.

25    All that plaintiffs request is for other defendants identify

1    clearly and publicly which immigration court from which they

2    can seek release.

3        THE COURT:  Right.  And I don't mean to cut you off but

4    that's what I stated from the beginning.  We are well aware

5    that Count 5 is only requesting this relieve.  All that we care

6    about here is exactly what Ms. Cho mentioned, which is a

7    voluntary cessation doctrine concern.  Okay?  So we know that

8    ordinarily this kind of situation raises the specter that the

9    government could potentially change their position in the

10   future, and so what plaintiffs are understandably concerned

11   about is it has to be clear, absolutely clear.  And this is

12   from case law from the Eleventh Circuit, that the allegedly

13   wrongful behavior could not reasonably be expected to reoccur.

14   So I want to just confirm again with the government.  And I

15   understand that there could be unique circumstances at Krome

16   having a problem being overrun, whatever it may be.  But as we

17   sit here today, I ever want to make sure that it's the

18   government's decision to allocate these bond determinations and

19   oversight over Alligator Alcatraz by Krome and that that

20   decision is to the extent possible permanent and complete.

21   It's unambiguous.  There's a consistent commitment to it and

22   we're not going to have for example in two weeks a different

23   facility designated or perhaps worse have a situation where no

24   facility is designated, which is really how this all began in

25   the first place, that there just wasn't any immigration court

1    identified.  And we had immigration judges saying they were

2    without jurisdiction.  So can I get representation today, on

3    the record, from the federal government, that we do have an

4    allocation to Krome when it comes to Alligator Alcatraz, and we

5    don't intend on -- or the EOIR defendants don't intend on

6    reversing the determination that Krome has jurisdiction over

7    Alligator Alcatraz.

8            MS. RODRIGUEZ:  Yes, Your Honor.

9            THE COURT:  So Ms. Cho let me ask you this.  I know you

10   mentioned in the stipulation.  The Eleventh Circuit in cases

11   similar to this has relied on representations that I just

12   distracted on behalf of specifically EE that the government's

13   decision to terminate this problem of not allocating a

14   decision-making body over Alligator Alcatraz is now no more.

15   It's unambiguous that they have made a representation that this

16   is going to be the facility that has oversight for bond

17   determinations.  And so are you comfortable with that statement

18   and that confirmation on the record at this point?

19           MS. CHO:  Well, we appreciate that the government has

20   something statement on the record.  We expect be that if the

21   government deviates from that position, that it purports that

22   we would be able to reinforce that with the Court again in the

23   future.

24           THE COURT:  Yes, absolutely.  I think for purposes of

25   the Court's determination today, though, I would like to refer

1    to not only the filing on Saturday, but the direct answer to

2    the Court's question that there is, athletes in my view, no

3    concern from a voluntary cessation issue because we now have

4    representations made in writing and from today's hearing that

5    they plan on having Krome be the entity with jurisdiction and

6    they publish size that information when it comes to Alligator

7    Alcatraz.  So I think that helps us quite a bit.  I know that

8    your view would be it's not formally moot because of voluntary

9    cessation doctrine, but I would think that if we had the

10   representation we just got that might change the equation a

11   little bit for the Court.  I'll look back and confirm but I

12   think there is really no expectation that this would reoccur.

13   I can tell you that for whatever reason the website changed or

14   determination disappeared the Court would have ground to

15   reengage the parties and find out exactly what's going on when

16   it comes to the Fifth Amendment claim and the relief that

17   you've requested.  Does that make sense.

18          MS. CHO:  Thank you, Your Honor.

19          THE COURT:  Okay.  Good.  So now that we've taken care

20   of really the Fifth Amendment issue, I think we can stay on the

21   issue of mootness more generally because we -- we want to go to

22   the First Amendment I think and talk a little bit about that

23   because we're kind of already in the mindset on the First

24   Amendment front.

25          Now, I want to make sure that I'm getting this right,

1    Ms. Cho, in your view, because there have been arguments made

2    -- this is more from the state defendants as opposed to federal

3    defendants -- that all the requests for detainees to something

4    legal counsel have been granted and I believe that their

5    position is that there's not a lot of controversy, if you will,

6    between the parties.  But my understanding from will go at your

7    papers is that the First Amendment claims persist.  They have

8    not been mooted and there's a couple of reasons why.  And I

9    think I can point to a number of these from Docket Entry 67.

10   You have argued that the defendants continue to impose

11   significant barriers to attorney access.  In particular, the

12   delays that have persisted in scheduling video conferences and

13   in-person visitation, which you maintain prejudices the

14   detainees a cases.  You've also pointed out that in some

15   instances detainees haven't had the opportunity to speak with

16   their attorneys at all.  You have pointed out confidentiality

17   concerns with legal video conferences as well as outgoing phone

18   calls.  And you've pointed out concerns as to confidentiality

19   with exchanging legal documents and their ability to receive

20   legal mail and basic information has been difficult to find, if

21   you will, when it comes to attorney access protocols.

22          So am I right that the plaintiffs maintain that even

23   though we may have had some meetings, even though we may have

24   had some communication, we continue to have an ongoing First

25   Amendment violation, particularly because of delay and

1    confidentiality safeguards.  I wanted you to tell me if I'm

2    right that that's the two kind of buckets that drive First

3    Amendment claim as it stands here today.  Because as we talked

4    about last week, we've moved from the total ban to something

5    different.

6            Can you /#2U67 on that?

7            MS. CHO:  That's correct Your Honor.  And I believe

8    that your synopsis of the facts at play at Alligator Alcatraz

9    with respect to attorney access is correct.  There is I think

10   detainees -- defendants have begun a process of in-person

11   visitation, however, these visits are not timely provided.  And

12   in many cases, the delay is tantamount to denial.  With respect

13   to video conferences, these video conferences are not granted

14   in a timely fashion.  And they are not confidential, which does

15   not allow for attorney-client privilege to take place.

16           In addition, detainees are not provided with

17   confidential out going legal calls.  The only way for detainees

18   to call out of the facility is currently on the Court monitored

19   line and that does not provide the confidentiality required for

20   outgoing legal communication.  There is no means for

21   confidential document exchange at the facility.  The defendants

22   freely admit that there is no legal mail system existing at the

23   facility.  When attorneys have attempted to provide documents

24   they are required to provide them in advance for review and

25   approval by the facility.  There is no way for attorneys to

1    bring documents into the facility without having a preexisting

2    appointment, which then also requires a review of the

3    documents.  There is no provision these policies of basic

4    information of what phone number, what email to contact in

5    order to request these visits.  This is basic information that

6    underlies the ability to even access these First Amendment

7    protections in the first place.  And attorneys aren't able to

8    confirm whether or not their clients are actually at the

9    detention facility because they are not showing up in the ICE

10   detainee locator.  All of these issues still arise to the level

11   of a First Amendment violation that violate both the detainees

12   a rights to communicate with their attorneys as well as the

13   organizational plaintiffs' ability toy communicate with their

14   clients who are detained at Alligator Alcatraz.

15        THE COURT:  Thank you for that.

16        So let me ask on the state side, state defendants,

17   Mr. Meros, I don't know if we're continuing to maintain a

18   mootness argument.  Obviously I think the Fifth Amendment

19   argument is all but moot with the stipulation, if you will,

20   from the federal defendants that we know Krome is a facility

21   and the scope of relief framed by the pleadings pretty much

22   narrow the Fifth Amendment claim to that that particular

23   question.  I mean, they were just seeking to know who has

24   designation, if you will, or who has jurisdiction over

25   Alligator Alcatraz.  On the First Amendment front, I would

1    agree, the claims have changed, if you will.  They've been

2    narrowed.  But I don't know that I am moot or have a mootness

3    problem.  There's still a lot of controversy with the nature of

4    access.  Can you speak as to that?  I know you've raised kind

5    of a specter that some of the arguments or some of the relieve

6    has been mooted.

7              MR. MEROS:  Yes, sir.  So we have not made a clear

8    mootness argument.  We have made the argument that all they

9    sought in their complaint and frankly in their renewed motion

10   for preliminary injunction was simply to have access to

11   counsel.  And that has been provided and undisputed that was

12   provided even before they filed their lawsuit which plaintiffs

13   did not let onto the Court it was provided as soon as I believe

14   July 15th it actually started to be provided as soon as

15   July 10th.  Once we gained access over the legal inbox.  So it

16   has been cleared.  Legal access has been provided and legal

17   access has been growing as the facility has been standing up.

18   So we have not argued that it is -- that it's moot.

19             What we've argued is as every day goes on, there's more

20   access provided.  As this Court has recognized building an

21   entire continue trick facility out of nothing will take time

22   not something that's going to happen immediately, but every day

23   that goes by, there is more access provided.

24             So what they're requesting has been changing which you

25   know we cannot believe is proper but to the extent that they

1  are allowed to make those changing claims, their claims aren't

2  being denied or anything like being denied is simply falls.

3  There they're relying on examples that actually aren't correct

4  the two biggest examples that they cite in their reply is the

5  example of Ms. An a wiser where she claimed that she had to

6  wait more than three weeks to be able to have a meeting and did

7  not have a meeting before her client was transferred whereas in

8  fact she did not send an email contacting the facility

9  July 23rd and in that email she did not request a meeting until

10  August 4th and that email the facility offered a meeting that

11  same day, responded on the fifth offering a meeting on the

12  fifth or the 6th sand Ms. Wiser actually declined and chose the

13  August 15th date.  So any you know delay there was on behalf of

14  Ms. Wisers /AE behalf not the state.  Same with Ms. Velasquez.

15  The plaintiffs argued in their reply that she first contacted

16  the facility on July 11th and did not receive a response for

17  her client C.M. was transferred on August 1st.  The state

18  defendants have checked multiple times.  There's been no

19  communication from Ms. /SREL.  So we highlight that only to

20  point out that the plaintiffs' -- the plaintiffs' arguments are

21  based on anecdote example.  But what is undisputed is that

22  every request by plaintiffs and all detainees at the facility

23  have been granted or scheduled and that everyone that has

24  requested a meeting has received one.  There have been no

25  complaints.  State defendants have not denied a single request

1    for a meeting.

2           Now, on the additional claims they're making on

3    confidentiality, document exchange, all those things, those are

4    simply incorrect.  They clearly contradict the declarations

5    that the state defendants have provided.  There absolutely are

6    -- there actually is Chell I in both video conference and

7    in-person meetings.  I can tell you that in the declarations we

8    provided the something conferences were occurring in booths

9    with -- in private areas with booths with, you know, drapes,

10   some kind of covering.

11          Now, since then the facility has continued to build

12   more structure, and now the private rooms where the in-person

13   meetings are occurring are now the same places where the video

14   conference rooms are occurring.  So both the video conference

15   and the in-person meetings are now occurring in private rooms,

16   with doors, and there is staff that is their monitoring, but

17   staff are not inside the room they are ear outside not within

18   hearing distance.  So there absolutely is confidentiality in

19   those rooms.  There also is absolutely the ability to exchange

20   documents.  Attorneys are allowed to bring documents to the

21   facility.  That is clear.  They are ear allowed to either have

22   the detainees sign the documents and take them with them or

23   they're allowed to leave the documents with the detainees.  And

24   while they are respected when they come to the facility, they

25   are not read, they are -- they do not need to be approved on.

 1    But they are inspected as is the case at any other facility to

 2    make sure that there is not contraband that they are bringing

 3    in and they can be left with detainees.  There's also the

 4    ability and the facility has also -- when attorneys have

 5    emailed documents to the facility the facility will then

 6    provide those documents to the detainees.  So there is --

 7    although there is not a U.S. Postal Service at Alligator

 8    Alcatraz there is the ability to provide documents.  They are

 9    confidential in the extent that they are not approved they are

10    not reviewed, but they are provided to the detainees.  And

11    while it's true that the phone calls being provided are

12    recorded, there is not a requirement that every single mode of

13    communication from the defendant facility has to be

14    confidential all sorts of facilities, all sorts of prisons --

15    this isn't a prison, but all sorts of facilities where there

16    are phone calls those are recorded and monitored.  And even

17    more importantly I think -- the think the overarching issue the

18    Court need to recognize is that the plaintiffs have not cited a

19    single case where beyond legal access that there is a First

20    Amendment requirement to provide almost everything that they're

21    asking for you know legal mail, you know, the -- providing

22    instructions in multiple languages.  All these things that

23    they're asking for that they've shifted their relief in their

24    renewed motion -- excuse me not in their renewed motion, in

25    their reply there's not a single case cited for that

 1  requirement.

 2      THE COURT:  Well let me first take a step back before

 3  we get into the ongoing nature of communication.  I want to be

 4  clear.  Although I don't disagree that the way in which the

 5  communication breakdown was described in the original complaint

 6  was characterized as a total ban I want us all to be on the

 7  same page that concerns regarding legal mail, confidentiality,

 8  and the like, were expressed in the original pleadings and in

 9  the supplement under 15(d).  So when you say to me, well,

10  everything is being done that they're asking for, that sound a

11  lot like mootness.  But then you're telling me I'm not making a

12  mootness argument.  So I want to make sure I make this very

13  clear.  I don't believe you guys are saying anything is moot.

14  I do believe you are arguing that the scope of relief may have

15  changed.  Now I know that on merit you're saying we've done

16  everything in terms of confidentiality, legal mail and the like

17  so there's not really anything there from a merit-based

18  determination.  But just so I'm clear, you and I, I think, are

19  on the same page that certainly concerns regarding

20  confidentiality and legal mail were expressed in the operative

21  pleadings, right.

22      MR. MEROS:  Yes, sir.

23      THE COURT:  All right.  I just wants to make sure.  So

24  it's not necessarily that you're making a mootness argument.  I

25  hear you there loud and clear.  You're just saying that in many

1    ways the relief or the narrative that's being put forth in the

2    pleadings is rebutted by the nature of what's happenings on the

3    ground.

4        Now, I guess my concern is, to your point, just as

5    you've noted confidentiality issues that you believe are being

6    addressed at Alligator Alcatraz and concerns with

7    communications, you know, obviously I also have evidence in the

8    record that would indicate some of the delays, for example, or

9    certainly still ongoing.

10        So, for example, an a wiser, attorney for plaintiff

11    Gonzalo Almanza Valdes waited three weeks to receive a response

12    to her request to meet with Almanza Valdes.  The two had a

13    meeting schedule for August 15, 2025, but then Ms. Valdes was

14    transferred out of Alligator Alcatraz on August 11, 2025,

15    before he had a chance to spoke with his attorney.  My

16    understanding is the same issue happened with plaintiff Borrego

17    and his legal counsel which is plaintiffs' sanctuary of the

18    south they had a meeting scheduled for August 4, 2025.  Borrego

19    is ultimately transferred from Alligator Alcatraz on August 1,

20    2025, before he's ever able to meet with legal counsel.

