## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| M.A., on behalf of himself and a class of similarly situated individuals, *et al.*,<br><br>      *Plaintiff*,<br><br>  v.<br><br>KEVIN GUTHRIE, in his official capacity as Executive Director of the Florida Division of Emergency Management, *et al.*,<br><br>      *Defendants*. | No. 2:25-cv-765-KCD-DNF |

## STATE DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS FOR CLASS CERTIFICATION AND FOR A PRELIMINARY INJUNCTION

JAMES UTHMEIER
  *Attorney General*

JEFFREY PAUL DESOUSA (FBN 110951)
  *Acting Solicitor General*
JASON MUEHLHOFF
  *Chief Deputy Solicitor General*
ROBERT S. SCHENCK (FBN 1044532)
  *Assistant Solicitor General*
CASEY WITTE (FBN 1070288)
  *Solicitor General Fellow*
WILLIAM H. STAFFORD III (FBN 70394)
  *Special Counsel*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399
Phone: (850) 414-3300
Facsimile: (850) 410-2672
*robert.schenck@myfloridalegal.com*

*Counsel for State Defendants*

# TABLE OF CONTENTS

Introduction ...................................................................................................... 3

Statement of Facts ............................................................................................ 4

    A.    The immigration crisis and creation of Alligator Alcatraz .................... 4

    B.    Legal background of immigration detention ........................................ 6

    C.    Plaintiff MA and the purported class .................................................. 9

Legal Standard ................................................................................................ 10

Argument ........................................................................................................ 11

I.    MA has not met the preliminary-injunction factors. .................................. 11

    A.    MA is unlikely to succeed on the merits of his claim that the State lacks authority to assist the federal government. ...................... 11

        1.    Alligator Alcatraz is permissible because of the federally declared "Immigration Emergency." ....................... 12

        2.    Section 1357(g)(10) permits the State's cooperation with immigration detention chiefly done by ICE. .................. 13

        3.    287(g) agreements also authorize the State Defendants to house immigration detainees. ......................... 15

    B.    MA has not been irreparably harmed .................................................. 28

    C.    The equities of deterring illegal immigration favor permitting the State to assist ICE while litigation develops. .............. 30

II.    MA has not proven that his class merits certification ................................. 31

    A.    The INA bars MA's proposed class because it interferes with the operation of immigration detentions ................................... 31

    B.    No source of law permits the novel "habeas class." .......................... 35

        1.    Rule 23(b)(2) does not permit habeas class-actions. ................ 36

        2.    MA cannot base a class on freeform principles of "equity" or the All Writs Act ................................................... 38

Conclusion ...................................................................................................... 40

## INTRODUCTION

Since the earliest "days of the Republic," "the States and Federal Government voluntarily provided one another" with "extensive mutual assistance." *Printz v. United States*, 521 U.S. 898, 911 (1997). Indeed, "history supports state officers *voluntarily* enforcing federal law" through numerous methods of assistance. *United States v. Whitlow*, 134 F.4th 914, 920 (6th Cir. 2025). Congress codified that tradition of sovereign cooperation in several provisions of the Immigration and Nationality Act (INA). *See, e.g.*, 8 U.S.C. §§ 1103(a)(10), 1103(a)(11), 1357(g)(1), 1357(g)(10).

To aid the federal government in addressing the illegal immigration crisis, Florida constructed Alligator Alcatraz, a detention facility. At that facility, Florida chooses to house certain federal immigration detainees at the request of the United States Immigration and Customs Enforcement (ICE). ICE personnel also supervise any immigration functions at the facility. Plaintiff MA is an alien detained at Alligator Alcatraz who seeks to undo this cooperation among sovereigns. He asks this Court for a preliminary injunction and class certification on the theory that Florida lacks authority to detain *any* immigrants at Alligator Alcatraz, even at the express request of ICE.

The Court should deny his request. No part of the INA prohibits Florida from assisting ICE in this way. In fact, the INA authorizes Florida's assistance multiple times over, several of which MA does not even challenge. First, the INA lets the federal government declare an immigration emergency and give Florida's officers any immigration power, which it did here. *Id.* § 1103(a)(10); *see infra* 4. Second, Florida may "cooperate" in any "detention" that ICE conducts. 8 U.S.C. § 1357(g)(10)(B).

3

Finally, Florida can enter into a written agreement with ICE to perform certain immigration functions, which include "detention." *Id.* § 1357(g)(1). Each of those provisions independently authorizes Florida's actions at Alligator Alcatraz.

MA's request for class certification fares no better. Most obviously, class-wide relief in this context, whether framed as a class for injunctive, declaratory, or habeas relief, is barred by 8 U.S.C. § 1252(f)(1). And habeas classes are further unavailable, both as a general matter and as applied to the specific relief MA seeks here.

## STATEMENT OF FACTS

### A. The immigration crisis and creation of Alligator Alcatraz

Florida, like the entire Nation, faces an illegal immigration crisis. On January 6, 2023, Governor Ron DeSantis declared a state of emergency "from the impacts of mass illegal migration into the State." *Friends of the Everglades v. Sec'y of U.S. Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567, at *1 (11th Cir. Sept. 4, 2025). Earlier this year, the Secretary of the Department of Homeland Security (DHS) formally declared a "mass influx" of immigrants into America. *Notice of Finding of Mass Influx of Aliens*, 90 Fed. Reg. 8399-02, 8400 (Jan. 29, 2025). Since then, the Secretary has repeatedly extended this declaration and "request[ed] the assistance of State and local governments in all 50 States." *See, e.g.*, *Finding of Mass Influx of Aliens*, 90 Fed. Reg. 45396-01, 45397–98 (Sept. 22, 2025). Those declarations emphasized the need for additional detention space to address the influx of unlawful immigrants and allow DHS to focus on removing the most dangerous aliens first. *See, e.g.*, *id.*

Florida heard this call to action. Governor Desantis directed the Florida Department of Emergency Management (FDEM) to coordinate with other agencies—federal and state—to assist the federal government in responding to the illegal migration crisis. *Friends of the Everglades*, 2025 WL 2598567, at *1. FDEM used its emergency powers to assume control of an airport in the Everglades, build Alligator Alcatraz, and house illegal aliens on behalf of ICE at the facility. *Id.* at *1–2.

Alligator Alcatraz "is a site built, led, operated, and funded" by Florida. *Id.* at *9 n.7. Eleven state agencies, including FDEM, run the facility. Ian Gadea-Guidicelli Decl. ("IGG Decl.") ¶ 10. Each state agency involved (other than FDEM) has an agreement with the federal government—known as a 287(g) agreement—that allows state officers and employees to conduct certain immigration-officer functions. In support of those operations, the state agencies contracted with private vendors to help "construct[]" Alligator Alcatraz and provide "day-to-day maintenance." IGG Decl. ¶ 12. Any immigration-related work is done under the "oversight, supervision, direction, and control" of the deputized state officials there. *Id.* ICE inspected and confirmed that the facility complied with ICE's detention standards. IGG Decl. ¶ 7.[1]

Every detainee's presence at Alligator Alcatraz results from federal-state cooperation. When ICE seeks temporary housing for its detainees in Florida, ICE reaches out to state officials to request detention space. IGG Decl. ¶ 9. State officials then

---

[1] In August, ICE confirmed once again that Alligator Alcatraz meets its "federal detention standards" and repudiated the media's "allegations of inhumane conditions." *See DHS Debunks Alligator Alcatraz Hoaxes*, Dep't of Homeland Sec. (Aug. 14, 2025), https://tinyurl.com/5b2trb66.

decide whether to accept or refuse ICE's detainee based on a variety of factors. *Id.* The State retains total "discretion in deciding" whether to house an alien on behalf of ICE. *Id.* If the State accepts, an ICE officer transfers that detainee to Alligator Alcatraz. *Id.* If the State or ICE no longer wants to house a particular detainee at Alligator Alcatraz, ICE transfers the alien out of the facility. *Id.*; DE68-1 at 13. ICE is responsible for the transfer of detainees in and out of the facility. IGG Decl. ¶ 9. Though ICE does not pay for detention space at the facility, ICE has authority over its detainees throughout the process. DE68-1 at 13; IGG Decl. ¶¶ 8–9. ICE can, for instance, require transfer at any time, litigates immigration removal proceedings, and ensures that all immigration functions at the facility are exercised in "compliance with federal immigration law and ICE policies." DE68-1 at 13; *see* IGG Decl. ¶¶ 9, 13.