21        So I say that because although there may be some

22    argument here on the merit regarding the nature of

23    confidentiality and legal mail, there does seem to be a live

24    case for controversy about delays or timing issues.  And

25    certainly I'm sure that there is arguments on the other side

1  that I've seen in the reply regarding where folks are

2  communicating with their lawyers within earshot, if you will,

3  of facility personnel and that there could be some concerns on

4  the confidentiality front.  But I hear what the state is

5  saying, in that there has been some mode of relieve.  Certainly

6  much more than what has been indicated in the first set of

7  pleadings when it came through the door and that some of these

8  delays are a natural by product of a facility being stood up

9  very quickly and continuously attempting to improper access.  I

10  do note that at least in some of the email traffic, there was a

11  commitment of Alligator Alcatraz to respect the right to

12  counsel, which I was happy to see.

13          Ms. Cho I, want to give you a chance --

14          MR. MEROS:  Your Honor?

15          THE COURT:  Yes, Mr. Meros.  You wanted to follow up on

16  that point.

17          MR. MEROS:  Yeah sorry.

18          THE COURT:  Yeah.

19          MR. MEROS:  The only point I wanted to make is the

20  issue with the anecdotal examples the one you raised with Ms.

21  Wiser I think our declarations directly contradict this point

22  because we mentioned that this -- this is in the motion for

23  preliminary injunction but it's clear after looking back at

24  documents the statement delay of weeks and weeks actually did

25  not occur because while she may have sent emails the emails

1    were either sent he to ICE or other emails.  They were not sent

2    to the facility.  So what actually happened is the first

3    contact with Ms. Wiser to the facility was on July 23rd.  But

4    in that email there was no actual request for a meeting.  So

5    the facility certainly cannot be faulted for not providing a

6    meeting that was not requested.  The first request for a

7    meeting to the facility was on August 346789.  The facility

8    responded the next day, which is consistent with our

9    declaration, that we've sent which is the policy of the

10   facility is to respond and to try to provide legal something

11   within a day.  On August 5th we respond and offered a meeting

12   that same day, and on August 6th.  Ms. Wiser declined and chose

13   the August 15th date.  So while the client was moved on the 11

14   that certainly can't be blamed on the facility.  Same with

15   Mr. Borrego.  That's a similar situation where the

16   representations by the plaintiffs were not correct in that the

17   seem delay of days and days or weeks and weeks was simply not

18   correct.  So while we're not arguing the mootness we are

19   certainly arguing that the relief they are seeking to the

20   extent it is required we are absolutely providing it.  And

21   cherry-picking and/or examples of one person had a meeting and

22   it looked like people were walking behind them or one person

23   had a meeting and it looked like they were chain linked.  Well,

24   there is chain link around the facility.  But now they are

25   always occurring in these rooms and also you know these and row

1  examples aren't enough certainly to overcome the plaintiffs'

2  burden to show that there is a clear denial of prisoner rights.

3         THE COURT:  So to try to state your position in an

4  alternative way, you believe that from a preliminary injunctive

5  relief standard and success of likelihood on the merits and the

6  extraordinary relief being requested that the evidence in this

7  record does not support a success of likelihood on the merits

8  as to the First Amendment claims so that any sort of relieve

9  can be afforded on the First Amendment counts because at

10  minimum there is a genuine dispute here as to whether these

11  anecdotes are accurate and whether or not there have been these

12  purport on had breakdowns in confidentiality, legal mail, and

13  the like.  Your point is, you have supplemented the record with

14  enough to rebut or at least call into question the denials of

15  First Amendment protections so that preliminary injunctive

16  relief at this stage would not be warranted.  Is that fair to

17  say.

18         MR. MEROS:  Yes, sir.  And I'll add real briefly I know

19  I've taken a lot of your time.  But we're happy to add

20  supplemental declarations to show the progress of the facility

21  since we last provided our declaration you know and we would

22  certainly have other arguments on the First Amendment and the

23  P.R. but yes, sir that accurately captures --

24         THE COURT:  And by the way obviously I'm doing this

25  because it's very important for the Court to first determine

1    really where we're at in the sense that there have been a lot

2    of changes on the ground.  I know there are other arguments

3    with venue, which will be with what we finish up with today but

4    it's important I get a sense as I did with the Fifth Amendment

5    claim as to what's still viable on the First Amendment claim.

6    So Ms. Cho let me ask you on this point I think we have pinned

7    down a position that they are not arguing, the statement

8    defendants are not arguing mootness.  This is still a live case

9    for controversy under Article 3.  It's not a concern on that

10   front as it was on the Fifth Amendment given that the relief

11   requested has been satisfied by filing and by representation

12   here in court.

13          But as I stated just a moment ago, there is a back and

14   forth, if you will, regarding confidentiality, regarding the

15   scope of access, and I want to hear where you're at on this

16   because obviously the state defendants believe that there

17   wouldn't be enough hereto justify the entry of preliminary

18   injunctive relief assuming the Court can reach that question

19   after handling venue.  What's your sense oh that?

20          MS. CHO:  Your Honor, as you have stated, we believe

21   that there is a very clear case in controversy at issue here

22   and that there continues to be a case in controversy despite

23   the defendant's representations of improvements to attorney

24   access at the facility.

25          On the issue of confidentiality at and video conference

 1    owes, for example, we ask that the Court credit the

 2    declarations and the statements of detainees themselves and the

 3    attorneys who have spoken directly about detainees themselves

 4    in the setting that is provided by the defendants.  The video

 5    conferences take place in a cage that is constructed out of

 6    chain-link fence.  The defendants themselves have referred to

 7    drapery.  None of that is conducive to a confidential setting

 8    for communication.

 9        The attorney declarants have seen other people walk in

10    and out of their frame during these conversations with counsel.

11    That is clearly not a confidential setting.  And they have

12    asked detainees directly themselves if they feel these calls

13    are confidential and if they feel at lint to share information

14    with the attorney.  And the detainees themselves have said no.

15    All of this indicates that the video conferences are taking

16    place in a setting that is not confidential, that does not

17    allow for attorney-client privilege to take place.

18        THE COURT:  Go ahead, Ms. Cho.  Go ahead.

19        MS. CHO:  With respect to the delays with respect to

20    the scheduling of in person and video conference calls, the

21    defendants take issue with Ms. Wisers /AE declaration, for

22    example, saying that the emails that she's something have sent

23    or received by the defendants.  However I think what this

24    perhaps points to is a larger problem with one the lack of

25    clear public information as to what the appropriate email

1    address should be that attorneys are supposed to email to

2    request video conferences and that is something that the

3    detainees have said that they aren't doing because they claim

4    that there is no First Amendment right on that.  It is very

5    clear that this basic information would -- there's no rational

6    reason for not publicize go this information as every other

7    correctional facility in the country does this on a routine

8    basis.  In addition it would certainly help to clear up any

9    confusion.  The other point is that it seems that the detainees

10   -- the defendants are trying to pinpoint -- they're trying to

11   place fault on the attorneys for their failure to be actually

12   able to track and receive and respond to accurately these

13   emails from attorneys.  It does not inspire confidence that

14   when you have sworn declarations from attorneys that state they

15   have repeatedly emailed the facility requesting visits and the

16   facility has no record of that, that does raise some question

17   as to whether or not the defendants have done a good enough job

18   to accurately share what information should be -- where these

19   requests should be made and whether or not they're actually

20   tracking these requests in an ordinarily, organized manner.  So

21   forward that reason, I would also point to -- there are many

22   other examples in the record, beyond Ms. Wiser, beyond Ms.

23   Blankenship, that show that this delay is a persistent problem

24   and that detainees are being prejudiced as a result of the

25   delays that are now of course tantamount to denial.

1           THE COURT:  Let me did you a legal question, actually.

2    Mr. Meros touched on it briefly.  One of the concerns for the

3    Court in looking at the papers is making a differentiation, if

4    you will, on the First Amendment legal standard when it

5    pertains to detained plaintiffs as opposed to attorney

6    plaintiffs.  On the one hand you have cases like *Turner* and

7    *Pesci*, which touch more on the penological interests.  And for

8    the attorneys we have cases like button and prime as and cases

9    of that nature, Haitian refugee case and those cases talk about

10   the First Amendment right of informing individuals of their

11   legal rights when counsel does so as an exercise of political

12   speech unaccompanied by expectation of remuneration.  I guess

13   my question to you on this point is, the reply really focuses

14   on the detainee cases.  We don't really have a lot billed out

15   on the attorney cases.  And to the extent the court weighs on

16   the merit determination on success of likelihood on the merits,

17   you heard just a moment ago your friend on the other side to

18   suggest there's in really isn't any case law you can point to

19   to First Amendment relief.  Can you speak will a little on that

20   differentiation.  Categorical restrictions or total bans, I

21   think, were easier.  We're not there anymore.  Now we have an

22   evolution of the restrictions in your view continue.  But I'm

23   trying to get a sense of your First Amendment theory, which

24   looks like it's now based purely on timeliness and

25   confidentiality.  Can you kind of maybe point to me where would

1    the claw in support of that First Amendment theory come from?

2    And it could be for both, right?  It could be different for

3    detained versus attorney plaintiffs.

4         MS. CHO:  Sure.  Well, I believe Your Honor's right

5    that the First Amendment claims for the organizational

6    plaintiffs and for the detained plaintiffs come from different

7    doctrinal standpoints for sure.  As you mentioned the

8    organizational plaintiffs based their First Amendment rights on

9    the primus and button line of cases, which provide that

10   organizational plaintiffs such as the ones that are present in

11   this case have the First Amendment right to communicate and

12   solicit clients in exercise of their free speech.  The Haitian

13   refugee and Cuban American cases are of course inapplicable

14   here because in those cases the Court was examining the rights

15   of the migrants who had not yet entered the United States, and

16   there was a determination by those courts that those migrants,

17   because they were not yet in the United States, had no rights

18   by which the organizational plaintiffs could exercise their

19   free speech in that in was no right to enforce and thus there

20   was no basis for the First Amendment right to be expressed.

21   Here we have a completely different case.  We have immigrants

22   who are being held at a domestic facility who clearly have a

23   variety of constitutional protections that are applicable to

24   them.  In fact, the Fifth Amendment right that we just spoke

25   about earlier today.  And those organizational plaintiffs have

1    a First Amendment right to be able to communicate with those

2    clients in order to exercise their free speech to advocate on

3    behalf of those whose constitutional rights have been violated.

4    For that reason, we would say that the organizational

5    plaintiffs maintain their First Amendment right to

6    communication here.

7         With respect to the -- with respect to the detained

8    plaintiffs, of course, that is based on the Al mean case expand

9    healthy line of case law that states that people who are in

10   detention have the right to communicate with counsel, and that

11   is really help protected under First Amendment.  Of course,

12   there are some disagreements between the parties as to whether

13   or not the *Turner* and the *Pesci* case apply, given that these

14   are people who aren't limb.  Civil detain not charged with any

15   crime not serving a sentence for any crime they are there in

16   order to have -- in order for the government to hold them while

17   their immigration cases are being adjudicated.  Therefore, it's

18   very different standard from which the Court should be judging

19   the First Amendment restriction.  One might even say a more

20   relaxed standard than one would in a prison or jail context.

21        When you look at whether or not the restrictions that

22   the detention facility has imposed on both the by directional

23   communication between attorneys and clients and detained

24   clients, that would -- under that, the same violations would

25   occur because it is both the restriction on the speech and the

 1   ability for detainees to be able to speak with their attorneys

 2   in a confidential manner as well as for attorneys to be able to

 3   speak to clients in a confidential manner.  And that is where

 4   the Fifth Amendment -- First Amendment violation is taking

 5   place.  It is one, restriction to access in the first place,

 6   because the detainees and attorneys cannot actually meet with

 7   one another due to the delays and denials in access and they're

 8   not able to do so in a confidential manner which is of course a

 9   bedrock principal of attorney-client communicate.  They're not

10   able to exchange documents.  Attorneys cannot get basic

11   signatures on documents that are required to be filed with any

12   court for example.  These are clear violations of that First

13   Amendment right to speech on behalf of both on the detained

14   clients and the attorneys themselves.

15          THE COURT:  And let me ask you this:  I mean again

16   we're traveling under a preliminary injunction relief standard.

17   We're here on a motion for preliminary injunctive relief.  We

18   know it's extraordinary.  We know our elements we need.  We

19   need to see success of likelihood -- likelihood of success on

20   the merits.  And one of the issues we talked about in the

21   briefing that's just mentioned it deals with the related but

22   not set for argument today, for class certification.  I say

23   that because in taking a preliminary peak at that motion it

24   seemed to have been framed over a total ban.  Meaning, it was a

25   lot easier when it comes to Rule 23 issues like commonality to

1    find that kind of unifying force or action under the First

2    Amendment that apply to all of the detainees.  Now we're being

3    told that in some cases, some detainees are having

4    communication.  Others, they are not.  In some instances

5    they've had video calls.  In other instances, they lack

6    confidentiality.  It just becomes a little bit more challenging

7    because the facts on the ground have changed.  We went through

8    something that was presumably identical to all plaintiffs to

9    something that can be a little different depending on who we're

10   talking to as we've seen just from the anecdotal evidence

11   today.  Should you this be something for the Court where do you

12   sit now on the viability of the class certification in that the

13   First Amendment restrictions that you argue are still in play

14   have differed, they're differed, they're changed.  Does that

15   change anything information you?  I would imagine the class

16   definition would have to change right.

17           MS. CHO:  No, Your Honor the class definition does not

18   change.

19           THE COURT:  Tell me why.

20           MS. CHO:  Because all the detainees are subject to the

21   First Amendment violations with respect to their ability to

22   communicate with counsel.  And commonality -- Rule 23 does not

23   require that all plaintiffs in a class have identical factual

24   patterns.  It is really the test -- the test really is to look

25   at whether or not there is a common legal question that should

1    be decided and that is of course whether or not there is a

2    First Amendment violation that is taking place at the detention

3    facility.

4            THE COURT:  That's fair.  And let me ask you this as

5    well.  This goes, I think, to some of our venue issues in just

6    a moment.  But what is the federal or DHS defendants' role on

7    the First Amendment claims?  You know that's why I really won't

8    to Mr. Meros on that, because it appears from the preliminary

9    injunction motion at Docket Entry 29.  And the reply brief at

10   67 that you don't really differentiate between the federal or

11   DHS defendants and the state defendants on the First Amendment

12   claims.

13          So I don't know if your theory is one of imputing

14   actions from the state to the feds under the 287 agreements,

15   almost like a vicarious liability theory, or is your position

16   today, no, Judge, really, it's on the ground concerns from the

17   state defendants, how they run the facility that drives the

18   First Amendment claim and not really anything from the federal

19   defendants which arguably were more the focus under EE of the

20   Fifth Amendment claim.  What do you -- do you differentiate?

21   What do you think about that.

22          MS. CHO:  Well that's a very good question, Your Honor.

23   I would actually point you to the ^ * go day a declaration.

24   This is ECF 49-2.  I would have you look at pages 25, 31, and

25   32 of that declaration.  And these are exhibits that the

1    defendants have provided with respect to the 287(g) agreements.