Florida and ICE play separate roles. Florida conducts the ordinary day-to-day operations of Alligator Alcatraz, while "ICE supervises all immigration functions." IGG Decl. ¶ 13. ICE officers "sign off on charging documents, review detainers issued by ICE, run federal database system checks, transfer detainees in and out of the facility, interact with detainees as needed, and provide guidance any time immigration authority is exercised." *Id.* ICE officials routinely communicate with state officials about immigration operations at the facility. *Id.* There are also "ICE officers" at the facility who coordinate the transport and physical custody of detainees. *Id.*

## B.  Legal background of immigration detention

In 1996, Congress amended the INA through the Illegal Immigration Reform and Immigrant Responsibility Act. *Reno v. American–Arab Anti–Discrimination Comm.*,

525 U.S. 471, 473 (1999). That law "protect[s] the Executive's discretion from the courts" by drastically reducing judicial review under the INA. *Id.* at 486.

The Executive's responsibility and discretion under the INA includes the detention and removal of certain aliens. Those functions are carried out by the Secretary of Homeland Security. 8 U.S.C. § 1103(a)(1); *see also* 6 U.S.C. §§ 202, 251, 291, 557. With that authority, the Secretary may detain any alien "pending a decision on whether the alien is to be removed from the United States," 8 U.S.C. § 1226(a), and for purposes of removal, 8 U.S.C. § 1231(a)(2). The INA mandates that the Secretary "shall" detain certain criminal and inadmissible aliens pending removal proceedings, *id.* § 1226(c), aliens to whom the federal government has not granted lawful admission to the country, *id.* § 1225(b), and certain aliens ordered removed. *Id.* § 1231(a)(2).

That detention power encompasses the selection of where an alien is detained. The INA "gives both 'responsibility' and 'broad discretion'" to the Secretary "to choose the place of detention for deportable aliens." *Geo Grp. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (citing 8 U.S.C. § 1231(g)). Section 1231(g) specifically empowers the Secretary to select "appropriate places of detention for aliens." 8 U.S.C. § 1231(g).

Congress also confirmed the States' traditional authority to assist federal officers in at least three ways.

**287(g) agreements.** Named after the statutory section that authorizes these agreements, 287(g) agreements permit the Secretary to deputize state officers and employees to act as federal immigration officers. 8 U.S.C. § 1357(g)(1)–(9). If she sees them as "qualified," those individuals may "carry out" any "function of an

immigration officer in relation to the investigation, apprehension, *or detention* of aliens in the United States." *Id.* § 1357(g)(1) (emphasis added). This power is subject to a few caveats. Deputies are "subject to the direction and supervision of the" Secretary. *Id.* § 1357(g)(3). And Section 1357(g) requires that the contract itself contain clauses requiring deputies performing an immigration function to "have knowledge of, and adhere to, Federal law relating to the function" and "a written certification that the" deputy has "received adequate training regarding the enforcement of relevant Federal immigration laws" about that function. *Id.* § 1357(g)(2).

**General cooperation.** The INA also authorizes general cooperation. Under Section 1357(g)(10), States—even apart from a 287(g) agreement—can "cooperate" with federal officials "in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10). The Secretary may also clothe "any State or local law enforcement officers" with all immigration powers when she declares an "actual or imminent mass influx of aliens off the coast of the United States, or near a land border." *Id.* § 1103(a)(10). Such a declaration has been in place since January 2025. *See supra* 4.

**Providing detention space.** States may alternatively assist by providing detention space. The federal government has inherent authority to contract or form agreements for detention space, *Geo Grp.*, 50 F.4th at 751, stemming from its authority to select appropriate places of detention, 8 U.S.C. § 1231(g), and its general authority to contract to expend money to exercise that discretion, 6 U.S.C. § 112(b)(2); 48 C.F.R.

8

§ 1.601(a); 48 C.F.R. § 3017.204-90; 28 U.S.C. § 530C(a); 8 C.F.R. § 235.3(e)). The federal government often uses this authority, for instance, to contract with private prison companies. *Geo Grp.*, 50 F.4th at 751. Relatedly, the federal government may reimburse States for immigration detention space. 8 U.S.C. § 1103(a)(11). "[I]n support of persons in administrative detention in non-Federal institutions," the Secretary is "authorized" to use "funds appropriated for . . . laws relating to immigration, naturalization, and alien registration" to pay for "the housing, care, and security of persons detained by the Service [(now ICE, an agency under DHS)] pursuant to Federal law under an agreement with a State." *Id.* The Secretary has entered into these types of agreements with numerous state and local governments. *See infra* 23–24 & notes 5–9.

### C.    Plaintiff MA and the purported class

MA is an anonymous alien "currently being detained at" Alligator Alcatraz. DE1 ¶¶ 9, 17, 19. His declaration is vague, but he entered the country in 2018 on a visa and later applied for asylum. DE1 ¶ 10. On July 23, 2025, officers of some law enforcement agency arrested MA, and he was sent to Alligator Alcatraz three days later. DE1 ¶¶ 11–12. After his arrival, MA alleges that he was sent to the hospital "twice for acute medical issues" when he "woke up unable to feel his legs and in acute pain." DE1 ¶¶ 14–16. MA says that he "has not appeared in ICE's online detainee locator" "[s]ince his arrest." DE1 ¶ 18.

In late August, MA sued the State Defendants, who operate Alligator Alcatraz, as well as an employee of a private vendor. DE1 ¶¶ 20–31. The same day, MA moved to represent a class of "[a]ll individuals who are detained, or will be detained, at

Alligator Alcatraz," DE1 ¶ 92; DE4 at 2, for declaratory and injunctive relief and writs of habeas corpus that "bar[] Defendants from detaining class members at the facility." DE1 at 24. More than a month later, MA filed a motion for a preliminary injunction. DE68. MA claims that Alligator Alcatraz violates the INA provision authorizing 287(g) agreements, 8 U.S.C. § 1357(g), and that the State Defendants lack authority to operate the facility as a result. DE68 at 2.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, plaintiffs must show each of the following: (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury absent the injunction; (3) their threatened injury outweighs the harm the injunction may cause to defendants; and (4) the injunction is in the public interest. *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020).

As for a class action, "the awesome power of a district court [to certify a class] must be 'exercised within the framework of [R]ule 23.'" *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004). That power deviates from the ordinary rule "that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–49 (2011). The plaintiff must prove each of the four factors of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and satisfy at least one category of Rule 23(b). *See* Fed. R. Civ. P. 23(a), (b). To squeeze into Rule 23(b)(2), plaintiffs must show that the party opposing the class has acted or

refused to act on grounds that apply generally to the class. *See* Fed. R. Civ. P. 23(b)(2).

The "rigorous analysis" of Rule 23 requires "evidentiary proof" that both the require-

ments of Rule 23(a) and "at least one of the provisions of Rule 23(b)" are met. *Comcast*

*Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013).

## ARGUMENT

I.   **MA HAS NOT MET THE PRELIMINARY-INJUNCTION FACTORS.**

A.   **MA is unlikely to succeed on the merits of his claim that the State lacks
     authority to assist the federal government.**

MA claims that Defendants lack authority to run a state facility that assists ICE

in its detention of illegal immigrants. Nothing in the INA commands that counterin-

tuitive result. The Supreme Court has been clear that, even in the immigration context,

"courts should assume that the historic police powers of the States are not superseded

unless that was the clear and manifest purpose of Congress." *Arizona v. United States*,

567 U.S. 387, 400 (2012) (citation omitted). Among those historic powers include the

ability of state officers to "*voluntarily* enforc[e] federal law." *Whitlow*, 134 F.4th at 920.