2    And, of course, both defendants, the federal and state

3    defendants, claim that the 287(g) agreements are what provides

4    the Florida -- what provides the Florida defendants with

5    authority to detain people at Alligator Alcatraz in the first

6    place.  And this of course is an agreement that in has entered

7    into with the United States.

8          And when you look at the 287(g) agreement that the

9    Florida defendants have signed with the United States, you'll

10   see that there are four important points to consider here.  The

11   first is that Miami field office director is identified as the

12   point of contact for the operation of the 287(g) agreement that

13   provides Florida -- the defendant's claim that provided Florida

14   the an authority to detain people at Alligator Alcatraz.  The

15   second is that both defendants -- the federal defendants and

16   the Florida defendant, as well as the 287(g) agreement states

17   and provides that the ICE Miami field office director is

18   responsible for oversight of the detention facility.  The third

19   is that the 287(g) agreement provides that detention shall be

20   operated in accordance with ICE standards.  And, of course,

21   these ICE standards include detention standards providing for

22   attorney access at the detention facility.

23         And fourth, the 287(g) agreement provides that if there

24   is another policy that is implemented at the detention

25   facility, owing, with respect to attorney access, the ice field

1    offense levels director shall be responsible for resolving any

2    conflict that arises out of the federal ICE detention centers

3    with respect to here to attorney access and whatever is being

4    implemented at the facility in tech.

5         So because of that role that the federal defendants

6    have in terms of oversight and enforcement of the ICE detention

7    standards, there is a clear role that the federal defendants

8    with respect to attorney an so is provisions at the facility.

9         THE COURT:  Okay.  And that's something that I will be

10   talking about in a moment because I think that that -- I

11   surmise that might be what we're going to hear from you in a

12   little bit, on venue, which is an overarching concern.

13        Let me jugs, if I could, move to -- assuming, again,

14   that we are in the First Amendment world still and not dealing

15   with a mootness concern, which the state defendants have agreed

16   with me on that, even though there is certainly a dispute as to

17   what's happening on the ground and whether in the view of the

18   defense team it takes the standard for preliminary injunctive

19   relief.  And we've heard a little back-and-forth on that.

20   There's kind of a question to step back on, that the federal

21   defendants -- and presumably the state defendants agree with

22   this -- have attempted to make on 1252(g).  Because certainly

23   let's assume for a moment that we are able to entertain the

24   First Amendment because beef venue.  Then the next step is,

25   well, do we have a jurisdictional bar or hurdle under the First

1   Amendment:  I, quite frankly, do not believe that '1252 place

2   any real impediment or creates any sort of barrier.  And I'll

3   tell you why.  I mean, again, the federal defendants can

4   correct me if I'm wrong, but I think we know that 1252(g) lists

5   just three discrete actions when it comes to the jurisdictional

6   concerns, actions to commence their proceedings, adjudicate

7   cases or execute removal orders.  And the Supreme Court has

8   said it pretty clearly we need to stay with the nuclear oh

9   reading it doesn't coverall claims that arise from deportation

10  proceedings.  And I know that on the federal defendant's

11  reading, 1252(g) bars detained plaintiffs' claims.  So even if

12  I could consider First Amendment, there's this separate and

13  jurisdictional bar in doing so in the view of the federal

14  defendants.

15          But I guess my concern with that is, you have to look

16  at the core of the claims.  So 1252(g) requires a specific

17  nexus between the claim and one of those covered actions,

18  right?  We can't just read arise from at swallowing all the

19  narrow categories.  The Supreme Court has set it in cases like

20  *Jennings* that 1252(g) doesn't sweep in any claim that can

21  technically arise from those listed actions.  You have to

22  connect it back to those three specific actions.  So you have

23  to look what the action being challenged is.  We can't just

24  read it in a vacuum.  And the action, as we just heard from

25  plaintiff's counsel being challenged, is not related -- quite

1    frankly, I don't think it's related remotely to any action or

2    decision by any defendant, federal or state, to commence

3    proceedings, adjudicate cases, or ^ * access removal.  To me,

4    none of those characters really come into play.

5          So I guess my question -- because this is one of the

6    jurisdictional arguments advanced by primarily the federal

7    defendants, is how would I read 1252(g) to stand in the way of

8    considering a potential First Amendment claim.  I mean, I heard

9    from Mr. Meros that it would fall based upon success of

10   likelihood on the merits not being met regarding what's

11   happening on the ground.  I heard the view in opposition of

12   Ms. Cho.  Now this is just a separate and distinct argument

13   that I can't even look at all and I don't see a connection of

14   what's being challenged and the specific categories that have

15   been enumerated on the statute.

16         Are we still maintaining 1252(g) as a bar on this First

17   Amendment claim?

18         MS. CHO:  Yes, Your Honor.

19         THE COURT:  Tell me how.

20         MS. CHO:  The reason is, if you look at the core of the

21   request, as far as First Amendment -- and we look at the case

22   law and cases from this district as well.  If I may?

23         THE COURT:  Sure.

24         MS. RODRIGUEZ:  We have to look at context of the

25   situation.  This is a new type of facility.  And we agree that

1    it's -- it's a new situation.  The facility was up for a couple

2    of weeks before the lawsuit was brought.  Courts in this

3    district have found that there's no requirement, a

4    constitutional requirement, for a perfect environment for

5    detainees to meet with their attorneys.

6           THE COURT:  Yeah, but what does that have to do with

7    your argument?  I mean I'm not talking about perfect and --

8           MS. RODRIGUEZ:  Right.

9           THE COURT:  In a stand up facility.  I'm talking but

10   you're arguing that this is one of the three discrete actions

11   jurisdictionally barred from reviewing under 1252(g) and I'm

12   saying where are we commencing a proceeding in the immigration

13   couldn't tokes, adjudicating a case or executing a removal

14   order.  The First Amendment claims don't talk about any of

15   those things.  All they talk about is access to their

16   attorneys, confidential something, legal materials.  Those

17   aren't things that arise from discrete actions in the statute,

18   right.

19          MS. RODRIGUEZ:  Well, at the core, I think that the

20   plaintiffs are challenging the decision of the Attorney General

21   of DHS to use the Alligator Alcatraz facility as a detention

22   facility.

23          THE COURT:  Okay.  So your argument is you believe that

24   the First Amendment arguments are really you know -- or the

25   claims are really positioned as First Amendment but in truth

1    are at their ground level core they are challenging removal

2    orders and the like.  That's your theory.

3            MS. RODRIGUEZ:  That's correct, Your Honor.

4            THE COURT:  All right.

5            MS. RODRIGUEZ:  And further evidence of that is, you

6    know, as the state has explained, they have been working

7    continuously, even before the lawsuit was brought, to ensure

8    that detainees had acknowledge cents to attorneys.  They've

9    ensured spaces where dealt debt can speak confidently with

10   attorneys with headphones.  The more that they try to provide

11   for these situations, it's just not enough.  Even the situation

12   with the immigration court.  We gave the plaintiffs, the

13   federal defendants gave the plaintiffs exactly what though were

14   requesting in their Lee leave but they wanted more.  Now they

15   want some type of consent decree or stipulation from the

16   defendants to say that's never going to change, we're never

17   going to move the immigration court from Alligator Alcatraz to

18   another court.  And it just seems that at the core, no matter

19   what the created, you know, approaches to the pleading are, no

20   matter how they frame their claims, it's really about the

21   decision of the Attorney General of DHS, of the executive

22   branch, to send detainees to Alligator Alcatraz.

23           THE COURT:  Okay.

24           MS. RODRIGUEZ:  And also, if you look at the filings in

25   this case, Your Honor, they're replete with it a say

1    inflammatory allegations of quotes from the president of the

2    United States that has nothing to do with the First Amendment

3    claim, quotes from the secretary of DHS that has nothing to do

4    with the First Amendment claim.  And at their core, it's really

5    an attempt to fragment, to prolong, to block the decision of

6    the executive.

7         THE COURT:  All right.  I hear you on that.  So I guess

8    Ms. Cho, I -- perhaps I get a better sense now of what the

9    argument is.  I think that no one could really argue that this

10   has anything to do with arising out of and all the different

11   languages on is the 1252(g).  I think the best argument they're

12   attempting to advance today on the federal side is this is

13   almost a trojan horse.  The first amendment argument is all

14   window dressing, that at its core, this is real a tempting to

15   challenge kind of the underlying immigration determinations or

16   detention determinations being made.  That is the argument in

17   van.  I will just say and I'll turn it back to you on that

18   front, that at least from my review of the complaint and

19   knowing what claw has made very clear, we are allowed to look

20   at and where we are stopped short because it's a decision or

21   action by the Attorney General that this particular claim,

22   under the First Amendment, the live claim that remains, doesn't

23   appear to drive from or arise out of any of the three dose

24   create actions in 1252(g).  And again, if it did -- and I think

25   if we were allow the federal government's theory, that the

1    Court can look beyond the allegations in a pleading such as

2    this, to try to divine the true intent, if you will, of a

3    lawsuit like this and have it be one focused on immigration

4    determinations, well, then that would essentially deviate from

5    the narrow the reading under 1252(g) that we've been told

6    directly we need to do, and it would impose really almost a

7    general jurisdictional limitation, right.  Anything that could

8    arguably be connected to an immigration decision in this

9    context, we know that that's not what the case law says to do.

10          What's your take on this whole -- I see where you're

11   coming from, but I don't know that in this record anything I've

12   seen connects it to the discreet actions that ^ *

13   jurisdictionally.

14          MS. RODRIGUEZ:

15          MS. CHO:  That's right, Your Honor we would agree with

16   that analysis.  As you know 1252(g) only applies to.

17   /SKWRAOUBG cases or execute removal orders) hear the plaintiffs

18   are challenging at least with respect to Count 1, with respect

19   to the First Amendment claim, regards access to counsel at he

20   detention facility.  As you noted, the Supreme Court in /AR

21   American 1252(g) is not a jurisdictional limitation that is

22   exactly what the defendants are trying to it appears imply

23   because the case arises out of detention and the Attorney

24   General's decision or ^ * AG's position to put people in a

25   detention facility.  Again, 1252(g) does not arise from

1    deportation proceedings and that is what the clearly the

2    Supreme Court today.  And of source conclusion with respect to

3    -- claims that are nearly -- claims that are being brought by

4    the plaintiffs in this case, the court again to the December a

5    nature case where, for example, the district court stated that

6    answer games are ancillary to 1252(g).  Although we're not

7    speaking of the Fifth Amendment claim the I man an and

8    something Perez case owes but also state that 1252(g) does not

9    apply to access to bond hearings in the first instance.  For

10   those reasons I think it is clear that 1252(g) is the is not a

11   jurisdictional bar to the plaintiffs' claims here.

12           THE COURT:  Yeah.  And at its core, at no point are you

13   contesting the detention of individuals at Alligator Alcatraz,

14   shutting down Alligator Alcatraz, conditions of confinement at

15   Alligator Alcatraz.  None of that is at play here.  In fact, we

16   now have a case, given the concession from the federal evidence

17   on the Fifth Amendment -- and again, I know there is a concern

18   about a stipulation -- we have good claw that a representation

19   on the record on that front will take care of voluntary

20   cessation concerns.  But we are just really left with a First

21   Amendment complaint.  That First Amendment claim has been

22   broken down and no longer a granular concern as much as it is

23   some of the new developments or prolonged delays I guess one

24   the better way to talk about it that we see still according to

25   plaintiffs combined with confidentiality and legal documents.

1   So I say that to say that the 1252(g) argument really if it's

2   applied to its logical conclusion here would just transform it

3   into a general jurisdictional limitation.  And I don't have

4   anything in this complaint, whether it be the original or the

5   supplement under 15(d), that suggests that it has to deal with

6   detention determinations, or commencement of proceedings, or

7   execution of removal, or the adjudication of cases.  I mean,

8   that's not really a function of the lawsuit.  So I don't

9   necessarily believe that a 1252(g) argument carries the day

10  here on jurisdiction.  I think where we're at now is 1252(g)

11  does not stop the Court from looking at the First Amendment.

12  The question then becomes to the extent I have venue can the

13  First Amendment arguments carry the day for a substantial

14  success of likelihood on the merits, which again that's really

15  what's been disputed on the ground.

16       Now, I've inferred or mentioned it multiple times, but

17  I think we've gone through the Fifth Amendment.  We've gone

18  through the First Amendment /PHEPL.  We've dealt with the

19  mootness on the Fifth, the merits on the First, 1252.  I've

20  heard from everyone on each one of their silos, if you will.

21  So we're going to go on and handle venue.

22       So as the Court said last week, venue continues to be a

23  very significant concern.  I understand that the plaintiffs

24  would have the Court sidestep venue and look to merit based

25  determinations right now.  I will just say as an aside, the

1    cases that have been presented to me in support of that

2    proposition I think were procedurally discontinuing in as much

3    as some of them were temporary restraining order considerations

4    and we are a not there right now.  We're with a much more

5    fulsome record.  So the Court is not really inclined to

6    sidestep venue, nor do I think it really helps anybody.

7    Because if the Court were to grant preliminary injunctive

8    relief without venue, I would fully expect an appeal and it

9    would be returned to the Court if I failed to analyze venue

10   properly.

11           So true that it's not a jurisdictional prerequisite,

12   but the Court feels very strongly -- and I think this is

13   expressed in claw consistent will you from my circuit -- that

14   it is a statutory requirement that we have to take a hard look

15   at.

16           So we've will talked a little bit about this, but I

17   think the first issue is dealing with the federal defendants.

18   So '1391 E-1 sets forth four different weighs in which we can

19   have the federal defendants brought into this suit.  And you

20   know, there's been arguments made this they've not satisfied.

21   But I think it's important that we go through them together.

22   You know you may bring this action against the federal

23   defendants in quote any judicial district in which the

24   defendant in an action resides.  That's A.  B, a substantial

25   part of the defendants or omissions giving rise to the claim

1    occurred, or a substantial part of property that is the subject

2    of the axis situated, or, C, the plaintiff resides if no real

3    property is involved in the action.

4         So we have all of these different subsections that you

5    can rely on.

6         And, you know, looking at these venue choices, you

7    know, I struggle to see why we wouldn't have venue on the

8    federal defendants under 1391 E-1, because there's different

9    ways to get there.

10        So the first argument is that no federal defendant

11   resides in this difficulties trek.  But I've looked at this

12   record, and we've included the ice ER O Miami field director,

13   Garrett Ripa, who is here in this district.  And you know as

14   far as I can tell, Ripa remains a defendant in this action.  He

15   resides in this district.  That's at the reply at 11 footnote

16   number three.  And then sites to supplement at paragraph 69.

17        And so I guess I'll go to the plaintiffs' first

18   something but I believe on the first argument would be that we

19   have a party that is here.  He resides here.  He's a federal

20   official in this difficulties trek.  Would that not be at least

21   on that first prong a basis under 1391 E-1A to have the federal

22   defendants in this district.