To rule for MA, this Court would therefore have to hold that Congress clearly

designed the INA to render the federal government helpless to ask the States to assist

it. That reading defies the text of the INA, basic notions of cooperative federalism, and

common sense. The INA authorizes Defendants' actions in three separate ways, and

MA offers nothing to refute these independent sources of state authority.

### 1.    Alligator Alcatraz is permissible because of the federally declared "Immigration Emergency."

The INA clearly provides authority for the State's actions under 8 U.S.C. § 1103(a)(10), which MA fails to address. That provision permits the Secretary of DHS to declare an emergency from a "mass influx of aliens" and then "authorize any State or local law enforcement officer" to perform "any of the powers, privileges, or duties" of any "officers or employees of" DHS. 8 U.S.C. § 1103(a)(10). Using that authority, the Secretary has requested "the assistance of State and local governments in all 50 States" to bolster ICE's "capacity to hold all aliens as required by the INA." *Finding of Mass Influx of Aliens*, *supra*. Without that assistance, ICE "would be hampered in this critical effort and be unable to detain a large number of aliens" that the INA requires, undermining its priority to detain and remove "aliens with criminal records, public safety risks, and national security risks." *Id.*

Nothing more is needed. In requesting the States' assistance to address an immigration emergency, DHS authorized Defendants to assist in detaining illegal aliens. *See* 8 C.F.R. §§ 236.1, 287.5, 287.8; 8 U.S.C. §§ 1225(b)(2), 1226(a), 1226(c). Any interference with those detention actions is barred from judicial review. 8 U.S.C. § 1226(e); *United States v. Velasquez Velasquez*, 524 F.3d 1248, 1252 (11th Cir. 2008). Section 1226(e) makes clear that courts may not "set aside any action or decision by the [Secretary] under this section regarding the detention of any alien." 8 U.S.C. § 1226(e). Section 1226(a) permits detention of any alien pending a decision on

removal, and Section 1226(c) requires that certain aliens be detained for the same. *Id.* § 1226(a), 1226(c).

### 2. Section 1357(g)(10) permits the State's cooperation with immigration detention chiefly done by ICE.

Adding to that, Section 1357(g)(10) separately supports Defendants' actions. Yet again, MA does not even note this source of authority. That section permits States to "cooperate with the [Secretary] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10). That cooperation encompasses actions by state officials taken under "express direction of federal officials," as distinct from "unilateral" state action. *United States v. Ovando-Garzo*, 752 F.3d 1161, 1164 (8th Cir. 2014). Cooperation includes activities by state officials who are "in a position to be—and, when requested, must in fact be—responsive to federal enforcement discretion," and "systematic" state actions constitute cooperation if they do not "conflict[] with the policies or priorities set by the Federal Government or limit[] the ability of the Federal Government to exercise discretion under federal law whenever it deems appropriate."[2] Put another way, a State cooperates with the United States when it aids ICE in conducting ICE's detentions.

That resolves this case. Holding and housing illegal aliens at Alligator Alcatraz is a form of cooperation done at ICE's "express" request. *Ovando-Garzo*, 752 F.3d at 1164. When ICE requests detention space from Florida, ICE asks for Florida's

---

[2] Dep't of Homeland Sec., *Guidance on State and Local Governments' Assistance in Immigration Matters* 8–10 (2011), https://tinyurl.com/yvhars9s.

cooperation; and by accepting detainees, the State agrees to cooperate. *See* IGG Decl. ¶ 9. Congress did not need to specify that giving detention space could be cooperation, given the Secretary's plenary authority to identify "appropriate places of detention for aliens." *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999); *see* 8 U.S.C. § 1231(g)(1). Just as there was no need for Congress to specify that private prisons would be appropriate places of detention, it did not need to specify that offering detention space at State facilities is a form of cooperation. *GEO Grp.*, 50 F.4th at 757 n.6.

Nor are state actors engaging in their own detentions—as opposed to cooperating with ICE's. MA is wrong that state officers are "detaining" individuals at all as the INA uses the term. *See* DE68 at 13, 22. Alligator Alcatraz detainees are instead properly understood as being detained *by ICE* under federal immigration law, with state officers lending cooperation by housing those federal detainees at the state facility. Those detainees are always in the legal custody of ICE.

While the INA does not define "detention," that term describes legal authority over a person. Detention means "holding a person in custody." *Detention*, *Black's Law Dictionary* (12th ed. 2024); *see* 8 U.S.C. § 1226(c) (treating "detention" and "in custody" synonymously). Custody can refer to physical custody or legal custody depending on context, where legal custody denotes "legal control over the person." *United States v. Joshua*, 607 F.3d 379, 386 (4th Cir. 2010). Only legal custody makes sense in the INA given the broad discretion the Secretary has over immigration detention. A focus on physical custody alone would mean the Secretary is shirking her duty to detain aliens by using any non-federal facility—because those individuals and not the

Secretary would detain them. *See* 8 U.S.C. §§ 1225(b)(2), 1226(c), 1231(a)(2). That is not so. *Geo Grp.*, 50 F.4th at 757 n.6. Because the Secretary is "vested with custody over such persons throughout their entire period of" detention, the INA "denotes a type of legal custody which remains" even when an alien "is assigned to an institution over which [DHS] has no control." *Milhouse v. Levi*, 548 F.2d 357, 360–61 (D.C. Cir. 1976). The INA observes this distinction. Even when the federal government pays for the "housing, care, and security" of aliens "in non-Federal institutions," those aliens are still "*detained by the Service*." 8 U.S.C. § 1103(a)(11) (emphasis added). That section treats "detention" as different from "housing" or "care."[3] *See id.* ICE retains ultimate authority over its detainees even at Alligator Alcatraz, meaning that ICE performs any detentions. *See United States v. Rodriguez-Fernandez*, 234 F.3d 498, 500 n.6 (11th Cir. 2000) (a person is in federal custody while "confined in an institution by direction of" federal authorities).

Florida's immigration-related activities at the facility are therefore authorized by the cooperation provision of Section 1357(g)(10).

### 3. 287(g) agreements also authorize the State Defendants to house immigration detainees.

Either of the statutory bases discussed above are enough to reject MA's claims. But the State Defendants' various 287(g) agreements further support Florida's efforts at Alligator Alcatraz. Section 1357(g) permits state and local governments to form

---

[3] One of MA's exhibits is a response to an interrogatory in a different case, with a response to a question about who has "legal custody" over detainees at Alligator Alcatraz. DE68-10 at 2–3. The facts here show, however, that state officers are not engaging in "detention" in the INA sense.

agreements with the federal government. When they do so, state or local officers or employees "determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens" may perform those functions. 8 U.S.C. § 1357(g)(1). All but one State Defendant has executed 287(g) agreements that permit their qualified officers and employees to house immigration detainees on ICE's behalf. *Supra* 5. At Alligator Alcatraz, the State Defendants do no more than "perform a function of an immigration officer." 8 U.S.C. § 1357(g)(1).

MA offers three responses. First, he claims that Section 1357(g) "does not authorize state agencies to operate their own immigration detention facilities." DE68 at 10–15. Second, MA argues that state officers deputized to act under 287(g) agreements cannot then "sub-delegate their authority to contractors" or "non-deputized state officers." DE68 at 15–19. Third, MA suggests that the deputies at the facility "have not satisfied [Section 1357(g)'s] training and supervision requirements." DE68 at 19–23. None has merit.

> ### i. Section 1357(g)(1) authorizes States to maintain a facility to assist ICE.

MA claims that States may not "operate their own immigration detention facilities" under 287(g) agreements. DE68 at 10. He supports that conclusion with a litany of negative-implication arguments from the INA that would, if accepted, maul the INA's key provisions, the Secretary's discretion, common understandings of how federal agencies work, and the underlying goals of the INA.