23        MS. CHO:  Yes, Your Honor.  We believe that is true.

24        THE COURT:  Okay.  So let me hear I begs from the

25   defense, Ms. Rodriguez, on this -- and there's multiple ways

1    the federal defendants in my view could be looped in here.  But

2    the first one is just the simple fact that the defendant Ripa

3    remains in or resides in this difficulties trek.

4           What would be the argument that that, in and of itself,

5    isn't enough.

6           MS. RODRIGUEZ:  Your Honor, looking at the complaint,

7    it's very difficult to see what the claim is against Garrett

8    Ripa.  To state a constitutional claim, a constitutional

9    violation, that's a very high bar.  The only allegation that I

10   saw, really, that deals with Ripa is an allegation that he is

11   the legal custodian of the detainees at Alligator Alcatraz.  I

12   don't see any allegations that would point to a constitutional

13   violation by Garrett Ripa.

14          THE COURT:  But you would agree with me, you haven't

15   bothered to come to this Court today with an argument as to

16   standing.  You have no motion dismissing him for standing.  You

17   have a 12(b)(3), but there's no argument that he's an

18   improperly-named defendant.  I mean, we're here with

19   well-established record.  If you felt that way, I would have

20   expected similar to what the county did, and we would have a

21   motion to dismiss for lack of standing.  So just to be clear,

22   we sit here today with him as a viable defendant.  He's named.

23   I don't think there's anything here saying that he should be

24   dismissed in front of the Court, right?

25          MS. RODRIGUEZ:  Well, Your Honor, at this stage -- this

1  is not a stage where there's obligation for defendants to move

2  to dismiss.  We were asked to brief whether there was

3  substantial likelihood of success on the merits.

4      THE COURT:  But wouldn't that necessarily entail that

5  you would not have success of likelihood on the merits if you

6  have a party that had no standing to be named?  That's not even

7  addressed in your papers, right?

8      MS. RODRIGUEZ:  It's not, Your Honor.  It's not.

9      THE COURT:  All right.  It's okay.  I just wanted to

10  make sure.  I just wanted to make it clear because I've been

11  watching the filings.  I never saw a standing argument.

12      Now, I'll tell you this:  Even if for whatever reason

13  the Court were to accept some sort of standing argument, how do

14  I then even get past the next prong?  Because 1391(e)(1)(B), no

15  one's doubting that most of the alleged incidents arise out of

16  incidents at Alligator Alcatraz.  No one is debating that

17  Alligator Alcatraz is in the middle district of Florid.  But

18  plaintiffs have also noted in their affidavits and it seems

19  clear that the ice ERO Miami field office oversees detention

20  facility operations, and it's responsible for ensuring ICE

21  detention standard including attorney-client access.  That's at

22  page 12 of the reply.

23      So having taking these allegations as true -- that's

24  the venue standard until it would be rebutted -- I guess my

25  question would be, how would I not find that the purported

1    failure of federal defendants in Miami to ensure state

2    defendants' compliance with attorney-client standard could be

3    for venue purposes.  Let's be clear:  A close nexus between the

4    federal defendants' actions and the failure to ensure

5    confidential attorney-client communications at Alligator

6    Alcatraz.  What do I do about Subsection (b)?  Even if for some

7    reason I would accept there's a standing problem with Ripa, it

8    looks like (b) provides an alternative way in for federal

9    defendants to have venue.

10           What do I do with that?

11           MS. RODRIGUEZ:  To begin with, Your Honor, as far as

12    the constitutional violation, it's very difficult to see what

13    the allegations is against Garrett Ripa.  With the 287(b),

14    issue there's been in APA claim that's been raised.  There's

15    been no contractual claim that's been raised.  And if they were

16    raised, it's been no APA claim.  The proper defendants there

17    would be in Washington, D.C.  All of the 287(g) agreements were

18    signed by officials in Washington, D.C.  Garrett Ripa is not a

19    signatory to any of those 287(g) agreements.

20           THE COURT:  Okay.  So let me -- your argument, then, is

21    the 287 agreements -- I'm looking at them.  My understanding is

22    that the 287 agreements between state and federal officials

23    show that quote the Miami field office director is responsible

24    for providing information to state personnel Alligator Alcatraz

25    under the agreements and for reviewing complaints regarding law

1    enforcement activities authorized by the agreements at

2    Alligator Alcatraz.  And I'm reading from the replies a

3    position, having looked at the declaration of Juan Lopez Vega

4    at ECF 50-one, paragraph 5.  So you're going to tell me with

5    that in the record that, still does not connect decision-making

6    sufficient to establish vine for the federal defendants coming

7    out of this district.

8             MS. RODRIGUEZ:  That's our position, Your Honor.

9             THE COURT:  I got you.  All right.  That's okay.

10            MR. MEROS:  As well -- as far as any supervisor

11   advisory authority, the ICE detention standards are standards.

12   They do not provide and they could not create constitutional

13   rights.  They do not create Constitutional obligations.

14            THE COURT:  I would agree with you there.  As I stated

15   last week, this isn't a 287 breach or an APA procedural type

16   claim.  This is constitutional in dimension, and we don't

17   establish constitutional safeguards by way of the 287 language.

18            MS. RODRIGUEZ:  Correct.

19            THE COURT:  So I'm not disagreeing with you that that's

20   not what the case is about.

21            MS. RODRIGUEZ:  ^ * ^ *  activity ICE something

22   standard is occurring in the Middle District of Florida.

23   That's where the facility is.  Alligator Alcatraz detainees are

24   in Collier County.  They're not in Miami-Dade county.  So the

25   activities that are being supervised pursuant to the 287(g),

1  which is even /TPOEPBLG activities, that supervision is

2  happening in the Middle District of Florida.

3        THE COURT:  Well, I'm going to get to that in a minute

4  because I'm not disputing.  I'm going to hear from Mr. Meros on

5  that and that goes back to the state defendants because without

6  venue over both and obviously the state and federal defendants

7  have been lumped in every count together other than Count 5

8  which is no longer a live count.  So we'll get to this problem.

9  My concern is that from the federal defendant's perspective, I

10  now have argument Ripa is a resident Southern District of

11  Florida, and that he is a proper official named in this action,

12  and there's no suggestion he's an improper party.  So I would

13  have 1391(a)(1)(A).  If I don't have that, then I have

14  1391(b)(1)(B) because there is an allegation -- a prima facie

15  showing, if you will -- that the ICE Miami field office through

16  Ripa oversees detention facility operations and compliance.

17  Again, this is only for venue purposes.  I would have the

18  federal defendants venued here properly under that.

19        But let me give you another one.  Because any of the

20  four work.  1391(e)(1)(C) only required plaintiffs to live in

21  this district.  And I know you've attempted to argue 245 well

22  Your Honor in dealings with real property in that it deals with

23  Alligator Alcatraz.  My own problem with that is that operates

24  with such a high legal of generality.  I mean, if it was just

25  simply any properties involved, it would almost subsume the

1    location of plaintiffs.  I mean, the mere fact that this action

2    provisionally involves the property of Alligator Alcatraz,

3    because it concerns First Amendment violations at Alligator

4    Alcatraz doesn't connect because you wouldn't have a venue for

5    federal defendants under 1391(e)(1)(C).  So I want to be clear

6    and it's three and not four because you have A B and C, that

7    under C there is no dispute.  I think that the plaintiffs do

8    live in this district.

9           Is the federal defendant's argument simply that C is

10   not a mechanism for venue for the federal defendants because of

11   the property?  And again, I'm reading from it where it saying

12   or, C, the plaintiff resides if no real property is involved in

13   the action.  You would say, it intentionally involves Alligator

14   Alcatraz.  As such, C is not another basis to bring the federal

15   defendants into the southern district; is that right.

16           MS. RODRIGUEZ:  Yes, Your Honor.  And it not only

17   involves the location of the property.

18           THE WITNESS:  But it also who is exercising control at

19   the property.

20           THE COURT:  Okay.

21           MS. RODRIGUEZ:  It is involved in who is exercising

22   activities at the property.  So it's not just that the facility

23   itself is located in the middle difficulties trek of Florida.

24   It has to do with control over the property.

25           THE COURT:  Let me ask Ms. Cho, on your side, we're

```
1   really jugs focusing on venue as it pertains to the federal

2   defendants.  So I've gone through it.  And again, we're

3   talking, so that we all are on the same page, Counts 1 and 3,

4   because those are the federal defendant counts.  Count 5 no

5   longer being viable, 1 and 3 are the ones that travel under

6   1391(e).  And I guess at this point I have my three choices for

7   venue under the statute.  I've pointed out that I think an

8   argument could be made under any of the three.  The first one

9   being Ripa, where he's at.  The second one is kind of that ICE

10  ERO oversight.  And then the third being where plaintiffs live,

11  which is here in the district.  Can you speak as to those?  I

12  think all three are viable and certainly you can rule on any of

13  them to make sure the federal defendants are in the right place

14  because the defendant is down here what's your sense oh that.

15       MS. CHO:  Yes, Your Honor.  We would with agree as to

16  the Court's analysis as to those three points entirely.  Again

17  under sub point A, Defendant Ripa is properly venued in this

18  district.  With regards to exception of activities that give

19  rise to the claim again as you pointed out the 287(g) agreement

20  provides that the ICE field director in Miami has

21  responsibility for oversight of the facility.  And C, there are

22  an number of plaintiffs, including C.M., Borrego Fernandez,

23  J.M.C., E.R., F.B., A.S., and N.B., ^ * something immigration,

24  and S.O.S. all of which are residents of this district.  And

25  for those reasons, we believe that venue is appropriate with
```

1   respect to the federal defendants in this case.

2          THE COURT:  And I guess -- just to be clear, Subsection

3   (B), 1391(e)(1)(B), lets us either have transactional venue

4   being proper or a substantial part of the property involved in

5   the axis situated.  But I guess it's -- really what I'm

6   focusing on is that transactional venue being another ground or

7   one of the three I think grounds that you can rely on to try to

8   keep the federal defendants here is that right.

9          MS. CHO:  Correct, Your Honor.

10          THE COURT:  All right.  So let me move to where I think

11   we started at the conference last week.  And this is the part

12   that I is a little more challenging.  This deals with the state

13   defendants.  Okay?  When we come to the state defendants, we

14   know that they are part and parcel of Counts 1 and 3, so

15   they're lumped in with the federal defendants.  And then they

16   have standalone in two and four because they come in under the

17   1983 counts.  And I think all of us agree that we're traveling

18   under 1391(b) two.

19          Now obviously I think you guys have pled this

20   thoroughly.  President we're now outside of the 13th 91 E-1

21   world.  Mr. Meros I think mentioned is this early, early on in

22   one of our status calls, that is obviously designed for the

23   federal defendants.  But we know that the statute makes very

24   clear that when we're dealing with the state defendants, we

25   have to look at venue for them under 1391(b) two.

1          So we have to find or figure out where is venue proper

2    for the state defendants in the standalone counts, two and

3    four, and is there any proper for them where they're joined

4    with federal defendants who come in under 1391 E-1.  And so the

5    big concern I have here is the question that I ended with on

6    Thursday, and it's really directed to the plaintiffs.  And I'll

7    redirect it again.  And I'll use my exact wording because I

8    want to make clear where my concern is.  It deals with kind of

9    the actions.  Right?  So I had asked the plaintiffs' team to

10   point me to any action, act, or omission, occurring in the

11   Southern District of Florida by the state defendants.

12         Can you tell me, Ms. Cho, what are you pointing me to

13   for purposes of having the state defendants properly venued

14   here.

15         MS. CHO:  Yes, Your Honor.  The state defendants have

16   hailed themselves of venue here in the Southern District of

17   Florida pursuant to the 287(g) agreement that they represent

18   provides them with authority to hold people at Alligator

19   Alcatraz.  And I would point you to the case of Harvard versus

20   inch, which of course is a case that the defendants themselves

21   site.  In *Harvard v. Inch* is particularly applicable here

22   because it is also a case that dealt with conditions of

23   confinement in a carceral setting.  In *Harvard v. Inch*, the

24   plaintiffs there were challenging the practice of solitary

25   confinement, and the Court in *Harvard* found that there were

1    actually two appropriate venues to hear that case.

2        The first appropriate venue was of course the place in

3    which the plaintiffs themselves had been incarcerate the and

4    suffered the solitary confinement.  The second venue in which

5    the Court found was proper for venue purposes was the venue in

6    which the policies that regulate had the -- regulated solitary

7    confinements were set.  And indeed, that is the venue in which

8    the case was ultimately heard.

9        Now, I point you again to the 287(g) agreement, which

10   the Florida defendants have entered into and which the Florida

11   defendants claim provided them with the authority to detain

12   people at Alligator Alcatraz.  And again I point you to the ^ *

13   Georgia day a declaration at 49-2, at pages 25, 31 and 32,

14   because this is where it is instructive.  Again, the defendants

15   -- the Florida defendants have signed this agreement and

16   entered into this agreement with the federal government, and

17   they -- 287(g) agreement specifies that the Miami field office

18   director is the point of contact for the 287(g) agreement, that

19   the Miami field office director has over side of the detention

20   facility, that the detention facility must be operated in

21   accordance with ICE standards and any deviation from those

22   standards and introduction of any other alternative set of

23   standards regulate willing the detention facility that conflict

24   shall be resolved by the Miami field office director.  And that

25   is where the policies that set the attorney access are

1  emanating from the act shall omission that is substantial in

2  the Southern District of Florida.

3      THE COURT:  I begs that's -- I knew that's what you

4  were going to say.  And I've been struggling with this because

5  I don't see this in the sense that I don't -- I don't see any

6  of these state defendants in these 287 agreements and I've been

7  looking at this record and I don't see any direction he from

8  feds to state.  If I had a record that would support that

9  essentially the state defendants are being up pet had by

10  individuals at I CRO in Miami or I saw direction from the if he

11  had to the state facilities in a way that essentially made the

12  federal government the operator of Alligator Alcatraz on the

13  ground through direction, I would completely understand where

14  you're coming from.  The problem is, I haven't seen a record

15  that supports that direction, and I don't see anything in the

16  287 agreements that would suggest that that kind of day to day

17  direction is being given.  If anything, it seems almost arms a

18  length.  My recollection of the Vega declaration was very high

19  level.  I mean, general information, generalize guidelines have

20  been provided by way of the agreements to the state defendants.

21  But when it comes to running Alligator Alcatraz, it appears

22  that the state defendants on the ground are doing their thing

23  without necessarily the input on a day to day level from the

24  federal government.  That's where I'm trying to understand.

25  And this has been a theme, as you know, from the beginning of

1    the case, of who exactly is running the facility.  And it just

2    seems to me today, with this record, that the state defendants

3    are running the facility, not the federal defendants telling

4    them how to run it.  Isn't that what the 287 seem to show any

5    don't see that direction them as parties -- the state

6    defendants.