16

MA leads with an artificial distinction between the Secretary and her subordinates. DE68 at 12. To him, the INA dictates that "all civil immigration detainees must be held" by "the Secretary" or "the Service" (now ICE), and assigns lesser duties to immigration officers. DE68 at 11–12. Because MA thinks federal immigration officers cannot detain aliens (they can), neither can deputized state officers. *See id.* MA ignores the basic reality that a "decision or action" of agency heads is "usually" done "through subordinates." *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013). Congress codified that understanding here. "All functions of all officers, employees, and organizational units of" DHS "are vested in the Secretary," 6 U.S.C. § 112(a)(3), and the Secretary has total discretion to "delegate any of the Secretary's functions to any officer, employee, or organizational unit of the Department." *Id.* § 112(b)(1); *see also* 8 U.S.C. § 1103(a)(4). MA's reading would require Secretary Noem—or, at best, DHS as an intangible entity—to personally detain aliens. That is nonsensical.

MA's view of immigration officers' powers makes no sense either. MA asks this Court to apply the negative-implication canon to the list of powers enumerated in Section 1357(a)–(f), which he says exclusively "specifies immigration-officer functions." DE68 at 13. Because "detention" and "managing long-term detention operations" are not in that list, MA surmises that deputized state officers cannot detain under Section 1357(g). DE68 at 10, 13–14. That argument cannot be squared with the text of Section 1357(g), which authorizes state officers to "carry out" any "function of an immigration officer in relation to the . . . *detention* of aliens." 8 U.S.C. § 1357(g)(1) (emphasis added). If "*none* of the functions described in Sections 1357(a)-(f) involve detaining

people," then that list must not define the world of delegable powers under Section 1357(g). DE68 at 13. The power to detain or hold must come from somewhere else— the Secretary's power to delegate any function to immigration officers. Those functions include "detention." 8 U.S.C. § 1357(g)(1); *see also id.* §§ 1225(b), 1226(a).

The negative-implication canon does not apply when, as here, a list is not exhaustive. *Chevron U.S.A. v. Echazabal*, 536 U.S. 73, 80 (2002). But because the Secretary can always delegate any function under the INA to immigration officers, 6 U.S.C. § 112(b)(1), and because other provisions of the INA expressly give immigration officers other powers, including detention, *see* 8 U.S.C. § 1225(d), Section 1357(a)–(f) is not exhaustive. *Echazabal*, 536 U.S. at 80; *see also United States v. Chen*, 2 F.3d 330, 334 (9th Cir. 1993) (holding Section 1357(a)'s list of powers is not exhaustive). MA's logic would also prohibit *federal* immigration officers from detaining aliens; so it is no surprise he has to walk that back and admit that immigration officers *can detain* aliens— pointing to DHS regulations. DE68 at 13–14. While MA then tries to leverage those regulations to limit "which 'detention' activities are immigration-officer functions," DE68 at 13–14, the damage to his statutory argument is already done. What is more, those "internal guidance" regulations cannot be used to "limit otherwise lawful activities of [DHS] or the Secretary." 8 C.F.R. § 287.12.

MA similarly misreads Sections 1231(g) and 1103(a)(11) to limit ICE's options for detention locations. He assumes that those detention-related provisions, which authorize payment to States, are the exclusive way for States to be involved in immigration detention. DE68 at 12–13.

Section 1231(g) has the opposite result: The Secretary's power to select places of detention is plenary. *Van Dinh*, 197 F.3d at 433; *cf. Tapia v. United States*, 564 U.S. 319, 331 (2011) (describing Bureau of Prisons' authority to select places of detention as "plenary"). "No provision limits that broad authority." *Geo Grp.*, 50 F.4th at 757 n.6; *see also Calla-Collado v. Att'y Gen. of the U.S.*, 663 F.3d 680, 685 (3d Cir. 2011); *Gandarillas–Zambrana v. Bd. of Immigr. Appeals*, 44 F.3d 1251, 1256 (4th Cir. 1995). Indeed, Congress stripped judicial review of this discretionary decision several times over.[4] MA claims that the second sentence of Section 1231(g) (unsurprisingly) indicates exclusion. DE68 at 11. But that sentence merely indicates Congress's preference for existing federal facilities, providing that the Secretary may build new federal facilities only when federal "facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental." 8 U.S.C. § 1231(g)(1). It says nothing about her ability to use detention space that States offer for free. That sentence also cannot be exclusive when it assumes the existence of powers not listed (the ability to rent detention space). *Id.*; *see also Echazabal*, 536 U.S. at 80–81 (non-exclusive list cannot support negative implication).

Nor does Section 1103(a)(11) upset the Secretary's discretion. Section 1103(a)(11) provides that "in support of persons in administrative detention in non-Federal institutions," the Secretary "is authorized" "to make payments" to state or

---

[4] *See* 8 U.S.C. §§ 1226(e), 1252(a)(2)(B), 1252(b)(9); *Öztürk v. Hyde*, No. 25-1019, 2025 WL 2679904, at *5 (2d Cir. Sept. 19, 2025) (Menashi, J., concurring); *Avramenkov v. I.N.S.*, 99 F. Supp. 2d 210, 213–15 (D. Conn. 2000).

local governments for "housing" under an agreement. 8 U.S.C. § 1103(a)(11). That
provision cannot bear the weight MA puts on it.

Again, Section 1103(a) is not exhaustive. It lists only *some* of the Secretary's
powers. *See, e.g.*, 6 U.S.C. §§ 112(b)(2), 251; 28 U.S.C. § 530C(a). It is not even the
exclusive source of her contracting or detention powers. Other parts of the United
States Code instead provide for the Secretary's ability to procure detention space
through "*any means*," 28 U.S.C. § 530C(a) (emphasis added), or through "cooperative
agreements." 6 U.S.C. § 112(b)(2); *see also* 6 U.S.C. § 251 (transferring the Attorney
General's functions under the "detention and removal program" of the INA to the
Secretary). To treat Section 1103(a)(11) as abrogating those authorities "would conse-
quently amount to finding a partial repeal" of those provisions (and the authority in
Section 1231(g)) "by implication," which requires "strong support." *United States v.
Vonn*, 535 U.S. 55, 65 (2002).

Nothing in the language of Section 1103(a)(11) indicates exclusivity either. Its
"expansive phrasing" "points directly away from the sort of exclusive specification"
that MA claims. *Echazabal*, 536 U.S. at 80. If anything, that provision only confirms
the State's ability to house ICE detainees. *See* 8 U.S.C. § 1103(a)(11). It states that the
Secretary's authority is granted "*in support of* persons in administrative detention in
non-Federal institutions," which presupposes that individuals are already in non-fed-
eral detention centers and that these payments will "support" that effort. *Id.* (emphasis
added). It would make little sense for Congress to express its desire to further detention
at non-federal facilities with language that would simultaneously limit that activity.

That is all the more true given that Congress in 1996 wrote this statute on the backdrop of the immigration authorities' extensive use of detention space in non-federal facilities, whether private, state, or local. *See infra* 23 & note 5. The right reading is more limited: this provision expands detention by allowing the use of funds appropriated for "immigration, naturalization, and alien registration," even if those funds were not appropriated for detention. 8 U.S.C. § 1103(a)(11). It is not a rejection of state assistance.

ii.    **Nothing in Section 1357(g) prohibits deputized state officers from working with non-deputized individuals.**

MA also takes issue with what he calls "sub-delegation." DE68 at 16. In his mind, deputized state officers are subdelegating their "immigration-officer authority under Section 1357(g)" to non-deputized state officers or private prison contractors. DE68 at 16. He compares what is happening at Alligator Alcatraz to a total abdication of duty, as if a police officer "hire[d] a private security company to make immigration arrests." *Id.* But MA provides not one scrap of evidence to show that deputized officers are asleep at the wheel. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (movant must have "clearly established . . . the four requisites" of a preliminary injunction). Without that, MA must show that the mere presence or assistance of non-deputized individuals violates Section 1357(g). He cannot.