7         MS. CHO:  Your Honor the Vega declaration as well as

8    the 287(g) agreement state that the ICE field Miami director

9    has oversight at the detention facility and that ICE detention

10   standards must be in operation.  20 U.S.C. 1391(b) two provides

11   that a substantial portion of the acts -- and this is the key

12   -- omissions giving rise to the claim must have taken place in

13   the district and here is where the cue mission has taken place

14   the lack of oversight and the lack of adherence to those ICE

15   detention standards, as we have stated throughout the pleadings

16   and in the preliminary injunction motion, the standards by

17   which ICE requires attorney access, if those standards had been

18   adhered to and if proper oversight had been conducted, we would

19   not be here in court today with respect to the First Amendment

20   claims.

21        THE COURT:  Let me tell you, though.  I get you're

22   extrapolating and putting forth quite a big inferential leave

23   has been my concern.  Because this case was never about a 287

24   breach.  This case has never been about that.  It's about the

25   First Amendment.  So you're having the Court take a big step

1    where you're saying that the -- let's really break down what

2    you're asking me to do.  You want me to find that for purposes

3    of venue, the omission by the federal defendants emanating from

4    the Southern District of Florida to enforce 287(g) shows state

5    defendants violated the First Amendment in the Southern

6    District of Florida.  I mean, that is -- which again I say it

7    out loud because you can see where the disconnect begins to

8    manifest itself, is how would I possibly say that an omission

9    on oversight under 287(g) is somehow what creates the omission

10   again by the state defendants in the Southern District of

11   Florida.  Because the omission that you're mentioning is very

12   much from the federal defendant's side as alleged.  I still

13   don't see how anything that the state defendants in the Middle

14   District of Florida, right, are doing that emanates or flows

15   back to the Southern District of Florida.  All of the First

16   Amendment bars or problems are happening on the ground, whether

17   it's when people show up and they don't have access, or they

18   can't get any confidentiality on a meeting.  Whatever it may

19   be, all of it seems to be happening by the state defendants at

20   or near the facility, not by way of instruction through federal

21   defendants in my district.  You see why I'm concerned there,

22   how there's a breakdown.

23          MS. CHO:  I appreciate that concern Your Honor and that

24   is why again I would point the Court to look at the *Harvard v.*

25   *Inch* case.

1            THE COURT:  Okay.

2            MS. CHO:  And that is why -- because again, the Court

3     in *Harvard v. Inch* found that venue was proper in the district

4     where the voluntary confinement abuses were taking place.  Hear

5     the equivalent would be the attorney access issues.  But the

6     *Harvard* Court also found that venue was proper in the venue

7     which the policies were set and here there's a clear

8     contractual agreement between the federal defendants and the

9     Florida defendants by the way the federal defendants have

10    benefited.  They have hailed themselves of this district with

11    respect to enforcement of the policies that are being set in

12    the Southern District of Florida.  And that is transactional

13    venue at its core.

14           THE COURT:  Do you think you guys have presented facts

15    showing that the state defendants have failed to act in

16    accordance with the agreements.

17           MS. CHO:  Yes, Your Honor.

18           THE COURT:  I think you may be are saying it the First

19    Amendment context only.  But there's nothing in the pleadings

20    that I've seen -- I mean, correct me if I'm wrong -- that there

21    is -- other than this First Amendment theory that they are not

22    following the 287 agreements is there.

23           MS. CHO:  Well, the case not about, as you said, about

24    the broader input of the 287(g) agreements.  This case is about

25    the application of the standards that are required and out

1    signed in the 287(g) agreements.

2         THE COURT:  But you would agree with me, then, that the

3    way in which you're positioning this -- and I am going to

4    obviously, as soon as I step off the bench, read my colleague's

5    *Harvard v. Inch* decision.  This is a district court case from

6    the Northern District of Florida; am I correct?

7         MS. CHO:  Correct, Your Honor.

8         THE COURT:  So one of the things I'm concerned about

9    here is the theory again comes down to whether the state

10   defendants fail to act in accordance with the 287 in their

11   governmental agreements creates a constitutional First

12   Amendment issue.  And I think where I'm struggling with it is,

13   you know, we don't need the existence of intergovernmental

14   agreement or detention standard to establish a First Amendment

15   violation.  Of course, that's why this nexus issue troubles me,

16   because it really -- just having a legally enforceable

17   agreement between the state and federal officials, that can't,

18   at least in my view, support venue on its own.  That would just

19   -- there would have to be a connection.  And that's what I've

20   been looking for coming into court today, is trying to get a

21   sense of where is the connection between the federal defendants

22   flowing or emanating from the Southern District of Florida and

23   what's happening on the ground.  And I think it's important

24   because if you read the supplement -- I have a copy of it here

25   in front of me -- everything that is going on from the state

1    defendants when it comes to First Amendment violations seem to

2    occur at Alligator Alcatraz.

3        So paragraph 4, defendants -- this is from the

4    supplement -- defendants in this case have blocked detainees

5    held at the facility from access to legal counsel.  No

6    protocols exist at this facility for providing standard means

7    of confidential attorney-client communication.

8        Paragraph 88 says that there's been restrictions to

9    immigrant detainees' access to counsel at Alligator Alcatraz.

10   The reply at page 5 says, defendants continue to pose

11   significant barriers to attorney access at the facility, that

12   the lack of attorney-client communication is taking place at

13   Alligator Alcatraz.  Even the reply says, at page 6 and 7, all

14   outgoing phone calls by detainees to their attorneys are

15   monitored and recorded.  Page 7 says legal conferences do not

16   take place in an enclosed space.  Instead, ^ * meet in a cage,

17   with officers in auditory proximity.  All of these things point

18   me when you look at Jenkins versus brick which is kind I ever

19   the Eleventh Circuit case for venue they all look to the place

20   where the wrong has been committed.  That seems to be the

21   focus.  So I guess the for thing for me is to go back and look.

22   But there's going to have to be some sort of connects

23   established in this record that would allow the Court to strap

24   late from federal 287(g) oversight of the state defendant's

25   operations at Alligator Alcatraz a First Amendment violation

1    that generates from that E and I think that -- just so I'm

2    clear, that is the venue hook, if you will, for the state

3    defendants down here.  Am I right on that.

4           MS. CHO:  Your Honor I would clarify that slightly.

5           THE COURT:  Tell me.  Clarify, yeah.

6           MS. CHO:  So just a few initial thoughts.  First is

7    that venue can be properly found not only in the district in

8    which -- the Tusser venue essentially is not where most events

9    take place it's where a substantial portion of the accidents

10   take place.  So the Court can properly find venue even in the

11   district where perhaps the plaintiffs were not actually

12   detained.

13          THE COURT:  But you would agree with me though and the

14   Eleventh Circuit has made this pretty clear, right?  That it's

15   not a minimum contact type analysis.  And we focus under the

16   case law on the defendants, meaning, the -- where are those

17   omissions taking place.  You're saying it's omissions by the

18   federal government, imputed to the state, from the Southern

19   District of Florida, 287 relationship as opposed to omissions

20   that substantiate First Amendment violations by the state

21   defendants at the facility.

22          MS. CHO:  Your Honor, what we are arguing is the state

23   defendants have hailed themselves through this district with

24   the signing of a 287(g) agreement.  That posits and

25   specifically specifies that the policies coming from the ICE

1    field office director so the the policies for attorney access

2    to Alligator Alcatraz is the basis for venue.

3         THE COURT:  Shouldn't I be worried that this sounds

4    like exactly personal jurisdiction, which has been disclaimed

5    by this district?  I get very worried when you tell me I've

6    availed myself ^ *.  That's a purposeful availment language

7    that I have not seen in a single case speaking of venue.  I'm

8    very concerned because that seems to be what Jenkins ^ * brick

9    warned us about, that, you know, where we should reasonably

10   expect -- let's put it another way.  If you really want to go

11   the personal jurisdiction route, it's almost as if saying,

12   well, I can expect to be sued because I've done this before

13   because I've purposely availed or hailed myself in this

14   district by signing off on a 287 with a CRO that is operating

15   out of Miami.  That seems a lot like purposeful avail act.

16        MS. CHO:  I understand the concern with that.  I would

17   again point you to the *Harvard* --

18        THE COURT:  I know.  I know.

19        MS. CHO:  The other thing to remember, this is a

20   transactional document.  Again, this is an agreement which the

21   plaintiff defendants and the Florida defendants have entered

22   into in which the Florida defendants have benefited from in

23   respect to they have claimed they have detained people that is

24   the transactional that they have claimed.  And the performance

25   of the agreement, again, they specifying but it takes venue

1    with respect to the ice field director in the Southern District

2    of Florida.

3         THE COURT:  All right.  Let me hear from Mr. Meros and

4    the state defendants.  I think you can tell my concern here

5    that this -- I had a suspicion this was the theory, and now I

6    have my hands on it, and I really understand.  We just had this

7    exchange a minute ago with Ms. Rodriguez and she pointed out.

8    This is not a 287 lawsuit this is not about breaching a 287

9    agreement.  It could have been brought that way.  It could have

10   been brought a lot of different ways, a condition of

11   confinement.  That's splashed through the papers.  It's not an

12   issue here.  It could have been brought in a different Fifth

13   Amendment theory, which is no longer viable at least in this

14   case.  But it's a First Amendment claim.  And so I have looked

15   through this record.  I required the discovery for this

16   explicit purpose, to try to figure out if I had venue hereunder

17   1391.  And the argument is, this type of hail themselves

18   purposeful avail act theory that requires the Court in my view

19   to find omissions very clearly expression had in the federal

20   oversight of the state defendant's administration of Alligator

21   Alcatraz, and it appears to me that there's a disconnect there.

22   I think you can understand why I'm concerned about these

23   logical leaps, that because there's a 287 agreement and because

24   they maintain its been breached, there is a flow of action from

25   that into a First Amendment violation by state defendants on

1    the ground.  I mean that -- it's -- it seems to be at lesion a

2    bridge too far.  I'm trying to understand it, but I -- and

3    again I haven't seen case law from at least my circuit that

4    would support that venue theory.  And I want to see how my

5    colleague until the northern district was able to reach that

6    conclusion in the inch case.  But here I think there's a break

7    down between federal and state defendants he in that no actions

8    or omissions for transactional venue by the state defendants

9    have taken place in the Southern District of Florida.  All of

10   the First Amendment claims may have manifested in the middle

11   district at the facility.  So if that's where I owned up and

12   logic we have a breakdown in that the state defendants are not

13   properly venued here.  So where are you on this point with

14   respect to the state defendants.

15          MR. MEROS:  Well Your Honor I couldn't say it better

16   than the court I will only add to reinforce that as the Court

17   find the Jenkins bringing case is the authority and that makes

18   clear that the relevant actions are those you know by the

19   defendants not by you know -- not by other federal defendants

20   but by the state defendants.  And I still have not heard a

21   single action by the state defendants in the Southern District

22   of Florida.  They are claiming actions or omissions by federal

23   defendants and as the Court mentioned, trying to impute that on

24   the state defendants but I would even push back on that in that

25   there has been no direction whatsoever by the field office

1    director defendants from either D.C. or from the southern

2    district to the extent they're supervision, that is not

3    directing.  There's -- to the extent there's anything like

4    advice or anything like that but there's no direction.  Because

5    as the defendants have made clear this is a state of Florida

6    facility not a federal facility.  They are in ICE custody.  It

7    is a state defendant, state facility and there has still not

8    been a single mention of any action by any of the state

9    defendants in the Southern District of Florida.

10           THE COURT:  Let me go one step further.  Let's assume

11   for the sake of argument this 287 theory.  Right?  Can you tell

12   me which 287(g) agreements in this record were signed by

13   Governor DeSantis or the Florida department of emergency

14   management or Guthrie?  Because as far as I can tell, there is

15   not a single 287 agreement that a state defendant named in this

16   action has even signed.  If that's the flow, right, we have to

17   at least see that the 287(g) agreements are signed off on by

18   the statement defendants.  If there is, you know, no 287(g)

19   with the Florida Department of Emergency Manage met or any

20   other state defendants, then this theory would also I think run

21   into a problem.  And again, maybe I missed it, but I don't

22   think I saw one signed in this record.

23           MR. MEROS:  Yes, sir.

24           THE COURT:  Not a single state defendant has signed one

25   of these 287s, right.

1          MR. MEROS:  No, Your Honor.  Nor the Governor or

2     Executive Director Guthrie.  They were all individual directors

3     or orchestrate or is of the agencies that were signing and that

4     signing all occurred where the policy was directed writes in

5     Tallahassee which the *Harvard v. Inch* case said the Northern

6     District wasn't the appropriate venue because the policy wasn't

7     set there.  So there could be proper venue in the Northern

8     District because that's where the government and Executive

9     Director Guthrie are actually directing policy but none of that

10    has been coming from the southern district neither from the

11    state defendants or the federal defendants so there's simply no

12    action by the state defendants in the southern district.

13          THE COURT:  So to your point you would concede that an

14    argument could be fleshed out that direction is coming from

15    state defendants from the Northern District, but there is

16    nothing tying them to the southern district absent a theory

17    that they are a being directed, which you have on behalf of the

18    state defendants have represented that that is not the case.

19    But there's the theory that the federal defendants at a very

20    high level are responsible for oversight in the state

21    government relationship -- is that it federal relationship.

22    Excuse me, here.  So they're something for oversight or the

23    omissions or failure to provide oversight in the view of the

24    plaintiffs is what has led down the path of a First Amendment

25    violation.  But your point has been number one number of these

1    relationships or directs are to the level of day to day, let's

2    say, administration of Alligator Alcatraz.  There's no federal

3    official who's telling the state on the ground what to do so

4    that there could even be an omission, right.

5          MR. MEROS:  Yes, sir.  Exactly.  And I want to clarify

6    that while the *Harvard v. Inch* case might apply here to the

7    Northern District to the extent there's some policy I would

8    argue that Northern District would not be proper because a

9    substantial amount of the policy and substantial amount of

10   decisions on the day to day is occurring at the familiarity, as

11   this Court has made clear is in the middle difficulties trek.

12   We're not conceding northern difficulties strict is the proper

13   venue.  But that was the situation in *Harvard v. Inch*, and that

14   was --

15         THE COURT:  Right.  I have not thought at any point

16   that the Northern District is a viable venue for this case

17   either.  I think we have all maintained from the beginning, it

18   should be Middle District, and there's been an argument in the

19   Southern District and plaintiffs have maintained Southern

20   District.  And we just spoke earlier that the federal

21   defendants in my view are appropriately in the Southern

22   District I think on this record.  I don't know that anything

23   here has dissuaded me of that point given the ICE EERO office

24   down here and the individual who's a resident here as a

25   particular defendant.  So I think my concern really is just on

1    the state defendants' side.  But I want to confirm that again

2    Mr. Meros that the 287s, they're not -- just so we're clear,

3    they're not signed by any of the state defendants in this case,

4    right?