At the gate, MA has no "cause of action" to superintend the Secretary's role in enforcing Section 1357(g). *Davis v. Passman*, 442 U.S. 228, 239 (1979). The statute does not give him any cause of action, and the "fairest reading" of Section 1357(g) shows that "Congress [has] displace[d]" any equitable cause of action. *Armstrong v. Exceptional*

*Child Ctr., Inc.*, 575 U.S. 320, 328–29 (2015). That statute empowers only the Secretary to "supervise and direct" the performance under a valid 287(g) agreement, and the power to determine who is "qualified" to conduct immigration functions. 8 U.S.C. § 1357(g). By "[e]xplicitly conferring enforcement of this judgment-laden standard upon the Secretary alone," Congress showed that it "wanted to make the agency remedy that it provided exclusive" to "avoid[] the comparative risk of inconsistent interpretations and misincentives from private enforcement." *Armstrong*, 575 U.S. at 328–29; *cf. also Pennhurst State Sch. v. Halderman*, 451 U.S. 1, 28 (1981) ("the typical remedy for state noncompliance" of a federal-state agreement is an "action by the Federal Government to terminate" the agreement). An equitable cause of action here would also distort the courts' historic remedial authority, because *Ex parte Young* actions are available only to private plaintiffs "to preemptively assert 'in equity . . . a defense that would otherwise have been available in the State's enforcement proceedings at law.'" *United States v. Texas*, 97 F.4th 268, 310 (5th Cir. 2024) (Oldham, J., dissenting) (quotation omitted). Nor does the INA grant MA a privately enforceable "federal right" on which to base a cause of action. *Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 902–05 (10th Cir. 2017). At bottom, MA wishes the Secretary had supervised Defendants' actions under their 287(g) agreements differently. Yet Congress gave MA no power to flyspeck the Secretary's judgment.

Even if MA had a cause of action and deputized officers were engaged in immigration functions, Section 1357(g) places no limitation on anyone helping those deputized officers. *See* 8 U.S.C. § 1357(g)(1), (g)(10). *Santos v. Frederick County*, which MA

cites, DE68 at 18, does not fit because the non-deputized officers there were not assisting deputized officers. 725 F.3d 451, 457, 465–66 (4th Cir. 2013) (ICE requested cooperation only after an unconstitutionally prolonged stop). The only relevant limit on assistance is Section 1357(g)(4)'s requirement that the deputized officer's execution of immigration functions must be done "subject to the direction and supervision of the" Secretary. *Id.* § 1357(g)(3). As explained later, that standard is met. *See infra* 25–26.

MA also emphasizes the allegedly "unprecedented" nature of Alligator Alcatraz. DE68 at 16. But that facility is not novel. ICE uses private prison contractors and state and local jails to house detainees all the time. *See* David S. Rubenstein & Pratheepan Gulasekaram, *Privatized Detention & Immigration Federalism*, 71 Stan. L. Rev. Online 224, 225–27 (2019). It did so before the enactment of Section 1357(g) in 1996,[5] and it has done it since.[6] Now, "the vast majority" of immigration detention facilities "are private prisons," "local jails," and "a combination of local-private partnerships."[7] As of this year, "[n]early 90% of people in ICE custody are held in facilities

---

[5] *See, e.g.*, U.S. Gen. Acct. Off., GAO/GGD-96-158, *Private and Public Prisons: Studies Comparing Operational Costs and/or Quality of Service* 21–22 (1996), https://tinyurl.com/343f5xta (noting at least two local government detention facilities run by private contractors housing immigration detainees); *see also* Pub. L. No. 104-208, § 133, 110 Stat. 3009-563 (1996). In fact, "the modern private prison was born in 1983" when a corporation "opened a private immigration detention facility in a former hotel in Houston, Texas." John F. Pfaff, *The Incentives of Private Prisons*, 52 Ariz. St. L.J. 991, 994 (2020).

[6] *See* Meg Anderson, *Private Prisons and Local Jails are Ramping Up as ICE Detention Exceeds Capacity*, NPR (June 4, 2025, at 5:00 ET), https://tinyurl.com/yc7hbxh5.

[7] Alina Das, *The Law and Lawlessness of U.S. Immigration Detention*, 138 Harv. L. Rev. 1186, 1196–97 (2025).

run by for-profit, private companies."[8] Private contractors also assist state or local detention facilities where they contract with the federal government—even immigrant-only facilities.[9] While those facilities typically operate using agreements under Section 1103(a)(11) for funding, they show that the way Alligator Alcatraz is run, in terms of having broad assistance from private actors, is not unprecedented.

As a result, when Congress enacted Section 1357(g) in 1996, it would have understood that States—and the federal government—would run detention facilities staffed in part by contractors and non-deputized state employees. The ultimate immigration functions at those facilities are performed either by deputized state officials or by ICE officials themselves, and contractors and non-deputized state employees merely assist in their efforts. They exercise no immigration-officer authority. That is wholly unremarkable.

### iii.    The relevant state officers have sufficient training and supervision from ICE.

Last, MA claims that Defendants fail Section 1357(g)'s "training and supervision requirements." DE68 at 19. Neither proposition is true. To begin, the close coordination with ICE again shows that these requirements do not apply to the actions

---

[8] Anderson, *supra* note 6; *see also Immigration Detention Statistics: A Retrospective and a Look Forward*, TRAC Immigr. (Feb. 21, 2025), https://tinyurl.com/bdhkvu5e; U.S. Immigr. & Customs Enf't, *ICE Annual Report* 19 fig. 10 (2023), https://tinyurl.com/hvufxje6 [https://perma.cc/S6CT-E2GQ].

[9] Das, *supra* note 7; *Detention Management*, U.S. Immigr. & Customs Enf't (Sept. 25, 2025), https://tinyurl.com/2t5azetc (at the bottom of the page, select "Previous Year-End Reports," download an Excel document by clicking "FY 2023 Detention Statistics," and, in that document, go to the sheet titled "Footnotes," where ICE notes the state and local government facilities that "house only ICE detainees" are "typically" "operated by private contractors").

taken at Alligator Alcatraz because state officers do not engage in detention. *See supra*
14–15. That coordination with ICE also provides sufficient supervision in any event.
The deputized officers have also received the immigration training that ICE deems
necessary, and MA cannot substitute his contrary judgment for that of the Secretary.

The deputized officers at Alligator Alcatraz have sufficient supervision. The
term "supervision and direction" refers to the ability to engage in general oversight of
actions, offer guidance, and "make final decisions for the agency." *Heggestad v. U.S.
Dep't of Just.*, 182 F. Supp. 2d 1, 10 (D.D.C. 2000) (using this term to describe the gen-
eral authority of agency heads over subordinates).[10] As long as that supervision exists,
there can be no violation from assistance by other individuals. A simple illustration
makes the point. Imagine a deputized officer who makes an immigration arrest after
pulling over an illegal alien. If that officer were traveling with a non-deputized officer,
MA's interpretation would require the deputized officer to not assist in any way; it
would seemingly require the non-deputized officer *to leave the scene*, even if the depu-
tized officer makes all substantive judgment calls about the arrest. Nothing in Section
1357(g) indicates that Congress cared about whether the custodian or lunch-lady at
state detention facilities is subject to ICE supervision.

The supervision standard is met here. As even MA notes, DHS personnel have
filed sworn declarations in other cases attesting that they provide "supervision" at the

---

[10] *See also Subject*, *Black's Law Dictionary* (12th ed. 2024) ("subject to" means "being under dis-
cretionary authority"); *Direction*, *id.* ("guidance"); *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1388 (5th
Cir. 1979) ("supervision and direction" connotes "the power to review and revise").

facility of "delegated immigration officer functions as required under the 287(g) pro-
gram." DE68-18 ¶ 19 (declaration of Assistant Field Office Director of DHS). There
are ICE agents at the facility, IGG Decl. ¶ 13, and ICE officials "provide guidance any
time immigration authority is exercised." *Id.* ICE has toured the facility to ensure com-
pliance with detention standards and maintains routine contact about immigration op-
erational matters. IGG Decl. ¶¶ 7, 13. ICE also decides whether to offer to the State
every single detainee who ends up at Alligator Alcatraz, and ICE can summon them
back at any time. IGG Decl. ¶ 9; DE68-1 at 13. In response, all MA can muster are
cherry-picked quotes and an unsupported assertion that supervision requires that ICE
"control the site," which would render Section 1357(g)(10)'s general cooperation pro-
visions entirely superfluous. DE68 at 19; *see also* DE68-18 ¶ 19 ("ICE does not direct
or supervise *construction or physical maintenance activities*[.]" (emphasis added)).