5           MR. MEROS:  I can confirm that, Your Honor.

6           THE COURT:  That's my understanding.  Look, I only

7    bring it up because I think if they're not signed by any of the

8    state defendants, that is, in my view at least, a problem for

9    the 287 argument.  It may not be fatal.  I mean I think the

10   argument continues to be a much more high level overview by the

11   federal government over the state defendants and how they're

12   doing business at Alligator Alcatraz.  And so I think that

13   continues to be the tether or the connection between the two

14   parties, the two sets of defendants that would in the view of

15   the plaintiffs, in their words, hail themselves to the Southern

16   District of Florida.

17          But I just don't remember seeing any 287s signed by

18   state defendants.

19          MR. MEROS:  Yes, Your Honor.  I'll look through and

20   confirm, but I have not found it through the first five or so,

21   the first six or seven.

22          THE COURT:  Let me ask again maybe to get a fine I

23   point on it.  Maybe Ms. Cho I'm reading it too technically.

24   And you would say to me, Judge, they didn't sign it because it

25   was of no moment because a fact remains there is a 287 in place

 1    and a 287 requires oversight.  Any omissions that flow by state

 2    defendants are imputed to the federal dents, on the federal

 3    defendants sit in the Southern District of Florida.  The state

 4    defendants should reasonably expect to be sued in the Southern

 5    District of Florida.  And the fact that you don't have direct

 6    control or oversight is not disqualifying.

 7            Am I getting that right?

 8            MS. CHO:  Certainly that is one argument that could be

 9    made, Your Honor.

10            THE COURT:  Okay.

11            MS. CHO:  I do want to point out the larger concern

12    that we're raising --

13            THE COURT:  Yeah.

14            MS. CHO:  -- with the fact that the Florida Department

15    of Emergency Manage who the defendants claim are running the

16    facility does not appear to have a signed 287(g), that perhaps

17    it's not an issue for this case, but raises broader questions

18    of authority OF Florida to be holding people at Alligator

19    Alcatraz.

20            But for purposes of this case, the defendants have --

21    in their response to the interrogatories, stated that the state

22    defendants -- the state agencies that are performing ^ * at

23    this facility, we would be ^ * with whom these 287(g)

24    agreements may have been signed.  And I want to let you know

25    that the Florida defendants that have been pled in are not pled

1    in in their individual capacity but their official capacity as

2    the state.  So, for example, governor he is named in the

3    complaint he of course stands in as an executive something in

4    all of these /EUBGTS.

5          THE COURT:  Meaning that signatories, in your view, is

6    not your major concern.

7          MS. CHO:  Exactly, Your Honor.  I looked at the

8    language of 287 agreements.  It's nowhere on the page.  But in

9    the transactional venue argument, it's performance that is

10   actually very key here.  And the 287(g) agreement itself of

11   course specifies that it is the Miami field office director

12   that is the key point of contact for the implementation of

13   287(g) agreement.  That Miami field office director is

14   responsible for oversight of the detention facility and is

15   responsible for managing any conflicts to the standards that

16   are applicable at the detention facility.  And of course, this

17   is the basis upon which Florida claims that it has detention

18   authority over people at Alligator Alcatraz.

19         THE COURT:  You know, from the very beginning, when we

20   had our first hearing and you elected to move to 15(d) to

21   supplement, I foresaw that we probably would end up here today,

22   which is this 287(g) agreement being kind of the linchpin of

23   your theory.  I guess I just expressed concern, as I have

24   multiple times during the litigation.  And I don't know why it

25   was framed this way.  I don't know what exactly the theory was

1   behind focusing on these particular claims.  But we don't have

2   a 287 breach case.  We don't have an argument that this is a

3   facility operating outside the bounds of federal oversight

4   under 287.  I mean, it's a -- that's a different case.  I just

5   -- I want to express that because I don't have allegations that

6   connect kind of the 287(g) state actors to the First Amendment

7   claims.  I know how you want to get me there, and that's why

8   this hearing is important, so I can understand your theory of

9   making that a step, taking that extra step.  But I just think

10  about all these arguments about performance -- you know,

11  performance as if it were the contractual obligation of 287.

12  It's challenging for me because I see that case and it's not

13  this case.  I see that case.  I see a case under 287.  I see a

14  theory.  The problem is I don't know that I see a theory under

15  a state action bringing it -- housing it until the Southern

16  District of Florida when it comes to purported First Amendment

17  denial of access or delay or lack of confidentiality.

18         Now, I have to go back and look because certainly I

19  haven't had the benefit of studying the logic from my colleague

20  up north but I'll take a quick look at that as soon as I step

21  off the bench.  I have a better sense though as I sit here

22  today of how you want the Court to get to a venue position for

23  the state defendants in order to allow it to remain in the

24  Southern District of Florida.

25         I will tell you that I think there's a bit of a

1  challenge there and I want to expeditiously rule on this and

2  I'm going to go back and look at that case.  But that to me is

3  the hardest sell, if you will, for the Court, that these state

4  defendants are committing a First Amendment violation anywhere

5  but near the facility or at the facility in the Middle District

6  of Florida, which no one disputes, because this record is

7  devoid, at least the record that I've reviewed coming into

8  court today, devoid of enough oversight, if you will, or 287

9  violations in the view of the plaintiff to allow omissions or

10  purported omissions by the federal defendants to be imputed to

11  the state defendants for purposes of supplying venue for First

12  Amendment violations that only they have committed according to

13  the complaint on the ground.  So that's where the rubber hits

14  the road.

15          So let's ask the question that we discussed yesterday

16  or Thursday, rather.  If for whatever reason the Court finds

17  that I don't have jurisdiction -- venue isn't proper, rather.

18  Jurisdiction -- let me not make that mistake because of course

19  venue and jurisdiction are very different issues.  But let's

20  assume that I don't have proper venue here for the state

21  defendants.  They are stuck or commingled with the federal

22  defendants in Count 1 and Count 3.  They're on their own in two

23  and 46789 but we have to look at each count independently.  It

24  puts me in a position where I'd have to look at the possibility

25  of a 1404 transfer to the middle district because the state

1    defendants would take the federal defendants with them, for

2    lack of a better way to phrase it, and the case would have to

3    be litigated there.

4        We all consented at the last hearing and the federal

5    defendants did as well.  But I do want to confirm that if the

6    Court finds that it does not have venue here for the state

7    defendants that everyone under 1404 would consent to transfer,

8    on Counts 1 through four, to the middle district.  Is that

9    still the position of the plaintiffs?

10        MS. CHO:  Yes, Your Honor.

11        THE COURT:  Okay.  Is that still the position of the

12    state defendants?

13        MR. MEROS:  Yes, Your Honor.

14        THE COURT:  Is that still the defendants of the federal

15    defendants?

16        MS. RODRIGUEZ:  Yes, Your Honor.

17        THE COURT:  All right.  Because obviously the most

18    important thing we can do today at least is get through a

19    couple of preliminary issues, right?  The Court doesn't feel

20    there's a 1252 problem, so jurisdiction is not going to bind me

21    from reviewing anything as far as I can tell.  And I certainly

22    do not believe that there's a mootness issue for the First

23    Amendment either in that the state has conceded that.  The

24    Fifth Amendment, we cleaned up because the something request

25    was provided and it's moot.  And /WAOEUTSD /*R it's a

1    concession.  So what we're doing here now is whether Counts 3

2    or four is viable.  If the Court gets to the merits on the

3    first something of merits claims and decides preliminary

4    injunction on that basis or the Court cannot reach the

5    preliminary injunction issue because of a lack of venue on the

6    state defendants only because the Court would then I think be

7    persuaded that the federal defendants were properly brought

8    here.  The problem is the federal is company mention had with

9    the state.  So if the state has to go, the first defendants

10   must follow.  At least the case moves forward.  But it wouldn't

11   allow me to get to the merits of the First Amendment claim for

12   preliminary injunctive relief and I need to find out looking at

13   this insurance case that has been provided if I can wrap my

14   mind around the theory without record evidence of a 287

15   agreement that really is supporting a breach, if you will, and

16   letting the First Amendment flow from that.  That's really what

17   we're down to.  So I need to answer that question for myself

18   based upon everyone's arguments today and hopefully let you

19   know if I can get to the merits, I will.  If I have to

20   transfer, I will.  But at least some of the preliminary issues

21   no matter what can be addressed by the Court on something built

22   which is important as first principals go.

23        Okay.  We're coming up on just about two hours.  I

24   think I've covered all of my concerns because the Fifth

25   Amendment real an I -- I had other issues about class relieve

 1   and all of that.  But I don't necessarily think that that's in

 2   play anymore.  I think that we've taken care of it.  It real an

 3   I comes down to the First Amendment and I understand where the

 4   First Amendment, merit wise, remains.

 5          Is there anything else that I've missed or anything

 6   else thank you-all would want to address that may be we haven't

 7   fleshed out today?  I'll start with the plaintiffs, Ms. Cho,

 8   anything else you wanted me -- anything else you want to put a

 9   finer point on.

10          MS. CHO:  Yes.  Your Honor, we want to just emphasize

11   that what is happening in Alligator Alcatraz is unprecedented

12   and is not normal.  The government has been in such a rush to

13   build and detain people at this facility, that it is one

14   roughshod over constitutional rights at the facility.  And we

15   have not talked very much about the irreparable harm that has

16   been suffered by the plaintiffs today.

17          THE COURT:  Let's talk about that.  Because I think --

18          MS. CHO:  Yes.

19          THE COURT:  You mentioned for example not to take or

20   interrupt you rather or steel your thunder on this but you

21   mentions for example that one individual was in Guatemala I

22   believe right?  So some folks have been deported without being

23   able to timely see their lawyers and obviously I don't think

24   anyone could dispute irreparable harm would manifest in those

25   excisions.

1          MS. CHO:  That's correct, Your Honor.  The hearing here

2     is extraordinary.  As you noted, there is a case of one person

3     at least that has been erroneously deported from the United

4     States while he is currently in immigration proceedings and

5     without a final order of removal.  This individual had his bond

6     hearing canceled as a result of his detention at Alligator

7     Alcatraz.  Other detention -- other detainees have suffered

8     significant and irreparable harm.  Officers have been going

9     around the facility, going from cage to cage, pressuring

10    detainees to sign voluntary removal orders without the

11    opportunity to speak to counsel.  And I point you to the record

12    in the case of at least one person, intellectually disabled man

13    who was told that he was signing a piece of paper to receive a

14    blanket when in fact it was a voluntary departure order and he

15    was removed soon after.  This is why access is to counsel is so

16    paramount and such an important right to make sure -- it is not

17    violated at the facility.  These violations beyond just the

18    First Amendment violation that constitutes irreparable harm in

19    and of itself has resulted in grave harm to the plaintiffs.

20    And for those reasons, because of the degree of harm that is

21    significant and irreparable here at the detention facility, we

22    request that the Court issue an order for preliminary

23    injunction.

24          THE COURT:  And let me ask you, actually now that you

25    mention that.  If the Court is in a position to reach the

1    merits on the preliminary injunctive relief issue -- and I know

2    the state defendants believe this record does not support

3    extraordinary relief if I get to a merits based determination.

4    What would that look like?  If I let you borrow this robe, and

5    you had to draft an order that specifically requires Alligator

6    Alcatraz to do certain things, or provide certain safeguards or

7    guarantees -- because you can imagine, we talked about this

8    back in the first iteration of the complaint.  The recipe for

9    relief was massive.  I mean, you had a request that the Court

10   would even get to providing a Haitian/Creole interpreters.  And

11   that's why I had said back then, it almost put the Court in

12   charge of Alligator Alcatraz, which I was not going to do.

13          But here now, we have a much more narrow claim, right?

14   Things have really been fine tuned to confidentiality, access,

15   to legal materials and timeliness.  How would the Court even

16   fashion such a remedy?

17          Because, for example, you've said that this is

18   unprecedented, that this facility is run outside the norm.

19   It's not up to ICE detention standards.

20          I mean, would the argument be well judge we'd ask that

21   you require that Alligator Alcatraz follow promulgated ICE

22   detention policies and procedures?  Is that the constitutional

23   floor?  Tell me how you would even draft that.

24          MS. CHO:  Your Honor, that is certainly an option that

25   the Court could take.  There are many policies that the

1    defendants themselves have offered to the Court as examples of

2    policies regarding visitation and attorney access at the

3    facility.  They themself goes in the Saunders declaration,

4    Exhibit Number 10, provide a draft visitation policy.  It

5    followed what actually we would argue past constitutional

6    muster with respect to attorney access.  The problem of course

7    is none of this is actually being followed.  We would also

8    agree that were the facility to follow the ICE detention

9    standards with respect to attorney access that this similarly

10   -- the degree of something that we're seeing at the facility

11   would not be taking place.  But because of the extraordinary

12   nature of the violation also that are taking place we have

13   asked for very modest relieve in comparison to the violations

14   that are taking place.

15          And you can look at the proposed preliminary injunction

16   order --

17          THE COURT:  That one is the whole kitchen sink.  That's

18   the draft that has -- short of me stepping -- stepping into the

19   facility and running it myself, that one is the most expansive.

20   Now you've moved away from that, I think, because that's when

21   you had a total ban.  And quite frankly, that was an easier

22   call.  Right?  A total ban is a total ban.  If they're not

23   getting attorneys, we have a problem.

24          As Mr. Meros has pointed out, they're not seeing them

25   fast enough, in your view, but they're getting access.  And it

1    sounds like maybe not all the calls are monitored.  That's a

2    little bit in dispute.  I mean, one thing is to give the

3    laundry list.  Another one is to say, Judge, the narrow relief

4    would be that they have confidentiality guarantees, that they

5    have accessibility guarantees with legal documents, and again

6    the biggest challenge being timeliness.  You know?  What am I

7    going to put an order, with all deliberate speed?  What is that

8    going to do?  You would have to have some metric.  It's not

9    necessarily it can't be done, but I think you can understand my

10   concerns with crafting a scope of relief that would work on the

11   ground we're where getting all of these lays.  That's what I'm

12   worried about.

13        MS. CHO:  Your Honor, I would point you to the fact

14   that the multiple courts around the country you with respect to

15   ICE detainees action have issued orders very similar to the

16   proposed order that the plaintiffs have provided.  It is not

17   out of the question.  This is not I think -- to address the

18   concern with becoming the warden of the facility, this is

19   actually a very generalized relief that is requested.  We point

20   to you to the ^ * bark a.m. /PHER code oh order.  You can look

21   at the SPLC, the District of Colombia, the ^ * /TORS order out

22   of the Central District of California.  These are all orders

23   that very specifically state that the attorney access for

24   example in-person visitation shall be timely, shall be

25   confidential.  And these are considerations that are put into

1    the order because of the fact that these violations do take

2    place.  And to guard against the continued repetition of such

3    violations.  So we do think that specificity is actually the

4    Court's -- a tool that the Court can field very carefully here

5    in terms of providing that in-person visitation is confidential

6    and that it is timely.  But defendants themselves have said

7    they're making all best efforts to respond within 24 hours,

8    then require them to respond in 24 hours.  In person access.