MA downplays the fact that every State Defendant aside from FDEM has a
287(g) agreement with ICE. *See supra* 5. MA redirects the Court to the presence of
FDEM and the private contractors at the facility but marshals no evidence that either
of them are performing detention functions as opposed to merely assisting other offic-
ers or coordinating with ICE. *See* DE68 at 18.

On training, MA reads atextual requirements into the INA. He contends that
Section 1357(g) requires deputized state officers to have the same training as federal
immigration officers. DE68 at 20–21. But Section 1357(g)(2) does not say that. All that
provision requires is that every 287(g) agreement have two terms. Those agreements
must (1) "require" that deputized officers "have knowledge of, and adhere to, Federal

law relating to the function[s]" they perform; and (2) "contain a written certification that [deputized officers] performing the function under the agreement have received adequate training." 8 U.S.C. § 1357(g)(2). The statute provides DHS alone with the authority to determine the adequacy of the training. *See id.* When Congress wanted to impose a substantive standard, rather than merely requiring a contract term, it knew precisely how to say that. *See id.* § 1357(g)(3), (g)(6), (g)(7). The agreements here meet the statutory standard in Section 1357(g)(2) because they contain language that satisfies both sets of terms. *See, e.g.*, DE68-2 at 2, 4–5, 8–9.[11]

Without support in the statute's text, MA again retreats to non-binding regulations. MA tries to shackle the term "adequate training" in Section 1357(g)(2) to the phrase "basic immigration law enforcement training" in ICE's regulations. DE68 at 21. Those regulations, he says, conclusively establish that Section 1357(g)(2) requires "21 weeks" of training, rather than the "five days" state officers reportedly receive. DE68 at 22. At bottom, none of these arguments matter because "internal guidance"

---

[11] Even if this provision imposed substantive standards, Section 1357(g)(2) fails to detail what "adequate training" means. It leaves any such determination to the Secretary's discretion, as part of her overall power to "determine[]" who is "qualified to perform" immigration functions. *Id.* § 1357(g)(1), (g)(2); *see also Transitional Hosps. Corp. of La., Inc. v. Shalala*, 222 F.3d 1019, 1026 (D.C. Cir. 2000) ("as determined by the Secretary" is an express delegation to define statutory language); *Kelly v. United States*, 241 F.3d 755, 760–62 (9th Cir. 2001) (training decisions are necessarily discretionary). MA nitpicks how ICE has structured its agreement with Florida's Department of Corrections (DOC), which requires that deputized officers both receive "training on ICE-approved detention standards" and are certified correctional officers in good standing. DE68-1 at 13. He finds that education insufficient because the 287(g) agreement does not detail the "amount of training" or require training *by ICE* specifically. DE68 at 22. That fails to state a persuasive case for why the Secretary's determination that this training is adequate abuses her broad discretion. In all events, any challenge to that discretion is barred. 8 U.S.C. § 1252(a)(2)(B) (stripping jurisdiction to "review" any "decision or action . . . specified under this subchapter to be in the discretion of the" Secretary); *Öztürk v. Hyde*, No. 25-1019, 2025 WL 2679904, at \*5 (2d Cir. Sept. 19, 2025) (Menashi, J., concurring); *cf. Brasil v. Sec'y*, 28 F.4th 1189, 1193 (11th Cir. 2022).

regulations cannot be construed to "limit [the] otherwise lawful activities of the De-
partment or the Secretary," or be "relied upon to create any rights, substantive or pro-
cedural, enforceable at law by any party." 8 C.F.R. § 287.12. The Secretary has the
"exclusive authority to enforce these regulations." *Id.*

Even on their own terms, the training regulations never provide the amount of
training deputized officers need nor imply this amount must be identical to federal
officers. *See id.* § 287.1(g). Those regulations provide no number-of-weeks require-
ment; MA instead points the Court to a seven-year-old news bulletin on ICE's website
about one form of training among a list of different courses that satisfy this require-
ment.[12] *See id.* Finally, even the list in DHS's regulations incorporates an entirely dis-
cretionary catchall that includes any "training substantially equivalent thereto *as deter-
mined by*" certain subordinates to the Secretary. *Id.* (emphasis added).

In sum, MA has not shown that he is likely to prevail on the merits. Florida's
activities at Alligator Alcatraz are lawful and are blessed by numerous independent
provisions of the INA.

### B.    MA has not been irreparably harmed.

Next, the failure to show irreparable harm alone "make[s] preliminary injunc-
tive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).
Given the extraordinary nature of a preliminary injunction, delay "necessarily

---

[12] ICE, *ICE Academy Instructors Teach Prospective Deportation Officers* (Oct. 10, 2018), https://ti-
nyurl.com/mwy56h34. At the time of filing, counsel for Defendants could not find any reputable
source definitively setting the length of these other courses.

undermines a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d

1244, 1248 (11th Cir. 2016). Thus, "[a] delay in seeking a preliminary injunction of

even only a few months—though not necessarily fatal—militates against a finding of

irreparable harm." *Id.* "As such, it is not uncommon for courts to deny a preliminary

injunction in the face of unexplained delays of more than two months." *InVue Sec.

Prods. v. Vanguard Prods. Grp.*, No. 8:18-cv-2548, 2019 WL 4671143, at *6 (M.D. Fla.

July 1, 2019), *report & recommendation adopted*, 2019 WL 4673755 (M.D. Fla. Aug. 15,

2019). MA was placed in Alligator Alcatraz on July 26, but his motion for a prelimi-

nary injunction was not filed until September 29, a delay of over two months.

Nor has MA identified any irreparable harm beyond being held by Defendants.

MA complains of Defendants' ability to house him on behalf of ICE, but he apparently

has no qualm with ICE's decision to detain him, so his detention is not an injury he

seeks to remedy. A purely legal violation like that is not irreparable, even for constitu-

tional violations (save for First Amendment rights). *Siegel*, 234 F.3d at 1176–78. As for

MA's alleged right to counsel, the First Amendment at most restricts unreasonable

limitations on access to counsel for immigration detainees, *Haitian Refugee Ctr., Inc. v.

Baker*, 953 F.2d 1498, 1513–15 (11th Cir. 1992) (per curiam), and review of any statu-

tory right to counsel is jurisdictionally barred. *E.O.H.C. v. Sec'y*, 950 F.3d 177, 187 (3d

Cir. 2020). He has not shown that any limits on access to counsel are unreasonable.

*See* Resp. to Preliminary Injunction, *C.M. v. Noem*, No. 2:25-cv-747 (M.D. Fla. Sept.

25, 2025), DE132 at 27–29 (addressing access-to-counsel claims).[13] To the extent MA
complains of unsubstantiated reports of conditions at the facility, *see* DE68 at 8, 24,
ICE has stated that the facility meets their standards, *supra* note 1, so no evidence sug-
gests that moving him to another ICE-approved facility would change any conditions
he faces. *See Siegel*, 234 F.3d at 1176–77.

### C. The equities of deterring illegal immigration favor permitting the State to assist ICE while litigation develops.

Finally, the equities favor the State. *See Swain v. Junior*, 958 F.3d 1081, 1091
(11th Cir. 2020) (per curiam) (balance-of-the-harms and public-interest factors
"merge" when "the government is the [opposing] party"). Any harm to MA is out-
weighed by the severe harm to the State and the public from an injunction. *Cf. Trump
v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("Any time a State is enjoined by a court from
effectuating statutes enacted by representatives of its people, it suffers a form of irrep-
arable injury." (alteration and quotations omitted)). The State is undoubtedly harmed
from its inability to assist the federal government in enforcing federal immigration law
and the consequences that would befall Floridians from less enforcement. *Friends of the
Everglades v. Exec. Dir.*, No. 25-12873, 2025 WL 2598567, at *12 (11th Cir. Sept. 4,
2025) (noting that "[t]he Supreme Court has held that 'the public interest demands
effective measures to prevent the illegal entry of aliens' at the border" (quoting *United
States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)). The balance of the equities must

---

[13] Most of MA's declarations attached as exhibits to his motion were executed over a month
ago, and none of them detail unreasonable denial of access to clients given the circumstances.

consider the "myriad 'significant economic and social problems'" attending illegal immigration and "the harms to the third parties who otherwise would benefit from the challenged government action," *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *4 (U.S. Sept. 8, 2025) (Kavanaugh, J., concurring) (quoting *Brignoni-Ponce*, 422 U.S. at 878), including the lawful "noncitizens who follow the rules and wait in line to immigrate into the United States" only to have illegal aliens "jump[] in front of" them. *Id.* at *5.