9    Again at any other detention facility in the state of Florida

10   does not require preexisting appointment.  Attorneys can go to

11   the facility with their bar card, their ID and pass through

12   security and be able to wait to visit their clients.  There's

13   no such form that you have to fill out with attaching documents

14   for the facility to review in advance and wait for days, maybe

15   even weeks, to schedule an appointment to see your client in

16   person that.  Simply does not exist.

17          With respect to the video conferences earnings the same

18   would be for timeliness.  If they say they're going to be

19   providing or sponge to requests for 24 hours make them do that.

20   And make sure that these video conferences are actually

21   confidential.

22          With respect to the outgoing calls, the same.  The

23   document exchange, the same.  These are not dramatic

24   interventions by the Court by any imagination, but are required

25   because defendants have shown that without such guidance that

1  these problems will continue to persist and the harms that are

2  suffered as a result are so grave.

3          THE COURT:  Thank you for that.

4          Let me hear from the state side.  As we conclude here

5  this morning, as I think everyone has heard, the Court has to

6  satisfy itself that venue has been met for the state

7  defendants.  I'm certainly prepared to reach a merit-based

8  determination, if I can get there, this helps quite a bit to

9  understand where the plaintiffs are at in terms of the scope of

10  relief they would request if the Court ultimately reaches the

11  First Amendment issue.  Where are we at on the statement

12  defendant's side, Mr. Meros?  Officially I know your position

13  continues to be one as to venue, that it should be the Middle

14  District of Florida.  And two, that from a preliminary

15  injunctive standpoint, there is just not a success of

16  likelihood on the merits.  I don't think anyone can really

17  dispute irreparable harm.  But we know you need all of the

18  elements met to be able to procure the relief that plaintiffs

19  are seeking.  So your view would be that on this record there

20  is not an initial indicator on likelihood of success on First

21  Amendment claims but again stepping back that the Court may not

22  reach it due to a venue problem.  Tell me if I'm right and

23  anything else you would want me to focus on in this front.

24          MR. MEROS:  Yes, Your Honor.  You're correct.  Venue

25  first and then certainly likelihood of success on the merits.

1    But there was a lot brought up by the plaintiffs.  And I'm a

2    little hesitant to try to address it all because the Court has

3    shown there is a venue problem and /TPR-PBG /HREU the Court.

4    So lumping a lot of arguments that we haven't had the chance to

5    respond to.  But real quick.  I mean, first I think) I think

6    there's a large problem with the scope of relief that the Court

7    would fashion.  I mean, certainly the Court would have to first

8    amendment violation first.

9         THE COURT:  Right.

10        MR. MEROS:  And again, going back to the arguments,

11   that the state defendants didn't have a chance to respond to

12   there's still a not a single case that plaintiffs have cited

13   for First Amendment violation asking for, nor is there any

14   First Amendment case law on the organizational plaintiffs, you

15   know, the Haitian case, the Cuban relief case, all those cases

16   owes you know not accurately represented by the plaintiffs.

17        So there are a number of issues with that.  I think

18   even larger -- what they are exactly asking this Court to do is

19   they're actually as the Supreme Court said as it is in *Turner*

20   and other cases, as the Court mentioned in the first hearing

21   plaintiffs would have to something Alligator Alcatraz and

22   become the warden because those orders that were granted by the

23   other court that they're seeking are general and fine those

24   actually set out certain requirements you know you have to have

25   a certain number of meeting this day you know you have to have

1   a certain number of -- you have to respond when a certain

2   amount of time.  That would absolutely make this Court become

3   the warden of Alligator Alcatraz and as the Supreme Court has

4   said in *Turner* the running of detention facilities or of

5   prisons is directly an executive and a legislative function,

6   not of this Court.  So plaintiffs would not just have you know

7   the Court follow some ice guidelines or follow some other

8   things which we submit we're already following but they would

9   have this Court go into the details and very specifically on

10  what's required an that's simply going yes, I understand what

11  this Court can do.  Setting back a little bit further there is

12  a larger issue are of class certification.  We're not getting

13  into all of the class certification issues here but even at a

14  large level of analysis you know the Court has to go through --

15  to get to any kind of certification of any kind of class,

16  whether provisional or not the court has to go through the

17  Rule 23 factors has to conduct that regular analysis and it has

18  to be in the record.  Pleading is not enough 6789 as the

19  Supreme Court has been made clear the burden is proof not

20  pleading.

21       THE COURT:  Well you would agree with me though not to

22  interrupt oh I'm sorry -- but as I stated earlier in my paper

23  order, really only look to the Rule 23 motion for class

24  certification is for purposes of determining a success of

25  likelihood on the merits as to this case.  So you're not wrong

1    that -- I mean again I would not be writing any orders going

2    through the Rule 23 factors because the Court would have no

3    occasion to certify anything at this point.  It would really

4    just be whether or not there's even a chance that certification

5    is viable because that does relate back.  And the supreme he

6    court has told us in recent case law that we should be looking

7    at that preliminary to figure out whether that even carries the

8    day and we've heard both on this, on the plaintiffs' side they

9    believe there's enough in there that class certification would

10   be a possibility as to the First Amendment claims to your point

11   and in your papers you've noted it, it's not so easy.  There

12   might be commonality problems.  And if I ultimately agree with

13   you on a merits based determination, that would cut against any

14   sort of success of likelihood of the merits if it's not viable

15   that a class could be erred.  The earth could also find as to

16   named plaintiffs early preliminary injunctive relief to be

17   granted and allow the class issues to be briefed in normal

18   course which everybody set that briefing deadline.  I hear you

19   loud and clear but I don't know that the Court would

20   necessarily go that deep into the class certificate.  But I

21   certainly have had to look at it because I think there are

22   issues in that certification motion that play into the

23   determination for preliminary injunctive relief.  So I would

24   agree with you on that.

25          MR. MEROS:  Yes, sir.

1          THE COURT:  Go ahead.  You were saying.

2          MR. MEROS:  Yes, sir.  But even -- there's even a more

3    fundamental threshold issue that even to get to the class to

4    even have any kind of relieve whatsoever for class, there would

5    be a standing go issue for all these plaintiffs.  You know the

6    Supreme Court has made clear that -- to do any kind of

7    certification whatsoever it has to be clear on the pleadings

8    that there's standing for not only individual plaintiffs and

9    also for the class themself and trying to certify a class or

10   trying to provide relieve on a professional status or otherwise

11   for all future -- all current and future members of -- not

12   members -- detainees of Alligator Alcatraz certainly cannot

13   show that there's standing for all those detainees.  And the

14   Court would have fog through some of the Rule 23 analysis to do

15   you know any kind of likelihood of success.  It would have to

16   actually be able to.

17         THE COURT:  Right.

18         MR. MEROS:  To have seen that the proof -- again not

19   from the pleading but there's actual proof that it would meet

20   all those levels and as this Court noticed, the original

21   complaint in the motion is in the -- in the certification

22   motion is more styled as a complete ban whereas here there are

23   so many individualized circumstances that there are clear,

24   commonality and other issues.

25         THE COURT:  Thank you.  I would agree with that.

1          MR. ZACHERL:  Your Honor, Frank Zachrel.  I'm actually

2    only here on the class certification issues, and I'm chomping

3    at the bit to just make the point on typicality.

4          Rule 23(a) has four requirements.  There's been a

5    little business of discussion on commonality.  There's been no

6    discussion on typicality.  The question the Court ultimately

7    has to ask itself is, if we try the claims of the named

8    plaintiffs based on generalized proof are we going to be trying

9    in adjudicating the claims of all the absent class members, all

10   of these detainees.  The answer to that question is,

11   manifestly, no.  It is impossible now that it is no longer a

12   complete ban case.  If we try the question for one of these

13   plaintiffs as to whether they got a delay in meeting with their

14   attorney does that resolve the question of John Smith absent

15   class member delayed?  Absolutely not.  And that is not

16   something that can be remedied.  When we're talking about the

17   likelihood of success on the merits on the issue of class

18   certification there has been no showing that we could ever

19   overcome that particular aspect of this case.  Obviously the

20   standing issues, the class cannot have people in it that do not

21   have standing, and the Court has to actually take up the issue

22   of standing of the named plaintiffs first before we can even

23   get to the certification analysis.  But ultimately, Your Honor,

24   the problem here is typicality and that issue of how to try the

25   case.  There's been no workable trial plan put forth by the

1    plaintiffs to accommodate these problems.  And so we believe

2    that this is one of the fundamental problems with the

3    injunctive relief component because there can't be a likelihood

4    of success on the merits on the issue of class certification.

5        THE COURT:  Wouldn't you agree -- actually, I quite

6    frankly think it's probably even less so -- I mean although I

7    think there's some arguments to be made under the more

8    traditional 23(a) kind of factors that you've pointed out that

9    you believe typicality, under 23(a)(3), is the bigger

10   impediment.  I mentioned commonality under two.  But I think,

11   quite frankly, it's even broader than earn that.  It would be

12   under 23(b)(3), meaning that under 23(b)(3), we have to also

13   have a predominance analysis.  That's really where it breaks

14   down.

15       You know the barriers for commonality and typicality

16   aren't the hardest to satisfy in the world.  I'm not saying you

17   don't have a good argument.  But the bigger fundamental

18   question is do common issues pre dominate under 23 B 36789 and

19   I will tell you that's where I think we start to get into a lot

20   of problems because we're now dealing with plaintiffs that are

21   not necessarily similarly situated.  We have organizational or

22   attorney plaintiffs.  We have detained plaintiffs.  Different

23   detained plaintiffs are at different places in the sense of

24   their case and their nature of the meetings with their lawyers

25   and what they have and not been able to do.  So it just becomes

1    a little unwieldy and the question then becomes is a class

2    mechanism, when you lack predominance the best way about doing

3    this.  That I can agree with you can be discussed at a

4    preliminary injunction motion here like today and in an order

5    that comes from this hearing because if there's a predominance

6    problem then that goes to the heart of likelihood of success on

7    the merits for operative complaint that asked for class

8    relieve.  But I think it's even more about 23 B than it would

9    be about typicality and commonality.

10         MR. ZACHERL:  Judge I think you're absolutely right on

11   all those points with the caveat that when I read the complaint

12   I didn't see a (b)(3) class.

13         THE COURT:  Yeah.

14         MR. ZACHERL:  I only saw a (b)(2).

15         THE COURT:  Yeah.

16         MR. ZACHERL:  This is a non final order it's a case

17   management.  Class certification is case management issue at

18   the end of the day.  Right?  So it is appropriate to look at

19   (b)(3).  But even under the (b)(2) analysis and the un vary

20   visibility requirement and the cohesiveness requirement there's

21   a lot of U.S. Supreme Court case law that is very specific on

22   this point, the Wal-Mart V Duke case is very specific in saying

23   that the Court has to be able to resolve the problem on a

24   (b)(2) class, which is what they're asking for, in one stroke.

25         THE COURT:  And you're right.  In fact -- my apologies.

1    Because it really is -- looking at the complaint here it's only

2    under a (b)(2) because it's injunctive relief but it doesn't

3    change the fact that under (b)(2) it must apply generally to

4    the class.  So it still -- it goes back a little more on

5    typicality and commonality because that general application in

6    your view begins to break down when you have all of these

7    plaintiffs dealing with different or distinct First Amendment

8    problems right.

9         MR. ZACHERL:  Well in our view, Judge, you don't need

10   to go any further in the analysis of likelihood of success on

11   the merits than looking at the likelihood of success on the

12   issue of class certification.  If you put that on the side, I

13   think the Court is correct, that you could issue some sort of

14   injunction on these individual claims based on perhaps a more

15   fulsome record than we have here.  But certainly on the issue

16   of class certification, there's been nothing put into this

17   record that would permit the Court to undergo that rigorous

18   analysis.  You know the valley drug case, I think it's called,

19   from the Eleventh Circuit, the Rule 23 requirements are not

20   just requirements, they are -- they are safeguards.

21        THE COURT:  Right.  And let me be clear:  Also, I don't

22   want any of the plaintiffs to be concerned.  We haven't, nor

23   are we going to rule on the motion for class cert.  In fact, I

24   know plaintiffs wanted us to try to brief that all today, and I

25   declined to do so.  I still thinking looking at it is valuable

1    when we look at the preliminary injunction analysis.  But I

2    don't want anybody on the plaintiffs' side to believe that

3    we're getting all the way into Rule 23.  And I think that at

4    bottom, we still have to look at the nature of the First

5    Amendment claims just as much as we need to look at Rule 23 as

6    a mechanism.  So I -- you know, I'll look at it.  But I hear

7    you, that it's a concern certainly that I have to address in

8    the preliminary injunction analysis for sure.  I hear you on

9    that.

10             MR. ZACHERL:  Thank you, Your Honor.

11             THE COURT:  Did you want to add something, Mr. Meros?

12             MR. MEROS:  Yes, Your Honor.  Thank you.

13             The last thing I wanted to mention is that not only is

14   there not grounds for First Amendment violation but the claims

15   that are being made hear you know are really for past relieve.

16   To the extent there's any -- you know there's any claim of

17   future relief injunction of course is not appropriate for past

18   relieve it's only appropriate when there is a real, immediate

19   threat of future relieve.  Because government act, are entitled

20   to the presumption that any wrongful conduct that may have

21   occurred will not occur again.  As we've shown in this record,

22   we have a -- we actively have a policy that we are policy that

23   despite the plaintiffs' claims we are following the ICE

24   guidelines.  And while one of the exhibits may be labeled a

25   draft, it is the actual policy that the facility is

1    implementing.  So to the extent that in order to get it -- an

2    injunction of any kind much less a mandatory preliminary

3    injunction, they would have to show there's a real or immediate

4    threat of future harm.  We simply suggest that there's clearly

5    not that showing here because we're continuing to provide that

6    kind of relief.  And to the extent you know that there are

7    anecdotal examples of things that may or may not have occurred

8    that certainly does not show a real and immediate threat of

9    future harm.

10         THE COURT:  No.  And I appreciate that.  I think

11   Ms. Cho, as you've pointed out, your position is pretty clear

12   that this is perspective concerns and relieve in that some of

13   the delays are ongoing.  You've pointed out, as you just did a

14   moment ago, the irreparable harm that flows from some of those

15   delays.  So I hear you loud and clear on this, Mr. Meros.  I

16   think certainly this issue of government actors ceasing certain

17   behavior is relevant, actually, for voluntary cessation

18   purposes when it comes to the Fifth Amendment, because that is

19   why I can make an argument here that with the representations

20   that I've gotten from the federal defendants and the disclosure

21   on Saturday, the bond issue is no more.  We know that these

22   individuals can be heard at Krome.  In fact, my recollection is

23   that some of them were transferred during the pendency I have

24   this litigation to Krome, where they have then be able to

25   pursue bond determination remedies.  So I hear you that there's

1    no question that there is a rebuttable presumption.  The case

2    law says it, Troy an oh and others the rebuttable presumption

3    of something behavior did not occur is afford an to a

4    government actor.  I'll take a look at that.  Of course the

5    same thing I've heard from the plaintiffs a team that we

6    continue to have some concerns here on the delay in getting

7    access to counsel.  Right?