On the other side of the ledger, MA's harm stemming from the location of his detention or the identity of his captors is minimal. ICE has confirmed that Alligator Alcatraz complies with its detention standards and any technical difficulties with counsel and bond hearings have been resolved. *See supra* note 1; Resp. to Preliminary Injunction, *C.M.*, *supra*, at 3. Most importantly, an injunction is unnecessary "to preserve the court's power to render a meaningful decision after a trial on the merits." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005).

## II. MA HAS NOT PROVEN THAT HIS CLASS MERITS CERTIFICATION.

The Court should also rebuff MA's attempt to certify an injunctive or declaratory relief class or a habeas class. The INA flat-out bars the type of class-wide relief MA seeks, and district courts furthermore lack the power to conjure habeas classes.

### A. The INA bars MA's proposed class because it interferes with the operation of immigration detentions.

MA's proposed class, whether framed as a class for injunctive or declaratory relief *or* as a habeas class, is barred by the very statute he seeks to invoke: the INA. In

1996, Congress decided that class-wide relief is inappropriate to restrain the INA's
detention-and-removal regime. 8 U.S.C. § 1252(f)(1). The text is clear. "[N]o court
(other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain
the operation of" Sections 1221 through 1232 of the INA, other than actions by "indi-
vidual alien[s]" to enjoin "the application of such provisions" as to them. *Id.* Those
sections "govern[] the inspection, apprehension, examination, and removal of aliens,"
as well as detention of aliens related to removal. *Garland v. Aleman Gonzalez*, 596 U.S.
543, 549–50 (2022); *see also* 8 U.S.C. §§ 1221–32. That bar applies "[r]egardless of the
nature of the action or claim." 8 U.S.C. § 1252(f)(1). Class-wide equitable relief there-
fore cannot be "appropriate" here. Fed. R. Civ. P. 23(b)(2).

 The Supreme Court expounded on that bar in *Aleman Gonzalez*. There, as here,
the plaintiffs argued that the conditions of their detention were unlawful and sought
class certification and injunctive relief. *See* 596 U.S. at 547. The plaintiffs in *Aleman
Gonzalez* claimed to be "entitled to bond hearings after six months' detention" under
Section 1231(a)(6). *Id.* Those claims were barred. *Id.* at 550–51. Section 1252(f), the
Court held, "prohibits lower courts from entering injunctions that order federal offi-
cials to take or to refrain from taking actions to enforce, implement, or otherwise carry
out the specified statutory provisions." *Id.* That standard is broad. It refers to any in-
junction that would "interfere with" officers' "efforts to enforce or implement" the
selected statutory provisions or that order officials "to take or to refrain from taking
actions to enforce, implement, or otherwise carry out the specified statutory

provisions." *Id.* at 550–52. Section 1252(f) applies even if these actions are "unlawful"
or "improper." *Id.* at 552.

MA's requested relief falls squarely within that holding. MA requests declara-
tory and injunctive relief that would bar ICE from placing immigration detainees at
certain facilities. DE1 at 24. That would directly interfere with the statutory regime of
detention in 8 U.S.C. §§ 1221–31. Most on point, a court order ruling out Alligator
Alcatraz as a detention option class-wide would necessarily "interfere with" the ability
of the federal government to "implement" or "carry out" the selection of the appropri-
ate places of detention under Section 1231(g)(1). *Aleman Gonzalez*, 596 U.S. at 550–52;
*see* 8 U.S.C. § 1231(g). Infringing on Defendants' ability to detain the class members
inevitably limits ICE's ability to send them where it thinks best. *See N.S. v. Dixon*, 141
F.4th 279, 289 (D.C. Cir. 2025) (bar applies to claim challenging federal Marshals'
authority to conduct immigration arrests under Section 1357(a) because of the inter-
ference with detention statutes). Section 1252(f) thus applies with full force to those
detained at Alligator Alcatraz.

Class-wide injunctive relief also implicates the INA's mandatory and permissive
detention statutes. Those provisions permit the federal government to detain every al-
ien pending removal proceedings and mandate detention of aliens who have commit-
ted certain crimes, were not lawfully admitted to the United States (even if they seek
asylum), or have been ordered removed. *See* 8 U.S.C. §§ 1225(b)(1)(B)(iii), 1225(b)(2),
1225(c), 1226(a), 1226(c), 1231(a)(2), 1231(c). The federal government must decide

where to house each detainee for each of these circumstances, so any injunction against Alligator Alcatraz would impede these decisions.

MA's tag-along request for declaratory relief does not allow him to duck this jurisdictional bar. In general, a declaratory judgment is "not available when," as here, "the result would be a partial end run around" other equitable precedents. *Green v. Mansour*, 474 U.S. 64, 73 (1985). Rule 23(b)(2), after all, permits a court to certify a class for "declaratory relief," but only where it "correspond[s]" to "final injunctive relief." Fed. R. Civ. P. 23(b)(2). So where "[t]he practical effect" of a declaration is to grant "a class-wide injunction against the detention provisions, which is barred by § 1252(f)(1)," the bar applies. *Hamama v. Adducci*, 912 F.3d 869, 880 n.8 (6th Cir. 2018); *cf. California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982) (barring declaration under the Tax Injunction Act).

MA cannot evade Section 1252(f)(1)'s jurisdictional bar by recasting his proposed class as a "habeas class." DE4 at 15. Section 1252(f)(1) forbids class-wide relief that would either "enjoin *or* restrain" specific sections of the INA "*[r]egardless of the nature of the action or claim*" as MA's proposed relief undoubtedly would. 8 U.S.C. § 1252(f)(1) (emphasis added). Though alternatively styled as a request for habeas relief, MA's complaint really seeks ordinary equitable relief. The writ of habeas "is at its core a remedy for unlawful executive detention." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 119 (2020). Where relief would "neither terminate custody, accelerate the future date of release from custody, nor reduce the level of custody," habeas is not an "available" remedy. *Skinner v. Switzer*, 562 U.S. 521, 534 (2011). Should MA

34

prevail, he will be detained regardless—just elsewhere. *See* DE1 at 24 (requesting only relief "barring Defendants from detaining class members at the facility"). His claim at most seeks a transfer to another facility or challenges the circumstances of his confinement, which are not habeas claims. *See Munaf v. Geren*, 553 U.S. 674, 693 (2008) (detention transfer); *Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006) (circumstances of confinement). They are prototypical requests for injunctive relief, and the Court need not pretend otherwise. *Hutcherson*, 468 F.3d at 754 (whether a claim sounds in habeas or injunctive relief "is based on" a practical assessment of "the effect of the claim").

Whatever label MA places on his request for relief, that relief amounts to enjoining or restraining the application of the INA and is barred by Section 1252(f)(1).

### B.    No source of law permits the novel "habeas class."

MA's request to certify a "habeas class" fails regardless. MA asks to certify a habeas class under either Rule 23(b)(2) or "equity informed by Rule 23 principles." DE4 at 15. Section 1252(f)(1) aside, class actions are already the exception—not the rule—of ordinary litigation. *See Dukes*, 564 U.S. at 348–49. As the Supreme Court recently reaffirmed, Congress must expressly authorize class actions in Rule 23 and courts may not "circumvent" that rule. *See Trump v. CASA*, 606 U.S. 831, 849 (2025). Neither vehicle permits MA to alchemize the individualized nature of habeas into the sprawling amalgam of a class action.

### 1.    Rule 23(b)(2) does not permit habeas class-actions.

Habeas relief does not fit into Rule 23(b)(2) for two reasons. First, Rule 23(b)(2) is limited to classes for, at most, declaratory and injunctive relief. Second, Rule 81 separately confirms that Rule 23 does not apply at all to habeas claims.