8         Let me then also jugs hear final Friday the federal

9    defendants.  Anything else manages rod on the federal defendant

10   front in terms of issues we may not have touched on or any

11   finer points you wish to make on the subjects we have a

12   covered.

13        MS. RODRIGUEZ:  Your Honor on the scope of the

14   injunction.

15        THE COURT:  Sure.

16        MS. RODRIGUEZ:  It's our position that the plaintiffs

17   cannot make a substantial showing of likelihood of success on

18   the merits.  They cannot meet the other requirements for

19   preliminary injunction.  And the request -- the relief that

20   they requested would not extend to the federal government.

21   They've requested relief that dealings with today to day

22   activities and is the actual operations that are happening at

23   Alligator Alcatraz.  Those are within the province and within

24   the power of the state.  The state agrees with that.  There's

25   no issue with that.

1          And so any un junction that would be issued -- and I

2    don't think that there is a basis for an injunction here, Your

3    Honor -- would necessarily not cover the federal defendants.

4    There's no basis for that.

5          THE COURT:  Yeah.  That's -- goes more also to some of

6    our earlier arguments that -- again I would imagine this is

7    directly relevant to the venue argument that has been made.

8    Right?  And that is there is no day to day oversight by the

9    federal defendants.  So in as much as any First Amendment

10   arguments are being advanced, it is not a function of the

11   federal defendants that allege First Amendment violations are

12   happening on the ground.  There is not direction or lack

13   thereof, as you heard from the plaintiffs' side, the omission

14   under 287, and that relationship by the federal defendants

15   giving rise to the First Amendment claim.  So the argument

16   would be that even if there was grounds for preliminary

17   injunctive relief, nah certainly it should not be encompassing

18   the federal defendants who in your view I think, Ms. Rodriguez,

19   have not taken an active role in running the facility.  So

20   therefore, they have not played any part in any First Amendment

21   violations because again simply as we've seen in this record

22   having people directed to Krome or directed to call, as some of

23   the state defendants have done, where there's been a question

24   about bond issues and immigration court, simply being directed

25   to reach out to Krome doesn't somehow transform the claim to

1    one of a First Amendment nature committed by the federal

2    defendants.  The only involvement really has been EOIR on the

3    Fifth Amendment, which is no longer a live issue.  So your

4    point is, there really is nothing for the federal defendants to

5    be ^ * enjoined with dealing with First Amendment issues

6    because they didn't participate in those issues in the first

7    place because they're not on the ground in Alligator Alcatraz,

8    correct?

9              MS. RODRIGUEZ:  Correct, Your Honor.

10             THE COURT:  Yes, Mr. Meros.

11             MR. MEROS:  I don't want to take too much time.  I know

12    the plaintiffs mentioned before the *Turner* test and

13    reasonability access we would say the *Pesci* and *Turner* does

14    absolutely apply so to the extent the Court dogs goat into any

15    of the reasonableness we -- certainly those tests apply in this

16    context in that given -- given no declarations given the record

17    we've demonstrated what we are applying.  It is -- it is

18    certainly clear to state defendants that the regulations we are

19    applying are certainly reasonable because there is -- you know

20    there is ample case law that for reasons of safety and security

21    and discipline of the facility, having some restriction on

22    First Amendment rights is certainly reasonable and we'd

23    certainly argue that we you know that there certainly are other

24    alternative -- there are certainly other reasonable

25    alternatives that can be applied and these kind of regulations

1   are not as the case law would found overreaction to the

2   situations.  I didn't want to get into that too much but I at

3   least wanted to flag that for the court.

4        THE COURT:  No I appreciate that because I think any

5   First Amendment claim requires a look at *Turner*.  I know

6   Ms. Cho has mentioned some of those cases as well in both the

7   attorney plaintiff and the detained plaintiff point of view.

8        Ms. Cho I want to give you an opportunity before we

9   conclude.  I don't want you to be concerned arguing too much

10  into the class certificate issue.  We got a little bit into

11  that and I've made clear we're only doing a preliminary peak on

12  it.  But did you want to add anything on that or other points

13  before we conclude.

14       MS. CHO:  Yes, Your Honor.  Thank you.  With respect to

15  the class certification motion, just to clarify that the

16  plaintiffs are not requesting class certification under

17  23(b)(3).

18       THE COURT:  Just (b)(2) right.

19       MS. CHO:  We are asking for a 23(b)(2) class.  And, of

20  course, 23(b)(2) class are -- this case has appeared in

21  Maryland objecting 23 B 23 class in that it is a civil rights

22  action asking for injunctive relief to resolve violation of

23  constitutional violation.  We have properly pled this and the

24  defendants have not responded to this.

25       And with respect to the arguments regarding typicality

1    and the (b)(3) argument, which of course is not an argument

2    that the plaintiffs have raised here, this has not been briefed

3    before the Court.

4            THE COURT:  Right.

5            MS. CHO:  And the Court would need to give the

6    plaintiffs a proper opportunity to reply to that.

7            THE COURT:  Know and I don't think I would be getting

8    into that issue at all.  I think the important thing is, to

9    your point, as a (b)(2) simply taking a look and making sure

10   that there's not a problem with kind of that general

11   commonality is the most the Court would look to just to see

12   that it's a viable mechanism for the First Amendment class

13   that's really what it is.  And I know, as you do, that there

14   could always be a determination on subclasses.  The Court would

15   be at liberty to redefine classes if I felt I needed to for the

16   confidentiality, et cetera.  So there's flexibility built-in to

17   the joints of a (b)(2) class that you've requested.

18           MS. CHO:  Thank you, Your Honor.  And I would, of

19   course then point you to the Florida immigration coalition case

20   that talks about the fact that the critical inquiry in a (b)(2)

21   class is whether the class members have suffered a common juror

22   identical injuries that could be addressed by classified

23   injunctive or declaratory relief and that of course is the case

24   here today.

25           THE COURT:  Right your view has been that it is common

1    enough under (b)(2) and we don't need to get caught up with the

2    nature or the maybe granular level of First Amendment

3    violation, whether it be legal documents, comfort at, or delay,

4    at its core those are all flowing from denial of access to

5    counsel type claims, right.

6         MS. CHO:  That's right Your Honor.  The other thing is

7    that we are slightly confuse the by the state's position

8    because it has been shifting throughout the case and indeed

9    throughout you today's hearing with respect to position

10    regarding voluntary cessation.  We believe that the statement

11    defendants have stated they're not stating a voluntary

12    cessation claim.

13         THE COURT:  My understanding is the only voluntary

14    cessation analysis in a would even feel is warranted would be

15    under the Fifth Amendment because that's the only one where

16    it's viable.  I have to go through that.  Much my understanding

17    of the court law in preparation for today is in these type of

18    situations, you would right to raise voluntary cessation

19    because there could be a concern that the ball shifts about

20    where the facility will be in the future in terms of bond

21    determination who's going to have jurisdiction.  That's why I

22    pressed Ms. Rodriguez.  I now have an answer on record and a

23    filing.  So I think I'm in a better position to be less

24    concerned, if you will.

25         And I guess my problem to the plaintiffs on that front

1   is, even if the Court does not find that I need to go through a

2   voluntary cessation analysis or that voluntary cessation is not

3   applicable because we have guarantees it doesn't mean that

4   there couldn't be a request for relief at some point if the

5   government decides to shift the ball again.  Right?  And decide

6   to pick a new spot, or worse, remove from the website where you

7   go get your bond determinations, I think you'd have every right

8   in the world to come back and seek relief in that case.

9          MS. CHO:  Thank you, Your Honor.

10          THE COURT:  Yeah.

11          MS. CHO:  Third issue that I just wanted to cover --

12          THE COURT:  Yeah.

13          MS. CHO:  -- really briefly is the issue of *Turner* and

14   the applicability of the reasonability standard.

15          The defendants have just stated for the first time that

16   the draft policy, I think, that was attached at the Saunders

17   declaration, Exhibit Number 10, is in operation at the facility

18   even though it is marked with draft.  That has never been a

19   fact that has been made clear to the plaintiffs or to the

20   Court.  And I want to just underscore the implications of the

21   defendant's representation right there.

22          If you look carefully at the Saunders declaration,

23   Exhibit Number 10, which is this draft policy that the

24   defendants are purportedly now implementing with respect to

25   attorney access at the facility, the facts on the ground show

1   that that policy is being clearly violated at every turn.

2   There are -- that policy actually provides that visitation

3   shall be happening in person, without a requirement for an

4   appointment.  It requires that visitation policies are openly

5   posted to the public and are provided to detainees.  These are

6   all things that defendants have claimed that they don't have to

7   do, and currently they do not dispute that that is not taking

8   place.

9        In addition, the importance of that admission that the

10  defendant's counsel has just made is particularly important for

11  the Court's analysis under *Turner*.  The *Turner* analysis states

12  that whether or not the Court agrees with the fact that this

13  should apply at the civil immigration detention facility, the

14  *Turner* analysis requires that if there are reasonable

15  alternatives to what is taking place at the facility now, that

16  it is, in fact, a violation of the Constitution, it is a

17  violation of the First Amendment because there is no reasonable

18  explanation or justification for the violations to be taking

19  place.  And if the defendants are positing that the draft

20  policy that is at Exhibit Number 10 is indeed the policy that

21  is in place, and that they can adhere to that policy, then

22  there is even less explanation as to why that is not a

23  reasonable alternative in the face of the violations that are

24  taking place currently.

25        THE COURT:  Yeah.  I guess -- look, I agree with you

1    that there is another undercurrent here, almost a different

2    claim that's been formulating or lurking in the background, and

3    that has been something that I have been looking at it and

4    watching it develop by way of the interrogatories and the

5    production of documents.  You know, it's not what I have before

6    me here on the First Amendment.  Again, I want to be clear:  We

7    don't have this type of 287 or ICE standard arguments, that

8    Alligator Alcatraz is operating outside the bounds of its

9    authority, or without authority, or outside the scope of a 287.

10   That has been a -- again, it's been in the outskirts of all of

11   the papers.  It's not really framed, but it's not something

12   that we should overlook.  I mean, I certainly don't know if it

13   will play a part for purposes of the hearing today and any

14   future ruling, but it has been a concern of the Court, you

15   know, from the very, very beginning, that certainly there could

16   be a disconnect between what is required by 287 and the ICE

17   standards and what is being done under the guise of this

18   federal authority ^ * seeded seated to the state in how it's

19   running Alligator Alcatraz.  That's been there, and that

20   continues to be a concern for the Court.

21          As I stated, I don't know that it will be one that

22   manifests itself in this case.  That might be a different case.

23   But certainly, I would imagine that if it comes out of this

24   litigation and has been clarified, then plaintiffs may wish to

25   seek relief on a separate and independent ground than what we

1    see here.  I will focus and train my eye on the First

2    Amendment, and I will, of course, be cognizant of the (b)(2)

3    concern, but I'm not going to get too caught up in that.

4              I do want to confirm, though, to your question:  Maybe

5    it would be good, Ms. Cho, that we get that explicitly

6    confirmed on the record today when it comes to that Exhibit

7    Number 10, I believe, right?

8              Is that correct, Mr. Meros?  That's the draft one.  Is

9    that operational?  I don't know the answer to that.

10             MR. MEROS:  Well, Your Honor, I would -- I would need

11   to confirm that with my client.  I mean, that has been my

12   understanding.  That is why we attached it as an exhibit.

13             THE COURT:  Your understanding is that is the

14   operational plan, that it's operative?

15             MR. MEROS:  Well, Your Honor, again I don't want to

16   make a representation to this Court and have to take it back.

17   So if the Court would like me to make a representation, I can

18   confirm that with the client.  But, you know, I don't -- again

19   --

20             THE COURT:  Yeah.  I will say this:  I don't know that

21   I need it for the record, but, certainly, you mentioned it just

22   now in your argument, and Ms. Cho correctly picked up on it.

23   If you want to clarify that, then I would ask that you perhaps

24   either submit something with the Court just to make clear

25   whether it is or is not operative.  It could be very similar to

1    what we received from the federal government on the issue of

2    the bond determination.  But that might help.  I don't know

3    that it is necessarily relevant for my ruling, but it would be

4    a material development that I think would benefit all of us to

5    understand what's happening on the ground.  So if you could,

6    please confirm that for me.  That would be helpful.

7            MR. MEROS:  Yes, Your Honor.

8            THE COURT:  And I would ask, if you can, file something

9    by the end of today on that, if you could.  All right?

10           MR. MEROS:  Okay.

11           THE COURT:  So by 5:00 p.m., let's just get a state

12   notice of whether or not Exhibit Number 10 is truly the

13   operational plan.  Let's get that because I think that'll help

14   us get a better sense ever what's happening on the ground.

15           Does that make sense, Ms. Cho?

16           MS. CHO:  Yes, Your Honor.

17           THE COURT:  So he'll look for that, Mr. Meros.  But I

18   think that everything else has been properly framed for the

19   Court.

20           So I will get to work right away because, again, I'm

21   very sensitive to the fact that if I feel hamstrung by the

22   venue statute, that I don't waste any time because we've

23   essentially teed up everything in this case, and it is

24   prepared, absent a venue problem, for a ruling on preliminary

25   injunctive relief on the First Amendment.  So my hope is that

1    if, ultimately, I feel constrained by venue for the state

2    defendants, and now that everyone has consented that if I do

3    so, under 1404, it should go to the Middle District, then I've

4    done everything I can, absent ignore statutory command, which I

5    will not do, to position this for a sister court in the Middle

6    District.  Because everything has been briefed.  The motion is

7    teed up.  The Court can put out an order that clarifies

8    everything I can in terms of mootness, jurisdiction, and the

9    like.  And then hopefully, if it can't be me, if I can't get

10   through 13 -- and I'm going to look at the *Inch* case.  But if I

11   can't get through the 1390 analysis, then I will attempt to

12   leave as much as I can in terms of breakdown on everything else

13   we've talked about today so that it advances the ball.  I don't

14   want this to be delayed any further.  We've tried to move

15   expeditiously.  But I know that plaintiffs need a ruling on the

16   injunctive relief portion of this as soon as possible.

17            So with that, is there anything else before we conclude

18   so that I can go back to chambers and begin reviewing and

19   writing?  And I meant to say 1391 -- excuse me -- would be the

20   bar, not 1390.

21            Anything else on behalf of the plaintiffs?

22            MS. CHO:  No, Your Honor.  Thank you very much.

23            THE COURT:  Thank you.  Anything else on behalf of the

24   state defendants?

25            MR. MEROS:  No, Your Honor.  Thank you.

1          THE COURT:  Anything else on behalf of the federal

2     defendants?

3          MS. RODRIGUEZ:  No, Your Honor.  Thank you.

4          THE COURT:  Thank you all very much for your

5     submissions.  The Court will issue a ruling as soon as

6     possible.  So thank you, everyone.  We are in recess.

7          THE COURTROOM DEPUTY:  All rise.

8          (Court recessed at 12:31 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25