To begin, Rule 23(b)(2) permits classes for "final injunctive relief or corresponding declaratory relief." Fed. R. Civ. P. 23(b)(2). Habeas is neither. *Heikkila v. Barber*, 345 U.S. 229, 230 (1953) (treating remedies as distinct); *Clifton v. Att'y Gen. of Cal.*, 997 F.2d 660, 663 (9th Cir. 1993) ("[A] habeas writ does not grant injunctive relief."). Injunctive and declaratory relief cannot be the same as the remedy of habeas due to their "mutually exclusive" nature, *Boyd v. Warden*, 856 F.3d 853, 877 (11th Cir. 2017), and the INA mirrors that understanding when it distinguishes between those remedies. *See Jennings v. Rodriguez*, 583 U.S. 281, 325 (2018) (Thomas, J., concurring). Habeas classes under Rule 23(b)(2) are also inappropriate given that the "key" to this type of class is the "indivisible nature of the injunctive or declaratory remedy," *Dukes*, 564 U.S. at 360, and habeas proceedings and remedies are fundamentally individualized.[14]

The problem for MA is broader still: Rule 23 does not apply at all to habeas proceedings. Rule 81 incorporates the other Federal Rules of Civil Procedure in habeas

---

[14] *See, e.g.*, *Borzych v. Bertrand*, 974 F. Supp. 1220, 1222 (E.D. Wis. 1997) ("Petitions for a writ of habeas corpus are by nature an individual action."); *In re Kosopud*, 272 F. 330, 332 (N.D. Ohio 1920) (similar); *cf. also United States ex rel. Bowe v. Skeen*, 107 F. Supp. 879, 881 (N.D.W. Va. 1952) (recognizing that "[s]everal applicants can not join in a single petition for a writ of habeas corpus"); *Odom v. Cannon*, No. 5:17-cv-3022, 2018 WL 580669, at *1 n.1 (D.S.C. Jan. 2, 2018) (similar), *report & recommendation adopted*, 2018 WL 581042 (D.S.C. Jan. 25, 2018); Note, *Multiparty Federal Habeas Corpus*, 81 Harv. L. Rev. 1482, 1494 (1968) (noting that "no case has been found which expressly sanctions" joinder in habeas).

cases only "to the extent that the practice in [habeas] proceedings . . . previously con-
formed to the practice in civil actions." Fed. R. Civ. P. 81(a)(4)(B). Given the "unique"
nature of habeas, the Federal Rules of Civil Procedure have "very limited application
to habeas corpus proceedings." *Harris v. Nelson*, 394 U.S. 286, 294–95 (1969). Applying
"conventional principles of statutory construction," *id.* at 298, the Supreme Court has
held that the rules do not apply, absent "specific evidence" that a "practice" was his-
torically "utilized" in habeas proceedings "prior to adoption of the Federal Rules of
Civil Procedure" in 1938. *Id.* at 294–95. And federal courts lack the "power to rewrite
the Rules by judicial interpretation[]." *Id.* at 298.

While the Supreme Court "has never addressed" the question of whether Rule
23 applies to habeas cases, *Jennings*, 583 U.S. at 324 n.7 (Thomas, J., concurring), the
answer is no. Class actions do not conform to "the history of habeas." *Harris*, 394 U.S.
at 293. Class actions had no historic application in habeas proceedings. *Multiparty Fed-
eral Habeas Corpus*, *supra* note 14, at 1493; *Developments in the Law—Federal Habeas Cor-
pus*, 83 Harv. L. Rev. 1038, 1170 (1970); *United States ex rel. Sero v. Preiser*, 506 F.2d
1115, 1125 (2d Cir. 1974) (noting that even joinder had no "considerable application
in habeas corpus actions"). Even the most ardent supporters of habeas class actions
admit that district courts only began to conjure them up in 1968, *see* Lee Kovarsky &
D. Theodore Rave, *Habeas Class Actions*, 139 Harv. L. Rev. (forthcoming 2026) (man-
uscript at 11–13), https://tinyurl.com/2x3yfjt6, and certainly not "prior to adoption
of the Federal Rules of Civil Procedure" in 1938. *Harris*, 394 U.S. at 295.

### 2. MA cannot base a class on freeform principles of "equity" or the All Writs Act.

In the alternative, MA propounds that vague "habeas equity principles" permit certification. DE4 at 15. But the federals courts' equitable powers are limited to those "traditionally accorded by courts of equity" at the Founding and additional powers granted by Congress. *CASA*, 606 U.S. at 841.

Neither source supports MA's claim. District courts lack inherent equitable or "statutory authority" to design relief for nonparties or to create class actions outside of Rule 23. *See id.* at 841 n.4. *CASA* forbids district courts from "forging a shortcut to relief" that serves to "circumvent" Congress's limitations on class actions in the federal rules or "to create *de facto* class actions at will." *Id.* at 849–50. MA cannot similarly end-run Rule 81, which establishes that Rule 23 does not apply in habeas actions. *See id.*; *see also Armstrong*, 575 U.S. at 327–28 (courts in equity may not circumvent "express and implied statutory limitations").

MA responds that *A.A.R.P. v. Trump*, 605 U.S. 91 (2025), recognizes this Court's authority to certify habeas classes. DE4 at 15. It did no such thing. In *A.A.R.P.*, President Trump invoked the Alien Enemies Act to remove certain aliens. 605 U.S. at 92. Two detainees sued and sought to certify a class, challenging their summary removals. *Id.* When the district court denied the detainees' request for an injunction barring removal, the federal government prepared to remove several putative class members from the country in just hours. *Id.* The detainees sought class-wide emergency relief in the Supreme Court, arguing that the removal decision violated their due-

process rights to notice, *id.* at 92–93, and their application sought "only to vindicate notice rights on a classwide basis." *Id.* at 97 n.1. Given those exigent circumstances, the Supreme Court granted "temporary injunctive relief to the putative class." *Id.* at 95. The Supreme Court granted relief for one purpose alone: "to preserve [the Court's] jurisdiction while the question of what notice is due is adjudicated" in the lower courts. *Id.* at 95–97 (citing the All Writs Act, 28 U.S.C. § 1651(a)). The Court expressly declined to "decide whether a class should be certified" and so it did not permit habeas classes. *Id.* at 98.

The All Writs Act similarly offers MA no support. That provision permits federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). But the All Writs Act cannot "enlarge" a court's "jurisdiction," *Clinton v. Goldsmith*, 526 U.S. 529, 534–35 (1999), and certifying a class does precisely that by expanding a court's "jurisdiction over unnamed class members." *In re Checking Account Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015). Nor would this writ be "agreeable to the usages and principles of law," 28 U.S.C. § 1651(a), a standard that a habeas procedure could only meet if it would assist a habeas petitioner in showing he is "entitled to relief." *Shoop v. Twyford*, 596 U.S. 811, 821 (2022). Because the class's claims fall outside the core of habeas, *see supra* 34–35, using the All Writs Act to certify a habeas class "needlessly prolong[s] resolution of [a] federal habeas case." *Twyford*, 596 U.S. at 821.

## CONCLUSION

Alligator Alcatraz is a lawful effort by Florida to assist the federal government with immigration detentions. MA has not shown otherwise. Nor has he justified his request for class certification. The Court should deny both motions.

October 20, 2025

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General*

/s/ *Robert S. Schenck*
JEFFREY PAUL DESOUSA (FBN 110951)
  *Acting Solicitor General*
JASON MUEHLHOFF
  *Chief Deputy Solicitor General*
ROBERT S. SCHENCK (FBN 1044532)
  *Assistant Solicitor General*
CASEY WITTE (FBN 1070288)
  *Solicitor General Fellow*
WILLIAM H. STAFFORD III (FBN 70394)
  *Special Counsel*

OFFICE OF THE ATTORNEY
GENERAL
The Capitol, PL-01
Tallahassee, FL 32399
Phone: (850) 414-3300
Facsimile: (850) 410-2672
*robert.schenck@myfloridale-gal.com*

*Counsel for State Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic service through the CM/ECF Portal on October 20, 2025, to all counsel of record.

/s/ *Robert S. Schenck*
Assistant Solicitor General